**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

SAVE RGV,

                Plaintiff,

    v.

SPACE EXPLORATION TECHNOLOGIES
CORP.,

             Defendant,

Civil Action No. 1:24-cv-00148

**SPACE EXPLORATION**
**TECHNOLOGIES CORP.'S AMENDED OPPOSITION TO PLAINTIFF'S MOTION**
**FOR PRELIMINARY INJUNCTION OR TEMPORARY RESTRAINING ORDER**

**TABLE OF CONTENTS**

I.     INTRODUCTION ............................................................................................ 1

II.    FACTS ............................................................................................................... 5

    A.    SpaceX and its service of the U.S. space program. ....................................... 5

    B.    The Starbase launch site and the Starship-Super Heavy launch program. ...................... 5

    C.    Development and use of the deluge system to ensure flight safety. ............................... 7

    D.    The Texas MSGP, the TCEQ Agreed Order, and the EPA Consent Agreement............ 8

    E.    Additional environmental review of the deluge system. ................................................ 11

    F.    Monitoring of the deluge system has confirmed that the system does not cause any significant environmental effects. ...................................................................... 12

    G.    Plaintiff's delay filing suit and delay seeking injunctive relief. ...................................... 13

III.  LEGAL STANDARD ...................................................................................... 14

IV.  ARGUMENT .................................................................................................. 14

    A.    SpaceX is likely to succeed on the merits. ................................................... 14

        1.    The deluge system discharges are permitted under the Texas MSGP....................... 15

        2.    Even if the Texas MSGP does not apply, Plaintiff's claims have already been addressed by the TCEQ and EPA Orders. .................................................................. 17

    B.    Plaintiff does not show irreparable harm absent the entry of a preliminary injunction or temporary restraining order. .......................................................................... 20

        1.    Plaintiff's delay in seeking relief is fatal to a finding of irreparable harm................ 20

        2.    There is no irreparable harm. ................................................................................ 22

        3.    Plaintiff's alleged procedural injury does not establish irreparable harm. ................ 23

    C.    The balance of the equities strongly favors denying Plaintiff's request for a preliminary injunction or restraining order.......................................................................... 23

    D.    The public interest strongly favors denying Plaintiff's preliminary injunction or temporary restraining order. ................................................................................ 27

V.    CONCLUSION ............................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ADT, LLC v. Capital Connect, Inc.,*
  145 F. Supp. 3d 671 (N.D. Tex. 2015) .................................................................. 20

*Allied Home Mort. Corp. v. Donovan,*
  830 F. Supp. 2d 223 (S.D. Tex. 2011) .............................................................. 13, 14

*Amoco Prod. Co. v. Village of Gambell, AK,*
  480 U.S. 531 (1987) ....................................................................................... 25, 26

*Anderson v. Jackson,*
  556 F.3d 351 (5th Cir. 2009) ............................................................................... 13

*Benisek v. Lamone,*
  138 S. Ct. 1942 (2018) ......................................................................................... 19

*Boire v. Pilot Freight Carriers, Inc.,*
  515 F.2d 1185 (5th Cir. 1975) ............................................................................. 20

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.,*
  710 F.3d 579 (5th Cir. 2013) ............................................................................... 13

*Expedi, Inc. v. Rebound Int'l, LLC,*
  2021 WL 3702169 (S.D. Tex. May 13, 2021) ..................................................... 20

*Friends of Lydia Ann Channel v. U.S. Army Corps of Eng'rs,*
  701 F. App'x 352 (5th Cir. 2017) ........................................................................ 21

*Fromhold v. Insight Glob., LLC,*
  657 F. Supp. 3d 880 (N.D. Tex. Feb. 23, 2023) .............................................. 13, 19

*Fund for Animals v. Frizzell,*
  530 F.2d 982 (D.C. Cir. 1975) ............................................................................. 20

*Gonannies, Inc. v. Goupair.com, Inc.,*
  464 F. Supp. 2d 603 (N.D. Tex. 2006) ............................................................ 19, 20

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,*
  484 U.S. 49 (1987) ............................................................................................... 18

*H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs., LLC,*
  2009 WL 1766095 (N.D. Tex. June 23, 2009) ..................................................... 20

*Holland Am. Ins. Co. v. Succession of Roy,*
  777 F.2d 992 (5th Cir. 1985) ........................................................................... 13, 19

*Janvey v. Alguire,*
  647 F.3d 585 (5th Cir. 2011) ............................................................................... 14

*Joseph Paul Corp. v. Trademark Custom Homes, Inc.,*
  2016 WL 4944370 (N.D. Tex. Sept. 16, 2016) .................................................... 20

*Khan v. Fort Bend Ind. Sch. Dist.,*
  561 F. Supp. 2d 760 (S.D. Tex. 2008) ................................................................. 13

*Mylan Pharms., Inc. v. Shalala,*
  81 F. Supp. 2d 30 (D.D.C. 2000) ......................................................................... 20

*Nat'l Parks Conservation Ass'n v. U.S. Forest Serv.,*
  2016 WL 420470 (D.D.C. Jan. 22, 2016) ............................................................ 22

*Optimus Steel, LLC v. U.S. Army Corp. of Engineers*,
  492 F. Supp. 3d 701 (E.D. Tex. 2020) ................................................. 26

*Org, v. City of Dallas*,
  529 F.3d 519 (5th Cir. 2008) ............................................... 17, 18

*Pruvit Ventures, Inc. v. Forevergreen Int'l LLC*,
  2015 WL 9876952 (E.D. Tex. Dec. 23, 2015) ............................. 20

*Rimkus Consulting Grp., Inc. v. Cammarata*,
  255 F.R.D. 417 (S.D. Tex. 2008) ...................................... 19

*Sampson v. Murray*,
  415 U.S. 61 (1974) ................................................... 19

*United States v. W.T. Grant Co.*,
  345 U.S. 629 (1953) ................................................. 19

*W. Ala. Quality of Life Coal. v. U.S. Fed. Highway Admin.*,
  302 F. Supp. 2d 672 (S.D. Tex. 2004) ............................... 19

*White v. Carlucci*,
  862 F.2d 1209 (5th Cir. 1989) ...................................... 21

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ............................................. 13, 22

## Statutes

33 U.S.C. § 1251 ............................................................... 12

Tex. Civil Practice & Remedies Code § 78.051(1) ......................... 14

## I.     EXPLANATION FOR AMENDMENT

Space Exploration Technologies Corp. ("SpaceX") submits this Amended Opposition to Plaintiff's Motion for Preliminary Injunction and/or Temporary Restraining Order.  On October 11, 2024, Plaintiff filed the Motion to attempt to stop SpaceX from using the deluge water system required to launch Starship-Super Heavy.  Later that day, SpaceX filed an Opposition to that Motion and supporting declarations, but the Opposition made certain inadvertent errors.  The launch that is the subject of Plaintiff' Motion occurred on October 13.  This Amended Opposition:

- Changes Defendant's name in the case caption from "Corporation" to "Corp."

- Corrects typographical errors to two citations in the Table of Authorities (adding a full citation to the *Amoco Prod. Co. v. Village of Gambell* case and deleting the "Other Authorities" subsection).

- Defines the "U.S. Environmental Protection Agency" on page 2 and the "Carolyn Wood Declaration" on page 8 of the Opposition.

- Corrects a grammatical error on page 2 of the Opposition (from "agency's" to "agencies'").

- Corrects typographical errors on pages 2, 5, 21, and 24 of the Opposition.

- Corrects accidentally omitted words to certain sentences on pages 3, 5, 10, 14, 18, 19, and 25 of the Opposition.

- Corrects page citations to Justin Styer's Declaration (pages 4, 5, 6, 24, 25, 27, and 28 of the Opposition).

- Deleted two sentences from the last line of page 25 to the seventh line of page 26 that was inadvertently included in the Opposition.

## II.     INTRODUCTION

Plaintiff Save RGV ("Plaintiff") seeks a preliminary injunction or temporary restraining order preventing Defendant Space Exploration Technologies Corp. ("SpaceX") from launching at its Starbase launch facility in Boca Chica, Texas.  SpaceX relies on critical equipment that sprays clean, potable water during static fire tests and launches to control fire, dust, and debris.  Called a

1

deluge system, similar systems have long been used since the dawn of the space program at federal launch sites including Kennedy Space Center and Cape Canaveral Space Force Stations in Florida, and Vandenburg Space Force Base in California.  Its use at the Boca Chica launch site has been approved by the Federal Aviation Administration ("FAA"), found by several agencies to reduce the environmental impacts of launches, and authorized by a Texas "general permit" issued by the Texas Commission on Environmental Quality ("TCEQ") under the Clean Water Act ("CWA").

If SpaceX cannot use the deluge system, it cannot launch.  An injunction would prevent SpaceX from completing development of the Starship rocket to meet critical milestones in support of NASA's plan to return humans to the moon for the first time in decades and other important launch needs.

Plaintiff incorrectly contends that TCEQ and the U.S. Environmental Protection Agency ("EPA") agree that SpaceX's operation of the deluge system is not authorized.  But Plaintiff is not likely to succeed on the merits of its claims.  As explained below and in the attached declarations, the motion for preliminary injunction or temporary restraining order should be denied because the deluge water is authorized under a separate, general permit called the Texas Pollutant Discharge Elimination System Multi Sector General Permit ("Texas MSGP").  The deluge system uses potable water purchased from the Brownsville Public Utilities Board that is the same water that residents drink.  The water is not used in manufacturing or processing; rather, the deluge system uses the potable water to suppress fire, dust, and debris during launches.  Of note, Jim Chapman, a Board Member of Save RGV stated in a recorded public interview that SpaceX should be *required* to use a deluge system because of its potential to have a protective impact on the environment including "dampen[ing] the sound, dampen[ing] the shock waves, and protect[ing]

2

the immediate area."[1]

Furthermore, even assuming that the Texas MSGP does not authorize deluge water discharges, Plaintiff fails to state a cognizable claim under the CWA because the TCEQ and EPA recently resolved enforcement orders against SpaceX, <u>before</u> Save RGV filed suit.  The agencies and SpaceX agreed that SpaceX could *continue to operate* the deluge water system but must apply for an individual CWA permit, meet several requirements while that permit application is pending, and pay civil penalties.  The agencies' orders have resolved the permitting status of SpaceX's deluge water discharges and all alleged past violations, and thus render Save RGV's belated suit unwarranted, moot, and foreclosed by CWA's diligent prosecution bar.  Despite this, Plaintiff asks this Court to ignore the findings and determinations of the expert state and federal agencies, which as explained more fully *infra*, have authorized further use of the deluge system and, instead, do the opposite by enjoining use of the deluge system and thus stopping further launches of Starship-Super Heavy for months while SpaceX obtains another permit that is not even required for harmless discharge of clean water at issue.

In addition to failing to show a likelihood of success on the merits, Plaintiff also fails to meet the irreparable harm, balance of equities, and public interest requirements for obtaining emergency relief.  Plaintiff cannot show irreparable harm.  Plaintiff's inexcusable delay in suing forecloses the last-minute, emergency relief it now seeks.  The deluge system has been in use for eleven months.  Plaintiff waited for months to send SpaceX a notice that it believes the discharges are unlawful and intended to sue, and then did not sue for several more months.  If the deluge system credibly posed any irreparable harm, Plaintiff would have sued long ago and diligently

---

[1] *See* https://www.tpr.org/podcast/the-source/2023-05-03/spacex-challenged-over-rgv-environmental-damage at timestamps 7:058 and 11:26.

sought relief.  It did not and its failure to do so forecloses relief, as courts have consistently held in similar circumstances.  Instead, it belatedly filed this request for "emergency" injunctive relief months later, after preparations for the fifth Starship-Super Heavy launch are already underway. Plaintiff also fails to even allege any additional environmental protections that an individual permit would require that would go above and beyond all of those already required under the MSGP and the TCEQ Agreed Order, with which SpaceX indisputably has been complying.  For all of these reasons, irreparable harm is absent.  Moreover, the facts and both TCEQ and EPA's findings here show that that the deluge water discharges are harmless.  The system uses clean, potable water, monitoring has shown the discharged water complies with effluent limitation in the MSGP, and TCEQ has expressly found that the discharges do *not* cause environmental harm.  Indeed, TCEQ also determined that SpaceX *may* continue using the system so long as SpaceX continues to conduct monitoring and ensure that its deluge water discharges comply with effluent limitations, among other conditions.  SpaceX has complied.  Plaintiff thus cannot show irreparable harm.

By contrast, a preliminary injunction would be certain to severely harm SpaceX and the public interest.  The deluge system is essential to ensuring safe operations and protecting both the launch site and surrounding area—without it, SpaceX cannot test or launch its revolutionary new Starship-Super Heavy launch vehicle.  A preliminary injunction would force SpaceX to abruptly stop Flight 5 of Starship-Super Heavy, which is expected to occur on or about October 13, 2024. Moreover, granting the preliminary injunction pending SpaceX obtaining an individual permit would ground Starship-Super Heavy for months and cost SpaceX millions of dollars by requiring it to stop Flight 5 preparations that are already underway.  Grounding the Starship-Super Heavy launch program would cause at least a day-for-day delay in operationalizing the launch vehicle, which would, among other irreparable harms: (1) undermine vital national interests that Starship-

Super Heavy is contracted to serve, including the Artemis program that aims to return astronauts to the Moon by 2026; (2) delay delivery of Internet access to unserved and underserved people around the world; and (3) delay and jeopardize SpaceX's receipt of billions of dollars of revenue tied to Starship-Super Heavy launches and cost SpaceX millions of dollars a day.  Any speculative allegations of harm by Plaintiff are vastly outweighed by these harms SpaceX and the public interest would suffer from grounding Starship-Super Heavy launch program during this litigation. For these reasons, the Court should deny Plaintiff's Motion for a Preliminary Injunction or Temporary Restraining Order.

## III.    FACTS

### A.    SpaceX and its service of the U.S. space program.

Since its founding in 2002, SpaceX has substantially reduced the cost of access to space, primarily by developing innovative, reusable, and extremely reliable launch vehicles. Decl. of Justin Styer ("Styer Decl.") ¶¶ 9-10.  These innovations have made SpaceX the world's leading commercial space transportation company and an essential part of the U.S. space program. *Id.* ¶ 10.  As a result of its launch reliability, SpaceX now handles about two-thirds of NASA's launches, is the only American entity able to reliably transport humans to orbit and return them safely, including to the International Space Station, and is responsible for delivering thousands of critical commercial, scientific, and national-security payloads to orbit. *Id.* ¶¶ 13-14.

### B.    The Starbase launch site and the Starship-Super Heavy launch program.

In 2014, after extensive, multiyear review under the National Environmental Policy Act and other environmental laws, the FAA licensed SpaceX to build and operate a private spaceport in Boca Chica, Texas, where SpaceX is developing its Starship-Super Heavy launch system. *Id.* ¶ 15.  SpaceX has since invested more than $5 billion into building its Starbase facility Boca Chica and developing Starship-Super Heavy. *Id.* ¶ 16.

Starship-Super Heavy is a fully reusable, super-heavy-lift launch system that comprises the Super Heavy first stage, or booster, and the Starship second stage, or spacecraft. *Id.* ¶ 17.  Starship-Super Heavy represents a monumental advancement in space exploration. *Id.* ¶ 18.  First, it is the most powerful launch vehicle ever developed, with the ability to carry to low Earth orbit payloads with a volume up to 100 cubic meters and a mass of around 100 metric tons. *Id.*  The large payload capacity enables Starship to deploy more satellites than any other spacecraft and transport larger and more sophisticated telescopes and other cargo than presently exist. *Id.* ¶¶ 16-18.  Second, Starship will be able to refuel in space and take these payloads to other destinations in the solar system.  Starship can also then serve as a human habitat on the Moon and other planets. *Id.* ¶ 19.  Third, Starship-Super Heavy is entirely reusable, which significantly reduces waste and enables sustainable, cost-effective access to space. *Id.* ¶ 18.  Fourth, Starship and Super Heavy are powered by Raptor engines, the most advanced rocket engines in history. *Id.* ¶ 19.  Raptor uses liquid methane and liquid oxygen as propellants. *Id.*  Liquid methane offers significant benefits over other fuels because it burns more cleanly, can possibly be produced on the Moon and Mars, and can be stored in propellant depots in space for months at a time. *Id*.

By increasing lift capacity, reducing costs by an order of magnitude or more, and using liquid methane for fuel, Starship-Super Heavy will enable groundbreaking achievements, including enabling humanity to return to the Moon, travel to Mars, and become a multiplanetary species, while also substantially benefiting life on Earth.  To name just two examples, NASA selected Starship to land the first astronauts on the Moon since the Apollo program ended in 1972. *Id.* ¶¶ 29-30.  And the U.S. Air Force awarded SpaceX a contract as part of its "Rocket Cargo" program to support development of Starship's point-to-point transportation capabilities, allowing the United States to deploy Starship cargo rapidly across the globe. *Id.* ¶ 34.

**C.      Development and use of the deluge system to ensure flight safety.**

SpaceX conducted the first orbital test launch of Starship-Super Heavy on April 20, 2023. *Id.* ¶ 23.   The launch vehicle successfully cleared the launch pad and flew for several minutes before breaking up over the Gulf of Mexico. *Id.*   The powerful rocket engines damaged the concrete launch pad. *Id.*

Following the test flight, SpaceX installed the water deluge system, among other measures. Decl. of Katy Groom ("Groom Decl.") ¶ 16.   The deluge system sprays water during launches to protect the launch site and surrounding areas by suppressing fire and helping prevent the dispersal of dust and debris caused by the thrust and heat of the Raptor engines. *Id.* ¶ 17.   The system also reduces environmental impacts by dampening vibrations. *Id.* ¶¶ 7, 46 & Groom Decl. Ex. F at 18.

The system uses potable water purchased from the Brownsville Public Utilities Board. Groom Decl. ¶ 7.   The water is stored in clean, dedicated tanks and pumped to the system via clean, dedicated pipes installed for that purpose.   No chemicals or substances are added to the water at any point. *Id.* ¶ 18 & Ex. B at 51.   Because the rocket engine exhaust contains only water vapor and gaseous carbon dioxide there is no change to the chemical makeup of the deluge water after contact with the exhaust. Groom Decl. ¶ 19.

While the rocket engines vaporize most of the deluge system water, about 20% of the liquid water may leave the launch pad. *Id.* ¶ 45.   Water that leaves the pad is confined to an area located on SpaceX property approximately 20 to 30 feet away from the pad, near a stormwater outfall specified in SpaceX's Stormwater Pollution Prevention Plan ("SWPPP") as "010" which is designated for this purpose and covered by the MSGP, as further explained below. *Id.* ¶¶ 28-32, 44.

In July 2023, TCEQ visited Starbase to learn about and observe the deluge system. *Id.* ¶ 6.   SpaceX explained the system to TCEQ, demonstrated it, and then walked the site.   TCEQ expressed no concerns that the system failed to meet the Texas MSGP. *Id.*

SpaceX has used the system multiple times between November 2023 and October 2024. *Id.* ¶ 48.  SpaceX successfully used the system for its November 18, 2023, March 14, 2024, and June 6, 2024 launches of Starship-Super Heavy. Decl. of Katy Groom ¶ 48 & Groom Decl. Ex. G. On all occasions, the deluge system operated as designed. Each deployment of the system used approximately 180,000 gallons of potable water. *Id.* ¶¶ 17, 49-51 & Groom Decl. Ex. G.  Most of this water was vaporized by the engines or contained in the on-site containment features. *Id.* ¶¶ 18-20.

On each occasion that the system has been used, including most recently for the static test fire operation on October 8, 2024, SpaceX sampled the deluge water, had it analyzed by a certified lab, and sent the results to TCEQ.  On each occasion, the system water fully complied with the Texas MSGP effluent limits and the TCEQ Agreed Order. *Id.* ¶¶ 48-51.[2]

**D.     The Texas MSGP, the TCEQ Agreed Order, and the EPA Consent Agreement.**

The Texas MSGP authorizes discharges from emergency firefighting activities, uncontaminated water used for dust suppression, and discharges from potable water sources. Groom Decl. ¶ 25 & Groom Decl. Ex. A at 83-84.  The deluge water falls into each of these authorized categories.  The deluge water prevents fire emergencies by suppressing flames from the rocket system that could damage SpaceX's launch pad infrastructure and spread to surrounding areas. *Id.* ¶ 7.  The water also suppresses dust that would be dispersed, preventing the spread of dust and debris caused by the first launch. *Id.*  The system also uses only uncontaminated, potable water. *Id.* ¶ 18.

Another requirement of the Texas MSGP is to identify the outfalls associated with discharges of the deluge system—the locations at or near which the deluge water will be

---

[2] SpaceX has not yet received the results from the samples of the deluge water discharged during the October 8, 2024 static test fire.

discharged into adjacent wetlands.  The Texas MSGP requires these outfalls to be identified in a SWPPP.  SpaceX's SWPPP identifies Outfalls 003, 004, 005, 010, and 011 as the pertinent outfalls for "approved non-stormwater discharge (deluge water used for dust and fire suppression) when the deluge system at the Orbital stand is used." *Id.* ¶ 28 & Groom Decl. Ex. B at 14.  TCEQ's website confirms that these outfalls are covered by the MSGP.[3]  The deluge water exits the SpaceX facility at or near these outfalls. *Id.* ¶¶ 32, 38 & Groom Decl. Ex. B at 13-14.  SpaceX samples the deluge water from a location near outfall 010, which is located approximately 20 to 30 feet from the launch pad.

SpaceX was also assured that it was properly managing deluge water discharges under the Texas MSGP.  Groom Decl. ¶¶ 23, 38; Decl. of Carolyn Wood Decl. ("Wood Decl.") ¶ 13. Additionally, SpaceX reported its sampling results to TCEQ after each deployment of the deluge system.  Groom ¶ 48-51; Wood Decl. ¶ 23-24.   SpaceX has provided TCEQ with spreadsheets showing that each of those samples are well-within the effluent limits for the Texas MSGP.  Groom Decl. ¶¶ 48-51; Wood Decl. ¶ 23 & Wood Decl. Exhibit E.

On August 2, 2024, however, TCEQ notified SpaceX that it had received at least one complaint from a member of the public about the deluge water system.  Wood Decl. ¶ 32.  For the first time, TCEQ seemed to change its mind and now wanted to characterize the deluge water as industrial wastewater. *Id.*  TCEQ recommended that SpaceX take corrective action by submitting an individual TPDES permit application for the deluge water system. *Id.*

To promptly resolve any other questions or complaints about the deluge water, SpaceX and TCEQ then negotiated an Agreed Order. *Id.* ¶ 33.  The Agreed Order, as mandated by Texas law,

---

[3]*See* https://www2.tceq.texas.gov/wq_dpa/index.cfm?fuseaction=home.permit_list_by_permit&permit_number=TXR05GD61.

states that SpaceX does not admit to violating the Clean Water Act and that SpaceX denies all allegations. Wood Decl. Exhibit B, I.¶ 3 ("The occurrence of any violation is in dispute and the entry of this Order shall not constitute an admission…of any violation…nor of any statute or rule"); *id.* at III (SpaceX "generally denies each allegation").

The Agreed Order also memorializes:

- That SpaceX has voluntarily submitted an administratively complete permit application for the deluge water (*id.* at I.¶ 9).

- That TCEQ conducted a technical review of the application and determined that the use of the system does not cause adverse risk to the environment (*id.*).

- That SpaceX may continue to operate the deluge water system so long as SpaceX continued to sample the deluge water and make those sample results available to TCEQ (*id.* at IV.2.a-d).

**Importantly**, TCEQ independently confirmed in writing that SpaceX may continue to operate the deluge system so long as SpaceX complies with the Agreed Order. *See* Wood Decl. Exhibit A, Sept. 19, 2024 e-mail from TCEQ's S. Schar ("To answer your question: Yes…so long as SpaceX follows the ordering provisions of the agreed order, TCEQ will consider SpaceX to be in compliance with the agreed order for any future discharges from the water deluge system…").

SpaceX has been complying with the Agreed Order, including but not limited to proceeding with the TPDES application process, sampling all deluge water in accordance with the Agreed Order, and making those sample results available for review by TCEQ.  The Agreed Order will be finalized shortly. Wood Decl. ¶ 36.

Similarly, SpaceX also negotiated with EPA a "Consent Agreement" that was finalized on or about September 5, 2024. *Id.* ¶ 37.  Like the TCEQ Agreed Order, SpaceX and EPA agreed that

SpaceX would pay to EPA a civil penalty of nearly $150,000 without any admission of wrongdoing as to all allegations that SpaceX had been discharging deluge water without a permit from 2022 to 2024. *See* Wood Decl. Exhibit D, EPA Consent Agreement at 11; *id.* at 9, ¶ 28.b (memorializing that SpaceX "neither admits nor denies" the allegations of the Consent Agreement). The EPA has confirmed that the Consent Agreement and SpaceX's application for a TPDES permit closes out EPA's enforcement matter. Wood Decl. Exhibit C, Sept. 12, 2024 letter from EPA's C. Seager ("[T]he materials you submitted have been determined to have satisfactor[ily] met the requirements in the above-referenced Administrative Order, and it is hereby closed.").

**E.      Additional environmental review of the deluge system.**

The deluge system's use has also been thoroughly disclosed, studied, and found by multiple agencies to not present any significant environmental effects. The FAA first evaluated the use of a deluge system in its 2022 Programmatic Environmental Assessment ("PEA") for the Starship-Super Heavy Program at Boca Chica. Groom Decl. ¶ 43 & Groom Decl. Ex. C. The U.S. Army Corps of Engineers, U.S. Coast Guard, U.S. Fish and Wildlife Service, National Park Service, and NASA served as cooperating agencies on the PEA. The PEA evaluated the impacts of a deluge system that would use up to 350,000 gallons per launch event (even though SpaceX is not currently using this much water). *Id.* ¶ 43 & Groom Decl. Ex. C at 162. The PEA concluded that a deluge system, if used, would not significantly impact surface water quality, groundwater quality, or floodplain function. *Id.* ¶ 43 & Groom Decl. Ex. C at 112-13. 115.

The FAA again evaluated the environmental impacts of the deluge system after the April 2023 launch in a Written Re-evaluation issued on November 15, 2023 ("November 2023 WR"). *Id.* ¶ 45 & Groom Decl. Ex. E. The FAA concluded that "*[i]t is not expected the deluge water would contain any pollutants during future operations.*" Groom Decl. Ex. E at 11 (emphasis

added).  The FAA also again found that deluge water discharges would not significantly impact biological resources.  The FAA explained that the amount of water that would leave the launch site as overland sheet flow, "push out," or condensation (71,000 gallons) "is comparable to slightly increased rainfall runoff." *Id.* at 22-23.  In fact, the FAA noted that "*an average summertime thunderstorm at Boca Chica would deposit more water over the landscape than any single or all combined activations of the deluge system.*" *Id.* at 35 (emphasis added).  Consequently, the FAA concluded that the risk of vegetation creep into nearby mudflat habitat was low. Groom Decl. ¶ 45.

The FAA and U.S. Fish and Wildlife Service ("Service") also reviewed the effects of the deluge system pursuant to the Endangered Species Act. *Id.* ¶ 46 & Groom Decl. Ex. F.  The Service found that operation of the deluge system could cause flushing and avoidance behavior that could decrease the risk of harm to species during launches. Groom Decl. Ex. F. at 18.  The Service found that the deluge system could also have *beneficial* effects to listed species by dampening noise and vibrations from launch operations and thus reducing levels of stress and disruption that wildlife may experience during launch events. *Id.*

In connection with the November 2023 WR and 2022 BCO Addendum, SpaceX agreed to monitor the deluge system closely and to report to the FAA and the FWS after every use. Groom Decl. ¶ 47.

## F.    Monitoring of the deluge system has confirmed that the system does not cause any significant environmental effects.

Monitoring of the deluge system has shown no significant environmental impacts and confirmed that the deluge water is well-within effluent limitations in the Texas MSGP and the TCEQ Agreed Order. *Id.* ¶¶ 48-51 & Groom Decl. Ex. G; Wood Decl. ¶ 8 & Wood Decl. Exs. E

& F.  Monitoring of other ecological indicators also has not revealed any negative impacts on the neighboring environment. Groom Decl. ¶ 52 & Groom Decl. Ex. H.

**G.     Plaintiff's delay filing suit and delay seeking injunctive relief.**

On June 4, 2024, Plaintiff sent SpaceX a notice of intent to sue "for violations of the [CWA], 33 U.S.C. §§ 1251 *et seq.*, and for failure to obtain a permit under the TPDES." Exhibit 1, 6/4/24 Save RGV Notice Letter at 1.

On July 3, 2024, SpaceX responded to Plaintiff to provide additional information, correct factual misunderstandings, and invite Plaintiff to meet and share information about the deluge system. Exhibit 2, 7/3/24 SpaceX Response Letter to Save RGV.  For example, SpaceX explained that "water that is not evaporated or captured in SpaceX's containment basins is dispersed within 20-30' of the launch pad on SpaceX's property, not the 0.6 miles," and that local waterways and aquatic resources were not being harmed.  *Id.* at 1-2.  SpaceX also offered to meet with Plaintiff to discuss the system and to seek a resolution of any dispute. *Id.* at 4.  Plaintiff declined.  Under the CWA, Plaintiff's first available date to file suit was August 3, 2024.

On July 19, 2024, Plaintiff issued a new notice letter that changed the theory of the alleged CWA violations.  Exhibit 3, 7/19/24 Save RGV Second Notice Letter.  Plaintiff now argued that SpaceX had failed to "obtain an *individual* TPDES permit" (emphasis added).  *Id.* at 4.  Plaintiff argued that "[d]ischarges from the deluge system are not eligible for coverage under the [Texas MSGP] because they are not discharges of stormwater or eligible non-stormwater discharges." *Id*. Under the CWA, Plaintiff's first available date to file suit for the violations asserted in this Notice Letter was September 17, 2024.

On October 10, 2024, Plaintiff notified SpaceX that Plaintiff intended to seek emergency relief to attempt to halt all uses of the deluge water system until SpaceX obtained an individual permit or "until a preliminary injunction" motion could be briefed and decided. Exhibit 4, 10/10/24

Email from L. Ice.  SpaceX informed Plaintiff of TCEQ and EPA's enforcement orders rendered after Plaintiff's notice letters and that there was no enforcement interest left for Plaintiff to vindicate. Exhibit 5, 10/10/24 Email from D. Feinberg.  Nevertheless, Plaintiff moved ahead with the instant motion.

## IV.   LEGAL STANDARD

"Injunctive relief is 'an extraordinary and drastic remedy,' and should only be granted when the movant has clearly carried the burden of persuasion." *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009) (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)).  "A plaintiff seeking a preliminary injunction [or temporary restraining order] must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The plaintiff further "bears the burden of persuasion on *all* four elements, and failure on any one of them warrants denial." *Fromhold v. Insight Glob., LLC*, 657 F. Supp. 3d 880, 887 (N.D. Tex. Feb. 23, 2023) (emphasis added).

## V.   ARGUMENT

### A.   SpaceX is likely to succeed on the merits.

"To show a likelihood of success, the plaintiff must present a prima facie case." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013).  While the plaintiff need not prove they are "entitled to a summary judgment," they must at a minimum "raise[] questions going to the merits so serious, substantial, difficult and doubtful, as to make

them a fair ground for litigation and thus for more deliberate investigation." *Allied Home Mort.*

*Corp. v. Donovan*, 830 F. Supp. 2d 223, 227 (S.D. Tex. 2011).  Plaintiff cannot clear this hurdle.

### 1.      The deluge system discharges are permitted under the Texas MSGP.

"To evaluate the likelihood of success on the merits the court considers the 'standards

provided by the substantive law.'" *Id.* (quoting *Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir.

2011)).  Plaintiff's original argument was that SpaceX was discharging without any kind of permit.

Exhibit 1, 6/4/24 Save RGV Notice Letter.  But Section A.6 of the Texas MSGP covers certain

non-stormwater discharges from approved outfalls.  The deluge water is covered by this provision

because it: (1) falls within at least three categories of permitted non-stormwater discharges, and

(2) discharges through approved outfalls.

Section A.6 of the Texas MSGP covers discharges for emergency firefighting, for dust

suppression, and of water from potable water sources.  The Texas MSGP "Fact Sheet," which

members of the public and TCEQ use as a permit compliance "cheat sheet," states that these types

of "discharges that may occur during normal operations of an industrial facility or a commercial

facility . . . do not require additional permit coverage" – in other words, they do not require an

individual permit instead of, or in addition to, coverage under the Texas MSGP. Wood Decl. ¶ 14

& Wood Decl. Ex. 14.

First, deluge water discharges are "discharges from emergency firefighting activities"

covered by MSGP Section A.6(a).  The term "emergency firefighting activities" is not defined in

the Texas MSGP or by TCEQ regulations, but other provisions of Texas law make clear that "fire

emergency" includes "an emergency response involving fire protection *or prevention*[.]" Tex.

Civil Practice & Remedies Code § 78.051(1) (emphasis added).  The deluge system plainly serves

to prevent fire and is thus used as part of "emergency firefighting activities."  Deluge water "is

used to reduce the fires caused by the thrust of the Starship–Super Heavy engine that ignites on the launch pad prior to launching and upon return to launchpad" to prevent the spread of fire within or beyond the launch and landing area, which has occurred before.  Groom Decl. ¶ 26.  Both the FAA and U.S. Fish and Wildlife Service also stated in their environmental reviews of the deluge system that one of its primary purposes was fire mitigation. Groom Decl. Ex. E at 5 (stating that deluge system discharges are "a fire prevention tactic" designed to "help minimize the risk of fires igniting in or spreading through adjacent vegetated areas, either within the unconstructed portion of the VLA or outside of the VLA"); *see also id.* Ex. F at 15-16 (same).

Second, deluge water discharges are "uncontaminated water used for dust suppression" covered by Texas MSGP Section A.6(i).  Deluge system water is both "uncontaminated" and "used for dust suppression."  The deluge water is potable water purchased from the Brownsville Public Utilities Board, the same water residents drink.  Groom Decl. ¶¶ 7, 26.  The water is stored in clean, dedicated tanks and pumped to the deluge system via clean, dedicated pipes installed for that purpose.  No chemicals or substances are added to the water at any point.  *Id*. ¶ 18.  As explained above, deluge water sampling since 2023 has confirmed that the water complies with all relevant TCEQ effluent limitations, and, more recently, the TCEQ Agreed Order.  This uncontaminated water is also undisputedly used for dust and debris suppression. *Id*. ¶ 26.  As both the FAA and U.S. Fish and Wildlife Service acknowledged in their environmental reviews, the deluge system prevents the breakup of the launch pad and the creation of a dust and debris cloud. *Id.* Ex. E at 2-3 (stating that the deluge system is "a water-cooling element" included with the steel plates that SpaceX installed at the pad "to protect against the potential of a pad breakup or a large dust cloud"); *Id.* Ex. F at 14 (stating that the deluge system "as implemented in combination with the steel plates and improved foundation, will have a secondary but important benefit of further

16

mitigating dust . . . .").

Third, and as discussed above, the deluge system discharges water from potable water sources that does not go through any industrial process prior to discharge, which is covered by MSGP Section A.6(c). SpaceX has reported, and continues to report, each of these discharges to TCEQ, along with sample results demonstrating SpaceX's compliance with the MSGP and Agreed Order requirements. Groom Decl. ¶¶ 48-51.

Also, the deluge water is discharged through and near specified outfalls that SpaceX disclosed to TCEQ would be used for this type of discharge. In accordance with the Texas MSGP, the SpaceX SWPPP identifies Outfalls 003, 004, 005, 010, and 011 as the pertinent outfalls for the "approved non-stormwater discharge (deluge water used for dust and fire suppression) when the deluge system at the Orbital stand is used." *Id*. ¶ 28 & Groom Decl. Ex. B at 14. TCEQ's website confirms that these outfalls are covered by the MSGP.[4] The location near outfall 010 is the location from which SpaceX samples the deluge water and provides the sample results to TCEQ. Each of those samples demonstrates that SpaceX's deluge water complies with the Texas MSGP effluent limits. Wood Decl. ¶¶ 48-51. Accordingly, the Texas MSGP clearly covers the water discharged by operation of the deluge system and, therefore, Plaintiff is unable to show a likelihood of success on the merits.

## 2.   Even if the Texas MSGP does not apply, Plaintiff's claims have already been addressed by the TCEQ and EPA Orders.

On August 2, 2024, after changing its position and characterizing the deluge water as industrial wastewater for the first time, TCEQ sent a notice of violation and recommended that

---

[4] *See* https://www2.tceq.texas.gov/wq_dpa/index.cfm?fuseaction=home.permit_list_by_permit&permit_number=TXR05GD61.

SpaceX take corrective action by submitting an individual TPDES permit application for the deluge water system. Wood Decl. ¶ 32.  Following this communication, SpaceX and TCEQ then negotiated an Agreed Order memorializing: that TCEQ determined that use of the deluge system does not cause adverse risk to the environment (Wood Decl. Exhibit B, I.¶ 3) and that SpaceX may continue to operate the deluge water system so long as SpaceX continued to sample the deluge water and make those sample results available to TCEQ (*id.* at IV.2.a-d).  Even more indicative of the mootness of Plaintiff's claims, TCEQ *independently* confirmed in writing that SpaceX *may continue to operate the deluge system* so long as SpaceX complies with the Agreed Order. *See* Wood Decl. Exhibit A, Sept. 19, 2024 e-mail from TCEQ's S. Schar ("To answer your question: Yes…so long as SpaceX follows the ordering provisions of the agreed order, TCEQ will consider SpaceX to be in compliance with the agreed order for any future discharges from the water deluge system…").  Accordingly, although the Agreed Order is not yet final, SpaceX is already in compliance (and always has been) with TCEQ's requirements and any operation of the deluge system, such as during the scheduled launch on October 13, 2024, is authorized and not in violation of the CWA.

Moreover, SpaceX also negotiated with EPA a "Consent Agreement" that was finalized on or about September 5, 2024. Wood Decl. ¶ 37.  As a result of the Agreed Order, SpaceX paid a substantial civil penalty of nearly $150,000 to EPA without any admission of wrongdoing as to any of the allegations, but agreeing that it would resolve any accusation that SpaceX had been discharging deluge water without a permit from 2022 to 2024. *See* Wood Decl. Exhibit D, EPA Consent Agreement at 11; *id.* at 9, ¶ 28.b (memorializing that SpaceX "neither admits nor denies" the allegations of the Consent Agreement).  Critically, the EPA has confirmed that the Consent Agreement, including the payment of a substantial civil penalty, and SpaceX's application for a

TPDES permit closes out EPA's enforcement matter. Wood Decl. Exhibit C, Sept. 12, 2024 letter from EPA's C. Seager ("[T]he materials you submitted have been determined to have satisfactor[ily] met the requirements in the above-referenced Administrative Order, and it is hereby closed.").

In other words, Plaintiff lacks standing to pursue its claims because no harm exists, and the claims alleged in the Complaint have already been addressed by the appropriate entities—the expert state and federal agencies. *Env't Conservation Org, v. City of Dallas*, 529 F.3d 519, 524-25 (5th Cir. 2008) ("The requisite personal interest that must exist at the commencement of litigation (standing) must continue throughout its existence (mootness)."). Here, Plaintiff is unlikely to succeed on the merits of its claims because no basis exists for it to seek further injunction or penalties based on the usage of the deluge system when such usage has already been addressed by the appropriate government entities and penalties have already been assessed for the past violations alleged by Plaintiff. *See id.* at 531. Put simply, the expert agencies (TCEQ and EPA) have: (1) addressed the use of the deluge system; (2) sought and received payment of civil penalties; and (3) authorized prior and further use of the deluge system. Accordingly, Plaintiff cannot truthfully assert that use of the deluge system is not authorized and in violation of the CWA.

Moreover, because Plaintiff filed suit more than 120 days after sending its initial notice letter, the diligent prosecution bar applies. 33 U.S.C. § 1319(g)(6)(B). Specifically, Plaintiff's initial Notice Letter was served on June 4, 2024. *See* Ex. 1. Given that TCEQ and EPA subsequently initiated formal enforcement actions against SpaceX for the use of the deluge system, Plaintiff was required to file suit within 120 days, or by October 2, 2024, to not be barred by the agencies' diligent prosecution. Plaintiff failed to do so. *See* Compl. Plaintiff's Second Notice Letter does not cure this deficiency because it changed the fundamental theory of its case and the

relevant agencies had already engaged in informal enforcement proceedings.  Because both the EPA and TCEQ have already commenced actions to address the violations alleged by Plaintiff, the Complaint has no merit and Plaintiff cannot state a viable claim for relief.  33 U.S.C. § 1319(g)(6)(A); *see also Lockett v. EPA*, 176 F. Supp. 2d 628, 634 (E.D. La. 2001).

**B.     Plaintiff does not show irreparable harm absent the entry of a preliminary injunction or temporary restraining order.**

Irreparable harm has "always" been "[t]he basis for injunctive relief in the federal courts." *Sampson v. Murray*, 415 U.S. 61, 88 (1974) (citation and internal quotation marks omitted).  The plaintiff's burden to demonstrate irreparable harm is a heavy one. *W. Ala. Quality of Life Coal. v. U.S. Fed. Highway Admin.*, 302 F. Supp. 2d 672, 678 (S.D. Tex. 2004).  If a plaintiff cannot show irreparable harm, the court may deny the motion on that ground alone. *See Fromhold*, 657 F. Supp. 3d at 887; *see also Holland*, 777 F.2d at 997.

Courts consider several factors when evaluating whether an alleged harm is irreparable. *See Quality of Life Coal.*, 302 F. Supp. 2d at 683-84.  First, the injury must be "neither speculative nor remote, but [ ] actual and imminent." *Id.* at 684 (citing *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)).  In other words, there must be "more than an unfounded fear" of injury. *Holland*, 777 F.2d at 997.  Second, "the injury must be permanent or of long duration" or one that "cannot be redressed by either an inequitable or legal remedy following trial." *Quality of Life Coal*, 302 F. Supp. 2d at 683-84.  Plaintiff fails to meet this "heavy burden."

**1.     Plaintiff's delay in seeking relief is fatal to a finding of irreparable harm.**

Plaintiff's delay in suing and seeking emergency relief also undermines its argument that the situation is urgent and that it will suffer irreparable harm.  To receive relief, "a party requesting a preliminary injunction [or temporary restraining order] must generally show reasonable diligence." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (per curiam).  A delay in seeking

injunctive relief "weighs heavily against a finding of irreparable injury." *Rimkus Consulting Grp., Inc. v. Cammarata*, 255 F.R.D. 417, 438 (S.D. Tex. 2008); *see also Gonannies, Inc. v. Goupair.com, Inc.*, 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006) ("Delay in seeking a remedy is an important factor bearing on the need for a preliminary injunction. Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief."). Courts have denied motions for emergency relief based on delays of weeks or months.[5] A delay will typically only be excused if there is a "good explanation." *Gonannies*, 464 F. Supp. 2d at 609.

Plaintiff presents no "good explanation" for their delay in filing suit. SpaceX first used the deluge system *eleven months* ago in November 2023, yet Plaintiff waited eight months until June 4, 2024, to first notify SpaceX that it intended to sue on its newly-manufactured theory that SpaceX requires an individual permit. This delay demonstrates that there is no emergency harm that would occur if the injunction did not issue; otherwise, Plaintiff would have acted sooner. *See Expedi, Inc. v. Rebound Int'l, LLC*, No. 4:20-CV-3897, 2021 WL 3702169, at *3 (S.D. Tex. May 13, 2021) (finding that waiting at least nine months until filing suit "indicates that any harm being caused by the alleged infringement was not 'imminent'"); *ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 698 (N.D. Tex. 2015) (finding an eight-month delay in seeking injunctive relief without

---

[5] *See, e.g.*, *Pruvit Ventures, Inc. v. Forevergreen Int'l LLC*, No. 4:15-cv-571-ALM-CAN, 2015 WL 9876952, at *8 (E.D. Tex. Dec. 23, 2015) (5-month delay "weigh[ed] heavily against granting injunctive relief"); *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975) (affirming district court's denial of temporary injunction where movant, among other things, delayed three months in making its request); *Gonannies, Inc.*, 464 F. Supp. 2d at 609 (six-month "undue" delay negated finding of irreparable harm); *H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs., LLC*, No. 3:09-cv-390, 2009 WL 1766095, at *4 (N.D. Tex. June 23, 2009) (five-month delay sufficient to overcome finding of irreparable harm); *Joseph Paul Corp. v. Trademark Custom Homes, Inc.*, No. 3:16-cv-1651, 2016 WL 4944370, at *16 (N.D. Tex. Sept. 16, 2016) (delay of six months "strongly undercuts" claim of irreparable harm and need for urgent relief); *see also Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (44-day delay "inexcusable"); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (two-month delay "militates against a finding of irreparable harm").

justification meant failure to prove imminent need).  Plaintiff also fails to offer any explanation as to why its claims cannot be handled in the normal course of litigation.

### 2.    There is no irreparable harm.

In its Complaint, Plaintiff contends that the deluge water is impacting waterways such as the South Bay of Lower Laguna Madre, are degrading water quality, or harming aquatic life.  But the facts are that the deluge water that is not captured in retention ponds is discharged onto the ground approximately 20 to 30 feet off of the launchpad onto SpaceX property.  Groom Decl. ¶ 50.  No waterways or aquatic life are being negatively impacted.

But don't take SpaceX's word for it: TCEQ conducted a technical review of the deluge water system and determined that the system did <u>not</u> cause environmental harm.  TCEQ also determined that SpaceX <u>may</u> continue using the system so long as SpaceX complied with the order's provisions.  And SpaceX has been complying with the order because samples of deluge water taken from each use demonstrates that the water complies with <u>all</u> effluent standards.

Plaintiff has provided no "independent proof" that SpaceX's use of the deluge system is certain to irreparably harm the waterways or wildlife, let alone specific land that Plaintiff uses and enjoys. *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) ("Without question, the irreparable harm element must be satisfied by independent proof, or no injunction may issue.").  In fact, Plaintiff's alleged harms occur on land on the *opposite* of SpaceX's facility from where the deluge system is used.  Plaintiff's bare allegations are based upon a "series of contingencies" and on "speculation built upon further speculation." *Friends of Lydia Ann Channel v. U.S. Army Corps of Eng'rs*, 701 F. App'x 352, 355-57 (5th Cir. 2017).  To the contrary, environmental reviews have shown that the deluge system could cause flushing and avoidance behavior that could *decrease* the risk of harm to species during launches. Groom Decl. ¶ 46 & Groom Decl. Ex. F. at 18.  Further,

the Service found that the deluge system could also have *beneficial* effects to listed species by dampening noise and vibrations from launch operations and thus reducing levels of stress and disruption that wildlife may experience during launch events. Groom Decl. ¶ 46 & Groom Decl. Ex. F. at 18.  Moreover, samples submitted for testing after each operation of the deluge system show that the measured concentrations were within TCEQ effluent limits.[6]  Groom Decl. ¶¶ 48-51.  Plaintiff offers no concrete evidence showing otherwise or that the upcoming launch will cause the alleged irreparable injury.

### 3. Plaintiff's alleged procedural injury does not establish irreparable harm.

Plaintiff also alleges procedural harm, asserting that SpaceX must seek an individual permit rather than relying on coverage under the general permit. Pl.'s Mem. at 20.  But any such procedural harm is "insufficient, standing alone, to constitute irreparable harm justifying issuance of a preliminary injunction."  *Nat'l Parks Conservation Ass'n v. U.S. Forest Serv.*, No. 15-CV-01582-APM, 2016 WL 420470, at *11 (D.D.C. Jan. 22, 2016).  Plaintiff does not explain how any alleged substantive harms, which fail for the reasons explained above, would have been prevented if SpaceX had obtained an individual permit earlier.  Indeed, even once SpaceX obtains an individual permit, Plaintiff cannot point to any evidence that SpaceX would have needed to take on additional measures in operating the deluge system.

## C. The balance of the equities strongly favors denying Plaintiff's request for a preliminary injunction or restraining order.

The next element—the balance of equities (the difference in harm to the respective parties) also supports a denial of the preliminary injunction or temporary restraining order.  In analyzing this element, the Court weighs "the competing claims of injury and . . . consider[s] the effect on

---

[6] To that end, Plaintiff has offered no evidence that the prior uses of the deluge system caused any of the alleged irreparable harm.

each party of the granting or withholding of the requested relief," while also considering the public consequences of granting injunctive relief. *Winter*, 555 U.S. at 24. Applied here, this factor strongly supports the Court denying injunctive relief to allow SpaceX to continue with its Starship-Super Heavy program.

Plaintiff's alleged injuries are entitled to little or no weight. Specifically, Plaintiff's purported injury in the absence of injunctive relief would be the allowance of "unpermitted discharges." Pl.'s Mem. at 16-17. However, this alleged injury is a mistaken one because any discharges are permitted non-stormwater discharges under the Texas MSGP, or, in all events, are permitted by TCEQ under SpaceX's compliance with the TCEQ Agreed Order. *See also* Groom Decl. ¶¶ 5-6; Wood Decl. ¶¶ 35, 37. Moreover, even assuming Plaintiff were correct, needing a different permit is essentially a non-substantive, procedural injury. Plaintiff has cited no protective measures that an individual permit would require that SpaceX is not already implementing in compliance with the Texas MSGP, the TCEQ Agreed Order, and other approvals by the FAA and U.S. Fish and Wildlife Service. Indeed, the discharges consist of water purchased from a potable water source—the Brownsville Public Utilities Board—that is the same as the drinking water provided to neighboring residents. Groom Decl. ¶ 7. The deluge water is regularly monitored and tested and has been found to fall well within safe parameters, therefore posing no threat to the public health or the environment. *Id.* ¶¶ 48-51. And this type of non-stormwater discharge is allowed under the Texas MSGP and the TCEQ Agreed Order, as explained above. Thus, there is no credible possibility of harm to Plaintiff, the public health, or the environment if their preliminary injunction or temporary restraining order is denied.

By contrast, Plaintiff's requested preliminary injunction or temporary restraining order would cause significant economic harms to SpaceX that would also have consequences for national

security interests.  In January 2022, the Air Force Research Lab awarded SpaceX a contract to demonstrate a self-sustaining Rocket Cargo transportation service.  Styer Decl. ¶ 34.  This strategic investment by the Air Force Research Lab will culminate in an orbital launch and landing of 30 metric tons of government-provided cargo using the Super Heavy/Starship launch system. *Id*. Over $149 million of payments under this contract are tied to Starship-Super Heavy development and performance milestones, including launch and landing of an integrated vehicle. *Id*.  A months-long grounding of tests and launches would delay millions of dollars in revenue under the Rocket Cargo contract for SpaceX and result in at least a day-for-day delay of this important military initiative. *Id*. ¶¶ 34, 41.

If not dismissed, Plaintiff's requested preliminary injunction or temporary restraining order would also cause significant economic and competitive harms to SpaceX by delaying deployment of the Starlink satellite-based internet service.  Millions of people across the world depend on Starlink for their internet connectivity, including communities struck by disasters and in remote or underserved areas. *Id*. ¶¶ 12, 42.  There is significant demand for additional Starlink services. *Id*. ¶ 39.  SpaceX is therefore actively engaged in launching V3 Starlink satellites into orbit to achieve the goal of delivering high-quality internet to tens of millions of people throughout the world. Through SpaceX's Starshield program, these satellites will also provide national security satellite capabilities to the U.S. Department of Defense and the intelligence community. *Id*. ¶¶ 12, 34-35.

Because the V3 Starlink satellites launch exclusively on Starship-Super Heavy, a delay to SpaceX's ability to test and launch would cause at least a day-for-day delay of SpaceX's ability to enhance the Starlink and Starshield programs.  *Id*. ¶ 34.  This would prevent Starlink from acquiring more customers sooner, hinder Starlink's ability to serve hundreds of thousands of would-be customers, and severely harm SpaceX's competitive advantage in this highly contested

space, advantaging SpaceX's competitors.  *Id.* ¶¶ 8, 38-39.  These are clearly significant harms. Any delay to Starship's launch schedules could delay the development and deployment of Starshield's upcoming national security satellite systems, which also constitutes further harm to SpaceX.  *Id.* ¶ 37.

The preliminary injunction or temporary restraining order would cause severe economic harms to SpaceX in other ways too if not enjoined.  SpaceX has already invested billions of dollars in developing its Starbase facility and Starship-Super Heavy, as well as billions of dollars in the Starlink satellite program that depends on Starship-Super Heavy.  Styer Decl. ¶¶ 16, 28.  Each day that SpaceX is unable to perform its Starship-Super Heavy launch operations will cost SpaceX millions of dollars and delay realization of returns on these capital investments, none of which would be recoverable from Plaintiff. *Id.* ¶ 8; *see Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 545 (1987) (finding that the plaintiffs' improbable environmental harms were outweighed by the loss of investment a company would suffer if its proposed project were enjoined)

First, SpaceX will continue to incur the costs of maintaining its Starbase facility and the Starship-Super Heavy program with little to no return.  Overall, the cost of maintaining Starbase and the Starship-Super Heavy development program is approximately $4 million per day. *Id.* ¶ 48. Without being able to perform launches, SpaceX would incur this cost with little to no return because SpaceX is at the point in Starship-Super Heavy development where launching is needed to continue program progress.

Second, every day that Starship-Super Heavy launch operations cannot occur would delay—likely day-for-day or longer—SpaceX's receipt of billions of dollars of revenue for meeting milestones under contracts tied to Starship-Super Heavy launch operations. *Id.* ¶¶ 5, 28,

33, 44.  For each billion dollars delayed, using the recent 3-month treasury rate of ~4.6%, that would be a loss of over $100,000 per day. *Id.* ¶ 47.  Further, the delay in operations will also result in the delay or even cancellation of the second human lunar landing contract agreed to between NASA and SpaceX in November 2022, which alone has a value of $1.15 billion. *Id.* ¶ 32.

In sum, the requested preliminary relief requested would cause significant harm to SpaceX, its customers, and the public interest by significantly delaying development and use of Starship-Super Heavy and the time-sensitive missions and other projects of national importance that it is contracted to serve.   These harms greatly outweigh Plaintiff's unspecified and improbable procedural and environmental harms from alleged "unpermitted discharges." *See Amoco Prod. Co.*, 480 U.S. at 545-46 (reversing issuance of a preliminary injunction where the plaintiffs alleged environmental harms that were improbable and outweighed by financial harms that a private company would suffer from a preliminary injunction); *Optimus Steel, LLC v. U.S. Army Corp. of Engineers*, 492 F.Supp.3d 701, 727 (E.D. Tex. 2020) (denying preliminary injunction and finding the balance of equities in favor of the Defendant that had committed significant resources, including navigating the various state and federal environmental regulations that the project implicates, in addition to physical construction).

**D.    The public interest strongly favors denying Plaintiff's preliminary injunction or temporary restraining order.**

For similar reasons, the public interest also favors denying the requested preliminary injunction or temporary restraining order.  As the FAA and NASA have repeatedly recognized that Starship-Super Heavy launches serve critical national interests.  For example, the FAA explained:

> The purpose of SpaceX's [Starship-Super Heave launch program] is to provide greater mission capability to NASA, Department of Defense, and commercial customers. SpaceX's activities would continue to fulfill U.S. expectation that space transportation costs are reduced to make continued exploration, development, and use of space more affordable. The Space Transportation section of the National Space Transportation Policy of 1994 addressed the commercial launch sector,

stating that "assuring reliable and affordable access to space through U.S. space transportation capabilities is fundamental to achieving National Space Policy goals."

Styer Decl. Ex. A at S-4–S-5 (FAA's PEA); *see also id.* ¶ 29 (NASA statements on Starship-Super Heavy).  Granting of Plaintiff's requested preliminary injunction or temporary restraining order would greatly detriment the public interest by delaying development and use of Starship-Super Heavy and the time-sensitive missions of national importance it is contracted to serve.  *See generally*, Styer Decl.

Specifically, NASA selected Starship-Super Heavy to bring the first two astronauts to the Moon on the Artemis III mission, which will mark humanity's first return to the lunar surface in more than fifty years (assuming China does not get there first). *Id.* ¶¶ 7, 29.  SpaceX has scheduled the fifth orbital launch of Starship-Super Heavy planned for October 13, 2024.  This flight of Starship-Super Heavy is a critical next step toward fully operationalizing the launch vehicle and meeting the Artemis program's aggressive schedule.  *Id.* ¶ 30.  SpaceX's inability to conduct these and other upcoming tests and launches for months will make it impossible for NASA to land astronauts on the moon by 2026, because SpaceX will perform an essential element of the Artemis mission.  *Id.* ¶ 33.  If Plaintiff's motion is granted, a preliminary injunction or temporary restraining order would thus undermine NASA's objectives to return astronauts to the Moon in advance of our rivals, a major harm to the nation's policy goals, while causing substantial financial harm to SpaceX.  *Id.*  Accordingly, the public interest weigh heavily in favor of SpaceX and against Plaintiff.

## VI.    CONCLUSION

For the foregoing reasons, SpaceX has shown that Plaintiff fails to present (i) a likelihood of success on the merits, (ii) that it will suffer severe, irreparable harm unless the Court preserves the status quo by granting preliminary relief, or (iii) that the public interest and balance of the

equities favor granting a preliminary injunction or temporary restraining order.  Accordingly, the Court should deny Plaintiff's Motion for a Preliminary Injunction or Temporary Restraining Order.

Dated: October 15, 2024                              Respectfully Submitted,

                                                     */s/ David L. Feinberg*
                                                     David L. Feinberg, Attorney-In-Charge
                                                     DC Bar No. 982635
                                                     S.D. Tex. Bar No. 3882833
                                                     VENABLE LLP
                                                     600 Massachusetts Avenue, NW
                                                     Washington, DC 20001
                                                     202.344.8278
                                                     202.344.8300
                                                     dlfeinberg@venable.com

                                                     Tyler Welti, *pro hac vice*
                                                     VENABLE LLP
                                                     California Bar No. 257993
                                                     101 California Street, Suite 3800
                                                     San Francisco, CA 94111
                                                     415.653.3714
                                                     415.653.3755 (fax)
                                                     tgwelti@venable.com

                                                     DAVID G. OLIVEIRA
                                                     State Bar No. 15254675
                                                     Federal ID No. 34165
                                                     ROERIG, OLIVEIRA & FISHER, LLP
                                                     10225 N. 10th Street
                                                     McAllen, TX 78504
                                                     Telephone: (956) 393-6300
                                                     Facsimile: (956) 386-1625
                                                     doliveira@rofllp.com

                                                     *Attorneys for Defendant Space Exploration
                                                     Technologies Corp.*

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been filed via CM/ECF and is available for viewing and downloading electronically and has been served on all parties signed up for CM/ECF on October 15, 2024.

<u>/s/ David L. Feinberg</u>
David L. Feinberg