**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| SAVE RGV, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 1:24-cv-00148 |
| | § | |
| SPACE EXPLORATION | § | |
| TECHNOLOGIES CORP., | § | |
| | § | |
| *Defendant.* | § | |

<u>**PLAINTIFF'S REPLY TO DEFENDANT'S AMENDED OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION OR TEMPORARY RESTRAINING ORDER**</u>

## **TABLE OF CONTENTS**

I.     Introduction & Summary ........................................................................... 1

II.    Argument .................................................................................................. 2

   A.   Defendant offers no new Arguments; Plaintiff is likely to succeed on the merits.  2

     i.    The deluge system discharges are not authorized under the Texas MSGP. ....... 3

       1.   The deluge system "push out", "sheet flow", and "overspray" bypasses approved outfalls under the MSGP. .................................................. 3

       2.   The deluge discharge is not for emergency firefighting activities, uncontaminated dust suppression, or potable water sources under the MSGP. .................................................................................... 5

     ii.   The TCEQ and EPA enforcement proceedings do not foreclose Plaintiff's citizen suit, because they cannot authorize a discharge in lieu of a TPDES permit.................................................................................................. 7

     iii.   Plaintiff's suit is timely and not otherwise barred by the EPA or TCEQ enforcement actions.......................................................................... 10

   B.   Plaintiff will suffer irreparable injury absent a preliminary injunction. ............... 11

     i.    Plaintiff has not delayed in seeking the appropriate remedy. .......................... 11

     ii.   Defendant's own sampling data confirms irreparable harm will occur from the next deluge system discharge. ....................................................... 14

   C.   The balance of harms and the public interest favor a preliminary injunction. ..... 17

   D.   Plaintiff respectfully requests an accelerated ruling. ........................................... 19

III.   Conclusion ........................................................................................... 20

## <u>INDEX OF AUTHORITIES</u>

**Cases**

*ADT, LLC v. Capital Connect, Inc.*,
    145 F. Supp. 3d 671 (N.D. Tex. 2015) ................................................................. 12

*Amoco Production Co. v. Village of Gambell, AK*,
    480 U.S. 531 (1987) ................................................................................................. 17

*BCCA Appeal Group, Inc. v. City of Houston*,
    496 S.W.3d 1 (Tex. 2016) ......................................................................................... 8

*Benisek v. Lamone*,
    138 S. Ct. 1942 (2018) (per curiam) ...................................................................... 14

*Canal Auth. of State of Fla. v. Callaway*,
    489 F.2d 567 (5th Cir. 1974) ................................................................................... 15

*Cnty. of Maui, Hawaii v. Hawaii Wildlife Fund*,
    590 U.S. 165 (2020) ................................................................................................... 7

*Contango Operators, Inc. v. United States*,
    No. CV H-11-0532, 2011 WL 13130834 (S.D. Tex. Oct. 26, 2011) ........................ 5

*Enter. Intern., Inc. v. Corporacion Estatal Petrolera Ecuatoriana*,
    762 F.2d 464 (5th Cir. 1985) ................................................................................... 15

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
    484 U.S. 49 (1987) ................................................................................................... 12

*Lockett v. E.P.A.*,
    319 F.3d 678 (5th Cir. 2003) ................................................................................... 10

*Montgomery Envt'l Coal., Inc. v. U.S. EPA*,
    1983 U.S. App. LEXIS 27509 (D.C. Cir. 1983) ....................................................... 9

*Nat. Res. Def. Council, Inc. v. Cnty. of Los Angeles*,
    725 F.3d 1194 (9th Cir. 2013) ................................................................................... 6

*Optimus Steel, LLC v. U.S. Army Corps of Engineers*,
    492 F. Supp. 3d 701 (E.D. Tex. 2020) ............................................................. 11, 18

*Piney Run Pres. Ass'n v. Cnty. Com'rs of Carroll Cnty., MD*,
    268 F.3d 255 (4th Cir. 2001) ..................................................................................... 5

*Puget Soundkeeper All. v. Pollution Control Hearings Bd.*,
  30 Wash. App. 2d 360, 545 P.3d 333 (2024), review denied sub nom. *Puget Soundkeeper All.*
  *v. Pollution Control Hearings*, 554 P.3d 1222 (Wash. 2024) ................................................... 6

*United States v. Smithfield Foods, Inc.*,
  191 F.3d 516 (4th Cir. 1999) ........................................................................................ 9

*Waterkeeper All., Inc. v. U.S. E.P.A*,
  399 F.3d 486, 498 (2d Cir. 2005) ................................................................................ 9

**Statutes**

33 U.S.C. § 1311(a) ........................................................................................................ 8

33 U.S.C. § 1319(g)(6)(A) ............................................................................................ 10

33 U.S.C. § 1319(g)(6)(B) ............................................................................................ 11

**Other Authorities**

26 Fed. Reg. 51181 ........................................................................................................ 10

**Regulations**

30 Tex. Admin. Code § 35.303 ...................................................................................... 10

30 Tex. Admin. Code § 35.303(a) ................................................................................ 10

30 Tex. Admin. Code § 35.303(b) ................................................................................ 10

40 C.F.R. § 122.41 ........................................................................................................ 10

40 C.F.R. § 122.41(m)(4) .............................................................................................. 10

## I.    INTRODUCTION & SUMMARY

Plaintiff Save RGV files this Reply to Defendant Space Exploration Technologies, Corp.'s[1] ("SpaceX" or "Defendant") Amended Opposition to Plaintiff's Motion for Preliminary Injunction or Temporary Restraining Order ("Defendant's Response"), filed on October 15, 2024.

Defendant's Response contains multiple inconsistencies, unsupported pronouncements, and half-truths, but is ultimately premised on two fatal errors: First, Defendant insists that the deluge water is authorized under the general stormwater permit called the Texas Pollutant Discharge Eliminations System Multi Sector Permit ("Texas MSGP" or "the MSGP"). The sheer fact that both the U.S. Environmental Protection Agency ("EPA") and Texas Commission on Environmental Quality ("TCEQ") have initiated enforcement proceedings for "discharges without a permit," indicate these agencies disagree. But regardless of whether the deluge water can be authorized under the MSGP, the design of Defendant's deluge system and launch facility means contaminated deluge water is being sprayed *beyond* its stormwater system. In other words, even if deluge water that passes through the stormwater system is permitted under the MSGP (it is not), there is no scenario under which the MSGP regulates all of this "push out", "sheet flow", and "overspray" as well. Defendant's Response and supporting documents attempt to downplay both the this overspray and the deluge water's contaminants—or simply pretend it does not exist—but this is not consistent with the information provided to other agencies, such as the EPA and TCEQ.

The second fatal flaw in Defendant's position is that Defendant insists that if the deluge is not covered under the MSGP, then the TCEQ and EPA agreed that SpaceX could continue to operate the deluge system *without* a permit. This is a gross mischaracterization of the enforcement proceedings initiated by each agency to date, and a position Defendant supports with no legal

---

[1] Plaintiff has amended the case caption to reflect the correction made by Defendant.

authority whatsoever. Defendant also mischaracterizes fundamental aspects of the Clean Water Act NPDES/TPDES permitting program and conflates the role that other federal regulators or statutory schemes play in authorizing various activities taking place at the SpaceX's Boca Chica Launch Site. To be clear, FAA may authorize launches and may be the lead agency in preparing certain environmental assessment documents under NEPA (National Environmental Policy Act), but FAA does not issue TPDES permits or otherwise authorize the discharge of deluge water.

When it is all said and done, Defendant proudly extolls the achievements and ambitions at the Boca Chica Starbase facility, but at no point in discussing its cutting-edge technology or the $5 billion investment, does Defendant provide a reason—or, more importantly, the legal authority—justifying its failure to obtain a TPDES permit prior to constructing a deluge system that is designed to discharge contaminated industrial wastewater into waters of U.S. But the reason for Defendant's failure to obtain a TPDES permit is irrelevant, because the Clean Water Act is a strict liability statute. The issues before the Court remain simply whether the discharges without a TPDES permit constitute a violation of the Clean Water Act and whether Plaintiff is entitled to a preliminary injunction in order to avoid the imminent and irreparable harm caused when hazardous heavy metals, heat, and other pollutants are forced into tidal wetlands.

## II.   ARGUMENT

### A.  Defendant offers no new Arguments; Plaintiff is likely to succeed on the merits.

As an initial matter, it is not genuinely disputed that the discharge of deluge water requires some type of industrial NPDES or TPDES permit under the Clean Water Act. Even after EPA and TCEQ initiated enforcement matters, Defendant maintains that the discharge of deluge water is authorized under its the MSGP's provision for non-stormwater discharges. In the alternative, Defendant argues that the discharge is somehow temporarily authorized by the actions of TCEQ

and EPA until such time as Defendant can obtain an individual industrial TPDES permit. Both

arguments fail, showing Plaintiff is likely to prevail on the merits.

> ### i. The deluge system discharges are not authorized under the Texas MSGP.

Defendant's assertion that the MSGP authorizes discharge depends entirely on Section 6

(Non-Stormwater Discharges), which provides, in relevant part:

> Industrial facilities that qualify for coverage under this general permit may discharge the following non-stormwater discharges through outfalls identified in the SWP3, according to the requirements of this general permit:
>
> (a) discharges from emergency firefighting activities;
> . . .
> (c) potable water sources (excluding discharges of hyperchlorinated water, unless the water is first dechlorinated and discharges are not expected to adversely affect aquatic life);
> . . .
> (i) uncontaminated water used for dust suppression.[2]

> ### 1. The deluge system "push out", "sheet flow", and "overspray" bypasses approved outfalls under the MSGP.

Regardless of whether "most" of the deluge water falls within one of the categories of non-

stormwater discharges allowed under the MSGP (it does not), the Court need not reach this

question, because it is undisputed that at least *some* quantity of deluge water is discharged over or

around the stormwater controls and approved outfalls identified in the Stormwater Pollution

Prevention Plan ("SWPPP," or "SWP3"), and directly into waters of the U.S. as defined by the

Clean Water Act.

Defendant describes Outfalls 003, 004, 005, 010, and 011 as the pertinent outfalls for its

non-stormwater discharge identified in its SWPPP.[3] But in documents on file with FAA, the deluge

system is described as having a "deluge impact area" of a 0.6-mile radius from the launch pad.[4]

---

[2] Def. Ex. A to Groom Decl. at 84 (internal 83).
[3] Doc. 14, Defendant's Response (hereinafter "Def. Resp.") at 17.
[4] Pl. Ex. 1 at 10 (2022 WR at 9 (internal)) attached to Plaintiff's Motion.

Likewise, in its pending application to TCEQ for an individual TPDES permit, Defendant includes a "deluge system dispersal limit" that will deposit deluge water over the retention basins and into the tidal wetlands directly.[5] The map below is taken from the application.



[5] An excerpt from Defendant's individual TPDES application submitted to TCEQ, specifically, the Site Map showing the deluge water dispersal limit, is attached as Ex. 7.

4

Defendant's Response also admits that "water not evaporated or captured by containment basins is dispersed 20-30' of the launch pad on SpaceX's property."[6] The fact that it is SpaceX property is irrelevant, because the area immediately bordering the Starbase facility are tidal wetlands, which are "navigable waters" as defined under the CWA. *See* 33 U.S.C. § 1362(7).[7] According to Defendant's estimates, this direct "push out," "sheet flow," and "overspray" of discharge could constitute as much as 71,000 gallons per event.[8] In short, the push out, sheet flow, and overspray that bypasses the retention basins—which is occurring when the deluge operates "as designed"[9]—is not authorized under the MSGP.

### 2.  The deluge discharge is not for emergency firefighting activities, uncontaminated dust suppression, or potable water sources under the MSGP.

The discharge from the deluge system is also not authorized under the MSGP as any of the allowable non-stormwater discharges. SpaceX's arguments to the contrary are not persuasive.

Federal courts have held that NPDES permits are treated like any other contract. If the language of the permit is plain and capable of legal construction, the language alone must determine the permit's meaning. *Piney Run Pres. Ass'n v. Cnty. Com'rs of Carroll Cnty., MD*, 268 F.3d 255, 270 (4th Cir. 2001); *Contango Operators, Inc. v. United States*, No. CV H-11-0532, 2011 WL 13130834, at *6 (S.D. Tex. Oct. 26, 2011) (following *Piney Run* in determining the meaning of permit clause is plain and capable of legal construction). Where the language is

---

[6] Doc. 14, Def. Resp. at 13.

[7] The wetlands are adjacent to and have a continuous surface connection to the Rio Grande River, which is a traditionally navigable water within the meaning 33 U.S.C. § 1362 and 40 C.F.R. § 122.2. *See also* Pl. Ex. 3-D at 7 (EPA CAFO at 3).

[8] Pl. Ex. 1 at 22 (internal) attached to Plaintiff's Motion.

[9] Doc. 14, Def. Resp. at 8 ("On all occasions, the deluge system operated as designed. Each deployment of the system used approximately 180,000 gallons of potable water. . . . *Most* of this water was vaporized by the engines or contained in the on-site containment features.") (emphasis added). "Most" is not "all."

ambiguous, however, a general permit will be interpreted as a regulation. *Puget Soundkeeper All. v. Pollution Control Hearings Bd.*, 30 Wash. App. 2d 360, 379, 545 P.3d 333, 344 (2024), review denied sub nom. *Puget Soundkeeper All. v. Pollution Control Hearings*, 554 P.3d 1222 (Wash. 2024) (general NPDES permits are interpreted as a regulation because they are issued according to an administrative rulemaking process).

Here, the language in Sections 6(a), (c), and (i) is plain and capable of legal construction. Section 6(a) allows "discharges from emergency firefighting activities," not regular fire prevention activities. See *Nat. Res. Def. Council, Inc. v. Cnty. of Los Angeles*, 725 F.3d 1194, 1206 (9th Cir. 2013) (A court must give effect to every word or term in an NPDES permit and reject none as meaningless or surplusage). "Emergency" is defined as "an unforeseen combination of circumstances or the resulting state that calls for immediate action."[10] Therefore, predictable discharges from each and every use of the deluge system are not, by definition, an "emergency," they are the norm. Said another way, firefighting activities cannot constitute emergency firefighting activities when they are routine and regular. The remainder of the Section 6 list is consistent with Plaintiff's definition for emergency firefighting activities, because other non-stormwater discharges are described in the context of "routine" activities.[11] Had TCEQ intended to include "all fire prevention" activities in Section 6, it could have simply said so, or otherwise used the word "routine" instead of "emergency." It did not.

The deluge water is also not an allowable "potable water source" or "uncontaminated water" used for dust suppression. Defendant bases this contention on the false assumption that just because the water that is stored in the deluge system tanks and pipes prior to discharge <u>comes from</u>

---

[10]     *Emergency*,     Merriam-Webster.com,     https://www.merriam-webster.com/dictionary/emergency (last visited Oct. 24, 2024).

[11] *See* Def. Ex. A to Groom Decl. at 84 (internal 83).

a potable source, the deluge system <u>itself</u> <u>amounts to</u> a potable water source and does not contaminate the water. Defendant's contention is based on the false belief that the deluge system does not add chemicals or substances to deluge water at any point.[12] These assumptions cannot be reconciled with Defendant's own data, in which levels of pollutants, such as aluminum, copper, iron, manganese, zinc (i.e., ablated metals expected from the heat and force of rocket engines)[13] are elevated in samples following the test event as compared to the potable water source.[14]

For all these reasons, the deluge system discharges are not authorized by the MSGP.

### ii. The TCEQ and EPA enforcement proceedings do not foreclose Plaintiff's citizen suit, because they cannot authorize a discharge in lieu of a TPDES permit.

Neither the EPA nor the TCEQ enforcement proceedings have, to date, resulted in a final individual TPDES permit for the deluge system, which is the only mechanism under the Clean Water Act that may lawfully authorize the discharges from the deluge system. *See* 33 U.S.C. § 1311(a) (the discharge of any pollutant by any person shall be unlawful, except as authorized by the Clean Water Act); *Cnty. of Maui, Hawaii v. Hawaii Wildlife Fund*, 590 U.S. 165, 169, (2020) ("The Clean Water Act forbids the 'addition' of any pollutant from a 'point source' to 'navigable waters' without the appropriate permit from the Environmental Protection Agency (EPA)"). And neither are the EPA's proposed CAFO or TCEQ's proposed AO final at this time.[15] Therefore, neither agency has already "addressed the use of the deluge system" or "authorized prior and

---

[12] Doc. 14, Def. Resp. at 7, 16.

[13] *See* Pl. Ex. 1 at 11 (2022 WR at 10, internal) (attached to Plaintiff's Motion) ("Ablation is the mechanical erosion of steel from the surface of the metal as a result of exposure to heat and force and is a common consequence from launch vehicle plumes on launch infrastructure (NASA 2015). The Starship/Super Heavy engine plume, when in contact with the steel divertor, could ablate up to 190 pounds of steel per launch.")

[14] Def. Ex. G to Groom Decl.

[15] Plaintiff discusses this more in their Motion, Doc. 5 at 13.

further use of the deluge system."[16] But regardless, nowhere does the EPA CAFO authorize further discharges from the deluge system. Defendant is relying entirely on one email it received from TCEQ's S. Schar and on TCEQ's *proposed* AO to boldly claim that it has authority to discharge from the deluge system without a TPDES permit.

Even assuming the proposed TCEQ AO would be lawful once final (it would not), an individual agency employee does not have authority to unilaterally approve an AO that—on its face—requires approval by the Commission. Either, S. Schar has acted outside of his official capacity in unilaterally authorizing an AO (or otherwise authorizing a discharge without a TPDES permit), or S. Schar has not authorized the AO or future discharge but has simply indicated that "TCEQ will consider SpaceX to be in compliance with the agreed order." This statement, assuming S. Schar has authority to make it, is akin to telling Defendant the agency will exercise its prosecutorial discretion and avoid future enforcement proceedings under certain conditions. See *BCCA Appeal Group, Inc. v. City of Houston*, 496 S.W.3d 1, 10 (Tex. 2016) (discussing that TCEQ has the discretion to determine whether a violation of a relevant state statute, TCEQ rules or order, or a TCEQ-issued permit warrants an administrative penalty).

While Save RGV would strongly oppose such a position, it is the only way to read S. Schar's message as both within his authority as an individual agency employee and also in harmony with the Clean Water Act. Because, not only does an individual employee not have the authority to unilaterally approve the AO, the individual also does not have the authority to unilaterally authorize a discharge without a permit. In fact, not even TCEQ can authorize a discharge without a permit (discussed below). And while TCEQ may reach an agreement with a violator to resolve an enforcement action, the violator may still be liable under a citizen's suit. See

---

[16] *See* Doc. 14, Def. Resp. at 19.

*United States v. Smithfield Foods, Inc.*, 191 F.3d 516, 526 (4th Cir. 1999) (finding one enforcement action did not bar another because the chosen enforcement methods were not achieving compliance); *Montgomery Envt'l Coal., Inc. v. U.S. EPA*, 1983 U.S. App. LEXIS 27509, n.6 (D.C. Cir. 1983) (not designated for publication) (explaining that a compliance order does not relieve a permittee from its legal obligation of complying with its NPDES permit and that the permittee may still be liable under a citizen's suit); *see also Waterkeeper All., Inc. v. U.S. E.P.A*, 399 F.3d 486, 498 (2d Cir. 2005) ("The Clean Water Act demands regulation in fact, not only in principle.").

In fact, this precise concern—that the TCEQ could circumvent the permitting process and administratively authorize a discharge without a NPDES permit—was raised in 1998 when Texas applied for the authority to administer the NPDES permitting program under its state program, the TPDES program. In response to public comments, EPA unequivocally stated that "TNRCC will not have the authority to issue permit-type discharge authorizations via emergency or temporary orders under the TPDES program."[17] 26 Fed. Reg. 51181.[18] EPA's approval of TCEQ's delegation specifically cited the restrictions of TCEQ's rule, 30 Tex. Admin. Code § 35.303, regarding temporary and emergency orders for discharges, stating this rule only provides authorizations for "bypasses" which meet the conditions of 40 C.F.R. § 122.41, and "[a]ny other use of emergency or temporary orders would be outside the scope of an approved program." TCEQ Rule 35.303 contains no less than eight findings that must be made before the TCEQ may issue an emergency or temporary order. 30 Tex. Admin. Code § 35.303(a); *see also* 40 C.F.R. § 122.41(m)(4) (defining a bypass as an intentional diversion of waste from a treatment facility and stating that a bypass is prohibited and subject to enforcement action unless certain conditions are met). None of the

---

[17] TNRCC was TCEQ's predecessor agency.
[18] Included for convenience as Ex. 8.

findings required by 30 TAC 35.303 or 40 C.F.R. § 122.41 for bypasses exist here. And importantly, TCEQ can not even consider them, because subsection 35.303(b) prohibits the use of emergency and temporary orders to discharge pollutants when the facility is not already permitted under a NPDES or TPDES permit. 30 Tex. Admin. Code § 35.303(b). In sum, because the deluge system does not already have a TPDES permit, it is not eligible for temporary or emergency authorizations; and even if it was eligible, the requisite findings have not been met.

### iii.   Plaintiff's suit is timely and not otherwise barred by the EPA or TCEQ enforcement actions.

Defendant attempts to conflate multiple issues to allege a diligent prosecution bar applies. Defendant first claims Plaintiff's second notice "changed the fundamental theory of its case," but can cite to no legal authority for why this type of change would bar Plaintiff's citizen suit.[19] Logically, the inverse would be true, since putting Defendant on notice of a "new" alleged violation could restart the clock before a citizen suit could be filed. *See* 33 U.S.C. § 1365(b)(1)(A) (a citizen suit requires 60 days' notice of the alleged violation).

Defendant next argues that EPA and TCEQ have already commenced actions to address the violations; however, the limitation in 33 U.S.C. § 1319(g)(6)(A) does not apply if notice was given *prior* to the government commencing action, and the citizen suit was filed before the 120th day after the notice was given. 33 U.S.C. § 1319(g)(6)(B); *Lockett v. E.P.A.*, 319 F.3d 678, 683 (5th Cir. 2003). Though the plaintiff in *Lockett* sent two notice letters and plaintiff filed suit within 120 days of the second notice, the second notice letter was sent *after* the state environmental agency had commenced its action. That is not the case here. Save RGV provided its second notice on July 19—which was before either EPA or TCEQ commenced an enforcement action. Defendant

---

[19] Doc. 14, Def. Resp. at 19-20.

admits elsewhere that TCEQ first sent its notice of violation on August 2, 2024.[20] There remains nothing to suggest EPA acted any sooner. Because Save RGV filed suit within 120 days of its second notice, the limitation in § 1319(g)(6)(A) does not bar Plaintiff's citizen suit.

To be perfectly clear, there exists a live case and controversy, because notwithstanding the enforcement actions of EPA and TCEQ, in which Defendant was told it needed an individual TPDES permit, and notwithstanding the fact that Defendant does not currently have an individual TPDES permit, Defendant discharged contaminated industrial wastewater into the tidal wetlands from its deluge as recently as October 13. Its violations remain ongoing and likely to continue. The S. Schar email and TCEQ's proposed AO do not authorize the wholly unpermitted discharge, and they certainly do not bar Plaintiff's citizen's suit.

### B.  Plaintiff will suffer irreparable injury absent a preliminary injunction.

#### i.  Plaintiff has not delayed in seeking the appropriate remedy.

Defendant argues, without the slightest bit of irony, that Save RGV lacks a show of diligence, when it is Defendant that constructed a deluge system first, repeatedly ignored government enforcement for nearly one year, and only filed a permit application after Save RGV sent a notice of intent to sue. Regardless, Save RGV has not delayed in seeking the proper remedy from this Court. Any perceived delay is explained by the nature of the statutory scheme under which Save RGV brings this suit and the circumstances surrounding the discharges in question. Courts in the Fifth Circuit have accepted delays of several months or more where plaintiffs are investigating claims in good faith, attempting to get information from the government, or are involved in a materially similar challenge. See *Optimus Steel, LLC v. U.S. Army Corps of Engineers*, 492 F. Supp. 3d 701, 719–20 (E.D. Tex. 2020) (finding no unreasonable delay where

---

[20] Doc. 14, Def. Resp. at 9, 17-18.

the claim was brought eleven months after the action and the request for the temporary injunction brought one month after negotiations ultimately failed) (citing *ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 698–99 (N.D. Tex. 2015); *Sierra Club*, 2020 WL 5096947, at *7.

The Clean Water Act is primarily the responsibility of our federal and state environmental agencies to enforce. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987) (citizen suits supplement rather than to supplant governmental action). Only if federal and state agencies decline or fail to act, may private citizens step into the shoes of private attorneys general and sue for unlawful discharges under the "citizen suit" provision. *Id*. Said another way, private citizens, including Save RGV, have a reasonable expectation that federal and state agencies will enforce the Clean Water Act and that a citizen suit is a means of last resort.

Defendant admits that it first launched with the deluge system in November 2023.[21] By this point, Save RGV was aware that multiple complaints had been filed with TCEQ and federal officials regarding the unpermitted deluge system.[22] On August 3, 2023, for example, Save RGV was reassured by TCEQ's Director of the Office of Water that "TCEQ are working with SpaceX representatives regarding activities that may require a permit or authorization."[23] Save RGV was also reassured that TCEQ was evaluating the use of the pressurized water system to "determine the applicability of TCEQ regulations for the use of this system."

In March 2024, Defendant performed another launch, activating the deluge system again, and Save RGV immediately learned that EPA had initiated an enforcement action on March 13, 2024. In an April 15, 2024 response letter to SpaceX, EPA articulated plainly: "The wastewater

---

[21] Doc. 14, Def. Resp. at 21.
[22] *See* Ex. 9, TCEQ Investigation Report (documenting 14 complaints about the SpaceX deluge system staring in August 2023).
[23] *See* Ex. 10 at 9 (Email to Save RGV from Cari-Michel La Caille, Director, TCEQ Office of Water)

from the deluge system is categorized as a type of industrial/process wastewater that is not covered under MSGP Stormwater Permit TXR050000. This industrial/process wastewater requires an individual permit for discharge authorization."[24] Though this should have put a stop to the unpermitted discharges, SpaceX announced plans for a June 2024 launch. It was upon learning that SpaceX intended to activate the deluge system in direct defiance of EPA's enforcement action and that the reassurances from TCEQ did not manifest into any meaningful enforcement action by the state, that Save RGV sent its first notice of intent to sue letter on June 4, 2024.

Though SpaceX submitted an application for an individual permit on July 1, 2024, it then informed Save RGV, in a letter dated July 3, 2024, that it was continuing to claim coverage of discharges from deluge system under the MSGP.[25] In response, Save RGV updated its notice letter to ensure SpaceX was clearly on notice that the discharges were not covered under the MSGP, which Save RGV sent on July 19, 2024. Shortly thereafter, Plaintiff learned that both TCEQ and EPA had initiated enforcement proceedings. Despite the proposed temporary authorization included with TCEQ's proposed AO (which Save RGV maintains would be unlawful, if approved), it remained pending before a final vote of the Commissioners. Rather than file suit immediately, Save RGV opted to submit comments to TCEQ and await a determination of the pending AO.[26] But on or about October 8, 2024, Save RGV learned that SpaceX was planning another launch for October 12 or 13, despite having no FAA launch license or individual TPDES permit for the deluge system. It was at that point that it became clear that neither EPA nor TCEQ's chosen enforcement methods were achieving compliance and Save RGV would need to file the citizen suit.

---

[24] Ex. 11 at 6 (April 15, 2024 Letter from EPA to SpaceX RE: Administrative Order Docket Number: CWA-06-2024-1746)
[25] Doc. 8-2, Def. Ex. 2.
[26] *See* Ex. 10.

Plaintiff has not unreasonably delayed in seeking the appropriate remedy; Plaintiff has been relying on reassurances and enforcement actions by TCEQ and EPA, and has been participating in these government-led actions regarding the same subject matter by filing complaints and comments.[27] It was not until it was clear that these enforcement actions would not prevent the continued unpermitted discharges, did Save RGV seek emergency relief. In addition, because these government investigations and enforcement actions have been ongoing, Defendant has not been surprised, and certainly not unfairly prejudiced by any perceived delay.

Furthermore, none of the cases that Defendant cites involve a citizen suit, or a similar statutory scheme in which 60-days' notice is required and the plaintiff's enforcement authority is supplementary to a government enforcer. Neither are they factually similar to the case at hand in any other way. The plaintiff in *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (per curiam), involved a plaintiff alleging improper gerrymandering of a map and a request for an injunction that was filed 3 years after the complaint was filed and 6 years after the map was adopted. The majority of the remaining cases involved trademark infringement and trade secrets, where the aggrieved party is the only one suffering harm and the only party who can take legal action.

In sum, given the circumstances, Plaintiff did not delay in seeking the appropriate relief. Any perceived delay is the product of the Clean Water Act's statutory scheme and the Plaintiff's pursuit for compliance through related actions led by government agencies.

### ii. *Defendant's own sampling data confirms irreparable harm will occur from the next deluge system discharge.*

Central to the very purpose of a preliminary injunction is avoiding irreparable harm. See *ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 694 (N.D. Tex. 2015). Federal courts

---

[27] This says nothing of Plaintiff's participation in other federal, state, and local proceedings and permitting related to the SpaceX Boca Chica site.

have long recognized that, when "the threatened harm is more than de minimis, it is not so much the magnitude but the irreparability that counts for purposes of a preliminary injunction." *Enter. Intern., Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985) (quoting *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 575 (5th Cir. 1974)). An injury is irreparable if it cannot be undone through monetary relief. *Id*. at 472–73.

Defendant provided sampling data with its response in an effort to show the Court it was complying with the MSGP's effluent limits; however, the sampling data actually provides further evidence that the next discharge from the deluge system will cause irreparable harm. Pursuant to the Executive Director's Statement of Basis (reflecting the technical review procedures applied to the pending SpaceX application), TCEQ staff's practice for determining potential for degradation of water quality by more than a *de minimis* amount is to compare the reported analytical data from the facility against percentages of the calculated daily average water quality-based effluent limitation.[28] "Permit limitations are required when analytical data reported in the application exceeds 85 percent of the calculated daily average water quality-based effluent limitation." TCEQ staff only considered the two sets of sampling results included with SpaceX's application (Tables 1 & 2 of the Pollutant Analysis Worksheet)[29]—nowhere near the 32 sampling results it has submitted to this Court with the Declaration of Katy Groom, Exhibit G.[30] Had TCEQ staff considered all of the sampling results pursuant to its stated procedures, the staff would have proposed additional limits.

For example, of the 32 samples, 22 exceeded the 85-percent threshold for zinc, and all of them—except one—exceeded the 85-percent threshold for copper. Interestingly, the one sample

---

[28] Ex. 12 at 3.
[29] Doc. 5-5, Pl. Ex. 3-B.
[30] Doc. 8-12, Def. Ex. G to Groom Decl.

that did not exceed the threshold for copper was one of the two included in the application. Not only is a permit limit required, but <u>the average concentration of copper in the sampling results is 10.57 µg/L, which far exceeds the 3.78 µg/L daily average and the 8.00 µg/L daily max effluent limitations calculated by TCEQ staff that would be necessary to protect aquatic life</u>.[31] The same is true for zinc. <u>The average concentration of zinc is 439.88 µg/L, which far exceeds the 89.5 µg/L daily average and the 189 µg/L daily max calculated by TCEQ staff that would be necessary to protect aquatic life</u>. In short, the data indicates the harm is more than *de minimis* and is imminent with the next use of the deluge system.

It is also worth pointing out that Defendant's Response states repeatedly that its discharge "complies with effluent limitations in the MSGP" (or some similar variation of this statement).[32] The above discussion regarding exceedances of *calculated* thresholds demonstrates that though the MSGP has annual monitoring and reporting requirements for some metals, it does not set the effluent limits based on site-specific conditions, nor does it necessarily regulate all pollutants of concerns, as is required of individual TPDES permits. Heat and hexavalent chromium are two pollutants that are known to be present in concerning levels in the deluge water discharge based on one set of results Defendant provided to TCEQ with its individual application (but not included in Exhibit XX), which showed a temperature of 38° C and hexavalent chromium concentration of 25.9 µg/L.[33]

It is also worth pointing out that Defendant's own sampling results are likely underreporting pollutants found in the discharge.  That is because if Defendant is only collecting samples at the identified outfalls of the retention basins, it is not conducting representative

---

[31] Ex. 12 at 9.
[32] Doc. 14, Def. Resp. at 4, 17.
[33] Doc. 5-5, Pl. Ex. 3-B.

sampling of the "diffuse point source".[34] Furthermore, the MSGP requires samples be taken within 30 minutes to one hour of discharge.[35] However, the SpaceX data is being collected as much as 6 hours after the discharges occurs. For example, samples on August 25, 2023 were collected at 18:30 (6:30 P.M.) but the test and activation of the deluge system took place around 12:38 P.M, nearly six hours earlier.[36] Similarly, the June 6, 2024 launch took place at 7:30 AM, but samples were not collected until 13:30 (1:30 P.M.), about six hours later. This means that the samples Defendant provided to TCEQ are not representatives of the deluge system discharge and are likely underreporting pollutants that would be present at the time of discharge.

### C. The balance of harms and the public interest favor a preliminary injunction.

Having already addressed Defendant's arguments that Plaintiff suffers only procedural harm, Plaintiff turns to the balance of Plaintiff's harms against the economic harms Defendant claims it would suffer should the injunction be granted. Defendant relies on two cases to argue that its economic harm outweighs the "unspecified and improbable" environmental harms here, but these cases are factually and procedurally distinct from the case at hand.[37]

In *Amoco*, the alleged environmental harm stemmed from the granting of oil and gas leases in violation of Alaska National Interest Lands Conservation Act ("ANILCA"), which generally provides certain protections for natural resources used for subsistence in Alaska. *Amoco Production Co. v. Village of Gambell, AK,* 480 U.S. 531, 534-35 (1987). Thus, the standard for determining environmental harm was very different from the one at hand, where the Clean Water Act prohibits lowering water quality to the degree aquatic life uses are impaired. Even still, the

---

[34] Doc. 8-7, Def. Ex. A to Groom Decl. at 127 (126 internal).
[35] *Id*. at 121 (120 internal).
[36] Ex. 13 (Sampling Reports from the complete Tech Package for SpaceX's application for TPDES Permit No. WQ0005462000: (available at : https://www.tceq.texas.gov/permitting/wastewater/pending-permits/tpdes-applications).
[37] Def. Resp. at 27.

leases only authorized "limited preliminary activity," including seismic activity and exploratory drilling, and having found this type of exploration stage activities had not significantly restricted subsistence uses in the past, the Court determined that "injury to subsistence resources from exploration was *not at all probable*." *Id*. at 545 (emphasis added). SpaceX's own data shows that it is discharging hazardous metals, heat, and other pollutants with every activation of the deluge system. The injury to Save RGV—the lowering of water quality to the point it is impairing aquatic life—is more than probable, it is *certain.* And not only is it certain to occur with the next discharge, it is also irreparable. U.S. Fish and Wildlife Service and Texas Parks and Wildlife Department have explained that the hazardous metals adhere to sediments in the discharge route and bioaccumulate in the environment,[38] meaning the pollutants persist. Thus, removal of such pollutants is not possible without severely damaging the ecosystem itself. With every use of the deluge system, more hazardous metals are added to the discharge route, where they will remain so the injury is compounding with each event.

This is also very unlike what happened in *Optimus Steel*, where the permitting entity responsible for issuing the Clean Water Act permit had already issued the NPDES permit being challenged, and thus, had concluded—through the course of permitting proceedings and not outside those proceedings—that the project would not violate the Clean Water Act. *Optimus Steel, LLC v. U.S. Army Corps of Engineers*, 492 F. Supp. 3d 701, 725 (E.D. Tex. 2020). Important to the court in denying the preliminary injunction in that case was that the harm alleged was from the construction of the pipeline alone and thus, not irreparable, and as a result of the permit being granted to defendant already, approximately 89% of the environmental impacts had already occurred cannot remedy. *Id.* at 725 (an injunction cannot remedy past harms). Finally, though the

---

[38] Ex. 14 at 3 (internal); Ex. 15 at 5 (internal).

court found that the private actor had expended resources, "including navigating the various state and federal environmental regulations the project implicates, as well as the construction itself," the Court was, again, referring back to the final Clean Water Act permit that was the subject of the challenge, on which the defendant relied *before* beginning construction. *Id.* at 727. Here, Defendant began construction before it had a permit; the potential lost revenue was a risk it knowingly incurred. With this as the backdrop and Plaintiff having demonstrated a strong likelihood of success on the merits, and imminent and irreversible harm should the unpermitted discharge occur, the foregoing also demonstrates that the preliminary injunction would serve the public interest.

### D.  Plaintiff respectfully requests an accelerated ruling.

Save RGV respectfully requests the court grant the motion for preliminary injunction expeditiously. It is not possible for plaintiff to predict the next anticipated discharge. However, Defendant currently has authority to conduct five launches (in its current configuration) per year. It has conducted three launches so far in the calendar year of 2024. It has also requested the authority to increase its launch frequency to 25 launches per year. This means that it is highly likely that SpaceX will conduct another one to two launches before the end of the year. Plaintiff is available for a hearing if that is the Court's preference, though because there is no genuine factual dispute on any relevant fact at issue, no hearing is required. *ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 683 (N.D. Tex. 2015) (the district court may rule on a motion for preliminary injunction without a hearing where no factual disputes are involved).

/ / /

19

### III.   CONCLUSION

For the reasons stated above, Plaintiff Save RGV respectfully requests that this Court issue a Preliminary Injunction enjoining Defendant from discharging wastewater from its deluge system until such time as Defendant receives its individual permit or this case can be adjudicated on the merits.

DATED: October 25, 2024.

Respectfully submitted,

*/s/ Lauren Ice*
Lauren Ice
Attorney-in-Charge
State Bar No. 24092560
S.D. Tex. Bar No. 3294105
lauren@txenvirolaw.com
Marisa Perales
*pro hac vice*
State Bar No. 24002750
marisa@txenvirolaw.com
**PERALES, ALLMON & ICE, P.C.**
1206 San Antonio St.
Austin, Texas 78701
Tel: (512) 469-6000
Fax: (512) 482-9346

*Counsel for Save RGV*

## **CERTIFICATE OF SERVICE**

I certify that on October 25, 2024, a true and accurate copy of the foregoing document was filed electronically via CM/ECF, which automatically provides notice of filing to the counsel of record.

*/s/ Lauren Ice*
Lauren Ice