**51164**      **Federal Register** / Vol. 63, No. 185 / Thursday, September 24, 1998 / Notices

## ENVIRONMENTAL PROTECTION AGENCY

[FRL–6166–3]

**State Program Requirements; Approval of Application to Administer the National Pollutant Discharge Elimination System (NPDES) Program; Texas**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Approval of the Texas Pollutant Discharge Elimination System (TPDES) under the Clean Water Act.

**SUMMARY:** On September 14, 1998, the Regional Administrator for the Environmental Protection Agency (EPA), Region 6, approved the application by the State of Texas to administer and enforce the National Pollutant Discharge Elimination System (NPDES) program for regulating discharges of pollutants into waters of the State. The authority to approve State programs is provided to EPA in Section 402(b) of the Clean Water Act (CWA). The approved state program, i.e., the Texas Pollutant Discharge Elimination System (TPDES) program, is a partial program to the extent described in this Notice (see section titled ''Scope of the TPDES Program''). The TPDES program will be administered by the Texas Natural Resource Conservation Commission (TNRCC). In making its decision, EPA has considered all comments and issues raised during the public comment periods. Summaries of the comments and EPA responses are contained in this notice. The comments and public hearing record are contained in the administrative record supporting this notice.

**EFFECTIVE DATE:** Pursuant to 40 CFR 123.61(c), the TPDES program authorization was approved and became effective on September 14, 1998.

**ADDRESSES FOR VIEWING/OBTAINING COPIES OF DOCUMENTS:** The Administrative Record (Docket 6WQ–98–1) and copies of the final program documents for the TPDES program are available to the public during normal business hours, Monday through Friday, excluding holidays, at EPA Region 6's 12th Floor Library, 1445 Ross Avenue, Dallas, Texas 75202. A copy is also available for inspection from 8:00 a.m. to 5:00 p.m., Monday through Friday, excluding state holidays, at Record Services, Room 1301, Building F, TNRCC, 12100 Park 35 Circle, Austin, Texas 78753. You may contact Records Services at (512) 239–0966.

Copies of the principal TPDES program documents (MOA, Program Description, and Statement of Legal Authority) are accessible on the Internet through the EPA Region 6 Water Quality Protection Division's web page *http://www.epa.gov/earth1r6/6wq/6wq.htm* and the TNRCC web page *http://www.tnrcc.state.tx.us.*

**FOR FURTHER INFORMATION CONTACT:** TNRCC expects to have a toll-free number for people to call with questions regarding the TPDES program operational by September 21, 1998. The TNRCC number is 1–888–479–7337.

**SUPPLEMENTARY INFORMATION:** Section 402 of the CWA created the NPDES program under which EPA may issue permits for the point source discharge of pollutants to waters of the United States under conditions required by the Act. Section 402(b) requires EPA to authorize a State to administer an equivalent state program, upon the Governor's request, provided the State has appropriate legal authority and a program sufficient to meet the Act's requirements.

On February 5, 1998, the Governor of Texas requested NPDES major category partial permit program approval[1] for those discharges under the authority of the TNRCC. Supplements to the State application were received by EPA Region 6 on February 12, March 16, April 15, and May 4, 1998. EPA Region 6 determined that Texas' February 5, 1998, approval request, supplemented by this additional information, constituted a complete package under 40 CFR 123.21, and a letter of completeness was sent to the Chairman of the TNRCC on May 7, 1998. EPA then proceeded to consider the approvability of the complete program application package.

The documents were described in the **Federal Register** Notice of June 19, 1998, (63 FR 33655) in which EPA requested comments and gave notice of public hearing. Further notice was also provided by way of notices published in the following nineteen newspapers on various dates from June 21–26, 1998: Tyler Morning Telegraph; Austin American Statesman; El Paso Times;

Lubbock Avalanche Journal; Forth Worth Star Telegram; Odessa American; San Antonio Express; Wichita Falls Record-News; Abilene Reporter News; 10 San Angelo Standard-Times; Dallas Morning News; Amarillo News; Beaumont Enterprise; Houston Chronicle; Corpus Christi Caller-Times; Daily Sentinel (Nacogdoches); Brownsville Herald; Laredo Morning Times; and Longview News Journal.

As a part of the public participation process, both a public meeting and hearing were held in Austin, Texas, on July 27, 1998. The public meeting provided as an informal question and answer session, and began at 1:00 p.m. The hearing started at 7:00 p.m. Oral comments were recorded during the hearing and are contained in the administrative record supporting this action. Comments were accepted by EPA on all aspects of the TPDES program authorization through the close of the public comment period, which was extended by the Hearing Officer to August 10, 1998. EPA also accepted comment through August 24, 1998 on some more detailed clarifying information on resources for the TPDES program, provided in TNRCC's comments submitted at the July 27, 1998, public hearing. All comments presented during the public comment process, either at the hearing or in writing, were considered by EPA in its decision. EPA's responses to the issues raised during the comment period are contained in the Responsiveness Summary provided in this notice. A copy of EPA's decision and its Responsiveness Summary has been sent to all commenters and interested parties (those persons requesting to be on the mailing list for EPA actions in Texas).

The Regional 6 Administrator notified the State of the program approval decision by letter dated September 14, 1998. Notice of EPA's final decision is being published in the newspapers in which the public notice of the proposed program appeared (listed above). As of September 14, 1998, EPA suspended issuance of NPDES permits in Texas (except for those permits which EPA retained jurisdiction as specified below in the section titled ''Scope of the TPDES Program'').[2]

---

[1] Major category partial permit program approval is provided for under Section 402(n)(3) of the CWA. Pursuant to that section, EPA may approve a partial permit program covering a major category of discharges if the program represents a complete permit program and covers all of the discharges under the jurisdiction of the agency seeking approval, and if EPA determines the program represents a significant and identifiable part of the State program required by Section 402(b) of the Act. As discussed below under ''Scope of the Partial Program,'' TNRCC seeks permitting authority for all facilities that have discharges within its jurisdiction. However, TNRCC does not have jurisdiction over all discharges within the State of Texas. A small portion of the State's discharges fall under the jurisdiction of the Texas Railroad Commission.

[2] Had EPA been unable to meet the statutory deadline for action on the pending NPDES program authorization request (September 14, as extended by the TNRCC), then EPA would have had to suspend the issuance of NPDES permits on that date (other than for those activities retained by EPA via our Memorandum of Agreement). However, failure to meet the deadline would not have meant that the TNRCC automatically gained NPDES authority. It is EPA's interpretation that a State agency would not gain NPDES authority unless and

## Scope, Transfer of NPDES Authority, and Summary of the TPDES Permitting Program

### A. Scope of the Partial Program

The TPDES program is a partial program which conforms to the requirements of Section 402(n)(3) of the CWA. The TPDES program applies to all discharges covered by the authority of the TNRCC. This includes most discharges of pollutants subject to the federal NPDES program (e.g., municipal wastewater and storm water point source discharges, pretreatment, most industrial wastewater and storm water point source discharges, and point source discharges from federal facilities), including the disposal of sewage sludge (in accordance with Section 405 of the Act and 40 CFR Part 503).

The TNRCC has the authority to regulate discharges from industrial facilities covered by all Standard Industrial Classification (SIC) codes except for those facilities classified as 1311, 1321, 1381, 1382, 1389, 4922, and 4925, which are regulated by the Texas Railroad Commission. Some activities at facilities within these SIC codes are regulated by the TNRCC, and a list of the ten facilities currently affected is included in Appendix 2–A of the TPDES application. EPA retains NPDES permitting authority and primary responsibility for enforcement over all discharges not under the jurisdiction of TNRCC and therefore not subject to the TPDES program, including those within the jurisdiction of the Texas Railroad Commission. The TNRCC has authority to regulate discharges of storm water associated with industrial activity and discharges of storm water from municipal separate storm sewer systems, except at facilities regulated by the Texas Railroad Commission (see above). The TNRCC has primary responsibility for implementing a Pretreatment Program and a Sewage Sludge Program. The TNRCC has authority to regulate discharges from publicly owned and privately owned treatment works and for discharges from concentrated animal feeding operations (CAFOs) within the TNRCC's jurisdiction.

EPA retains permitting authority and primary enforcement responsibility over discharges from any CAFOs not subject to TNRCC jurisdiction. EPA and TNRCC are currently unaware of any CAFOs that are not under the jurisdiction of TNRCC. However, there is the potential that certain CAFOs that began using

playas as waste treatment units before July 10, 1991, could claim exemption from State water quality standards in limited circumstances—effectively removing them from the jurisdiction of the TPDES program. This issue is discussed in detail in the response to comments sections of today's notice. EPA is simply taking this opportunity to inform the public that the Agency will retain NPDES jurisdiction over any such CAFO that falls outside of TNRCC's jurisdiction under the TPDES program.

TNRCC does not have, and did not seek, the authority to regulate discharges in Indian Country (as defined in 18 U.S.C. 1151). EPA retains NPDES permitting authority and primary enforcement responsibility over Indian Country in Texas.

### B. Transfer of NPDES Authority and Pending Actions

Authority for all NPDES permitting activities, as well as primary responsibility for NPDES enforcement activities, within the scope of TNRCC's jurisdiction, have been transferred to the State, with some exceptions. EPA and the State agreed to these exceptions in the MOA signed September 14, 1998. In addition to the exceptions listed below, EPA retains, on a permanent basis, its authority under Section 402(d) of the CWA to object to TPDES permits proposed by TNRCC, and if the objections are not resolved, to issue federal NPDES permits for those discharges. EPA also retains, on a permanent basis, its authority under Sections 402(I) and 309 of the CWA to file federal enforcement actions in those instances in which it determines the State has not taken timely or appropriate enforcement action.

#### 1. Permits Already Issued by EPA

40 CFR 123.1(d)(1) provides that EPA retains jurisdiction[3] over any permit that it has issued unless the State and EPA have reached agreement in the MOA for the state to assume responsibility for that permit. The MOA between EPA and the TNRCC provides that the TNRCC assumes, at the time of program approval, permitting authority and primary enforcement responsibility over all NPDES permits issued by EPA

prior to program approval, with the following exceptions:

a. Jurisdiction over those discharges covered by permits already issued by EPA, but for which variances or evidentiary hearings have been requested prior to TPDES program approval. Jurisdiction over these discharges, including primary enforcement responsibility (except as provided by paragraph 3 below—Facilities with Outstanding Compliance Issues), will be transferred to the State once the variance or evidentiary hearing request has been resolved and a final effective permit has been issued.

b. Jurisdiction over all existing discharges of storm water associated with industrial or construction activity [40 CFR 122.26(b)(14)], including allowable non-storm water, authorized to discharge as of the date of program approval under one of the NPDES storm water general permits issued by EPA prior to approval of the TPDES program. The storm water general permits affected are: Construction storm water general permit (63 FR 36490), NPDES permit numbers TXR10*###; Baseline non-construction storm water general permit (57 FR 41297), NPDES permit numbers TXR00*###; and Multi-sector storm water general permit (60 FR 51108, as modified)[4], NPDES permit numbers TXR05*###. (For an individual facility's permit number, the * is a letter and the #'s are numbers, e.g., TXR00Z999). Jurisdiction over these storm water discharges, including primary enforcement responsibility (except as provided by paragraph 3 below—Facilities with Outstanding Compliance Issues), will be transferred to TNRCC at the earlier of the time the EPA-issued general permit expires or TNRCC issues a replacement TPDES permit, whether general or individual.

c. Jurisdiction over new discharges of storm water associated with industrial or construction activity, including allowable non-storm water, eligible for coverage under one of the NPDES storm water general permits issued by EPA prior to TPDES approval and listed above. Facilities eligible for but not currently covered by one of these

---

[3] 40 CFR 123.1(d)(1) uses the term "jurisdiction" to describe the fact that EPA may retain administration over any permits issued by EPA, and for that reason, the term "jurisdiction" is used in this section. However, use of this term does not mean that EPA retains permit issuance authority for new permits, or that TNRCC does not have authority to issue TPDES permits for discharges covered by the permits over which EPA retains administration.

[4] The Multi-sector general permit was modified on August 7, 1998, to clarify permit coverage for storm water discharges covered under Sector G, Metal Mining. A further modification is currently awaiting publication in the **Federal Register** to expand the scope of coverage to all types of facilities previously covered under the 1992 baseline general permit. However, because permit modification does not trigger the transfer of permit jurisdiction under this section, the Multi-sector storm water general permit will remain under EPA's jurisdiction until it expires or is replaced by a TNRCC permit regardless of whether it is modified prior to program approval.

general permits may continue to apply to EPA for coverage. Jurisdiction over these storm water discharges, including primary enforcement responsibility (except as provided by paragraph 3 below—Facilities with Outstanding Compliance Issues), will transfer to TNRCC at the earlier of the time the EPA-issued general permit expires or TNRCC issues a replacement TPDES permit, whether general or individual.

Except as provided in paragraphs 2 and 3 below, EPA does not retain, even on a temporary basis, jurisdiction over discharges from individual storm water permits; storm water outfalls in waste water permits; and storm water discharges designated by the State in accordance with 40 CFR 122.26(a)(1)(v). The state has jurisdiction and permitting authority, including primary enforcement responsibility, over these discharges.

d. Jurisdiction over all discharges covered by large and medium Municipal Separate Storm Sewer System (MS4) permits issued by EPA prior to TPDES program approval. Jurisdiction over EPA-issued MS4 permits, including primary enforcement responsibility (except as provided by paragraph 3 below—Facilities with Outstanding Compliance Issues), will transfer to TNRCC at the earlier of the time the EPA-issued permit expires or TNRCC issues a renewed, amended or replacement TPDES permit.

## 2. Permits Proposed for Public Comment but not yet Final

EPA temporarily retains NPDES permitting authority, (except as provided by paragraph 3 below— Facilities with Outstanding Compliance Issues), over all general or individual NPDES permits that have been proposed for public comment by EPA but have not been issued as final at the time of program approval. Although Section 402(c)(1) of the Act establishes a 90-day deadline for EPA approval or disapproval of a proposed state program and, if the program is approved, for the transfer of permit issuing authority over those discharges subject to the program from EPA to the state, this provision was intended to benefit states seeking NPDES program approval. As a result, and in the interest of an orderly and smooth transition from federal to state regulation, the time frame for transfer of permitting authority may be extended by agreement of EPA and the state. See, for example, 40 CFR 123.21(d), which allows a state and EPA to extend by agreement the period of time allotted for formal EPA review of a proposed state program. In order to render programmatic transition more efficient

and less confusing for permit applicants and the public, the State of Texas and EPA entered into an MOA that extends the time frame for transfer of permit issuing authority over those permits that EPA has already proposed for public comment, but which are not yet final at the time of program approval. Permitting authority and primary enforcement responsibility will be transferred to the State as the permits are finalized.

## 3. Facilities with Outstanding Compliance Issues

EPA will temporarily retain primary NPDES enforcement responsibility for those facilities which have any outstanding compliance issues. EPA will retain jurisdiction of these facilities until resolution of these issues is accomplished in cooperation with the State. Files retained by EPA for the reasons given above will be transferred to the state as the actions are finalized. Facilities will be notified of this retained jurisdiction and again when the file is transferred to the State. Permitting authority over these facilities will transfer to the State at the time of program approval.

A list of existing Permittees that will temporarily remain under EPA permitting jurisdiction/authority is included as part of the public record and available for review. Texas will continue to provide state-only permits for those dischargers over which EPA temporarily retains permitting authority, and which need state authorization to discharge.

No changes were made to the proposed TPDES program documents based on information obtained in the public comments received. However, TNRCC did provide some updates to its Continuing Planing Process (CPP) prior to its approval on September 10, 1998. More information on the CPP and these updates are found in comments and responses in the Responsiveness Summary section of today's notice.

## Responsiveness Summary

EPA received a large number of comments on this authorization request. Many comments expressed the concern that the TNRCC may not be able to implement the program as described in their application package (e.g., due to possible future resource constraints). While EPA appreciates the concerns expressed in these comments, conjecture on future actions is not a basis for program disapproval. Texas has made a solid commitment to this program and has demonstrated that it meets minimum EPA requirements. TNRCC is not required to show that its

TPDES program will exceed Federal requirements. Because the federal requirements are geared to ensure continuous environmental improvement, this ensures continues water quality improvement under the TPDES program. As part of its oversight role (including quarterly program reviews), EPA will review the implementation of the TPDES program to ensure that the program is fully and properly administered

The following is a summary of the issues raised by persons commenting on TNRCC's application for authorization of the TPDES program and EPA's responses to those issues. Due to the interconnected nature of many issues EPA received comment on, a degree of repetitiveness was unavoidable in the responses to comments. In an attempt to minimize redundancy, while still allowing those interested in a particular aspect of an issue to find an answer to their question, the responsiveness summary was structured by subject area. This resulted in related aspects of several issues being addressed in more than one subject area. Unless otherwise noted, all references to "MOA," "statement of legal authority," "program description," and "chapter [1–8]" refer to the corresponding documents in the TPDES program submittal by TNRCC. Likewise, "TPDES application" or "application" refers to the TPDES program submittal as a whole. Unless otherwise indicated, "the **Federal Register** notice" when used without reference to a specific date or citation refers to the June 19, 1998, notice of Texas's application for NPDES authorization (63 FR 33655–33665).

## Overall Support/Opposition Comments

### 1. Issue: General Statements of Support or Opposition

Many industries, trade groups, and regulated entities in the State of Texas expressed strong support for approval of the TNRCC application to administer the NPDES program in Texas. Most of these letters of support looked forward to the opportunity to reduce the additional confusion, time and expense of dealing with two regulatory agencies with largely duplicative permitting systems. Several citizens and public interest groups sent in strong letters of opposition, requesting EPA disapprove TNRCC's application. Many of these citizens and organizations believe the checks and balances of two permitting programs afford the State's ecosystems and waters, and its citizens, a greater level of protection than one system run by the State. Many of the letters EPA received were form letters from citizens

opposing the authorization of the TPDES program and highlighting two major concerns: (1) adequacy of TNRCC's resources and commitment to implement and enforce the program, and (2) concerns about public participation under the Texas-run program. Several comments, both for and against, related their information and issues directly to EPA's specific request in the **Federal Register** for public input on ten aspects of the proposed TPDES program (63 FR 33662).

*Response:* EPA agrees with the regulated public that a single regulatory agency eliminates duplicative efforts by both the regulated public and the governmental agencies trying to provide protection for our natural resources. It was clearly Congress' intent that states have every opportunity to directly administer the NPDES program and that EPA's main role would be providing national consistency and guidelines in an oversight role. EPA was only intended to run the NPDES program until states could develop programs adequate to protect the waters of the U.S. To this end, EPA had never been fully funded to do all the jobs required for full direct implementation of the NPDES program. This is the responsibility of State-run programs, and provides incentives for states to take over the program. States that wish to directly ensure protection of its State resources, and equitable treatment of its regulated public will take over the responsibilities of the NPDES program as Texas has applied to do. EPA does understand the concern citizens may have about State agencies replacing the federal presence. Some citizens are concerned that states are more easily influenced by political pressures. Some enjoy the double opportunity to separately participate in the regulatory process at both the State and Federal level to ensure protection of the natural resources important to their health, livelihood, and recreation.

EPA believes that the program outlined by the State of Texas will provide protection of these resources. EPA intends to work closely with the State in an oversight role to ensure the described program is implemented in accordance with the requirements of the CWA. EPA's continued authority to review and approve water quality standards, the Continuing Planning Process (CPP), and Water Quality Management Plans, oversee State-issued permits (and object if necessary), directly inspect dischargers, and over-file State enforcement actions affords the same level of CWA protection to the surface waters in Texas as if there were

still separate State and EPA permits. EPA appreciates all of the input it received on the ten areas it specifically requested comments on in the **Federal Register** Notice. The comments below summarize all of the issues, information, and concerns which EPA received during the comment period; they include those on these ten specific topics and others of concern to the public.

In addition, EPA has reviewed comments that were submitted during the process of reviewing the TPDES program for completeness. Although these were sent prior to the official comment period, EPA has reviewed the issues and information in those letters, and incorporated all relevant issues in this response to comments. EPA has done this to ensure the public is provided with all the information germane to EPA's decision. This responsiveness summary serves as EPA's response to comments on the authorization of the TPDES program.

**Issues on Which EPA Specifically Requested Public Input**

*Public Participation*

2. Issue: Limits on Use of Federal Citizen Suits

One comment argued that provisions in Texas law would limit the ability of the public and local governments to use the citizen suit provisions of the Clean Water Act. Suggested first is that TNRCC's provisions for temporary orders or emergency orders could be used to authorize what would otherwise be a violation, in effect immunizing a violator from a citizen suit for the violation. The comment asserts that orders issued in the past under Chapter 7 of the Texas Water Code "often" authorized discharges of partially-treated or untreated wastewater or wastewater with constituent concentrations in excess of permit standards.

*Response:* Texas SB 1876 consolidated various statutory provisions governing emergency and temporary orders under new TWC Chapter 5, Subchapter L. Although some categories of orders might have been used in the past regarding pre-TPDES permits to provide exemptions under State law, Chapter 5 contains specific provisions making this authority inapplicable to provisions approved under the federal NPDES program. TWC § 5.509. (See also 30 TAC 35.303). Accordingly, the situations under which TNRCC will be able to use Chapter 5 emergency orders and temporary orders under the TPDES program (see 23 TX Reg 6907) will not result in

"authorizations" pursuant to new or modified permits, nor provide a shield to citizen suits. See also specific comment on emergency orders and temporary orders. EPA will also be provided a copy of draft emergency and temporary orders for review and approval in accordance with MOA section IV.C.6.&7. The temporary and emergency orders also provide for public notice, public comment, and the ability of affected parties to request a public hearing. EPA does not agree with the comment's claim that this authority could be used to "immunize" violators.

3. Issue: Defenses Under TWC 7.251 Limit Use of Citizen Suits

One comment maintained that the defense under Section 7.251 of the Texas Water Code limits the use of the federal citizen suit provisions. The comment argues that federal law, unlike Texas law, does not provide excuses from violations and requires the operator to be prepared for reasonable worst case conditions. See also comments on strict liability.

*Response:* TWC § 7.251 provides only a narrow defense for innocent parties. As interpreted by the Texas Attorney General, TWC § 7.251 in effect requires the operator to be prepared for reasonable worst case conditions, because it does not excuse violations that could have been avoided by the exercise of due care, foresight, or proper planning, maintenance or operation. In addition, the provision does not shield a party from liability if that party's action or inaction contributed to the violation. There is a violation where a permittee allows a discharge to continue, in cases where the permittee could have taken steps to stop the discharge from continuing, but failed to do so. There appears to be no reason why the existence of the narrow defense in this law would impair citizens' right to bring suit.

Moreover, CWA § 505(a)(1) allows citizens to bring suit against any person alleged to be in violation of an effluent standard or limitation. As discussed in the **Federal Register** notice, EPA and the courts have interpreted the CWA as a strict liability statute. The defenses outlined in TWC § 7.251 are not recognized in the federal law. Accordingly, EPA does not believe that the authority in CWA § 505(a)(1) would be affected by TWC § 7.251.

4. Issue: Potential for Use of Penalties Not Recovering Economic Benefit to Block Citizen Suits

One comment suggests that Texas law does not require TNRCC to consider economic benefit in determining the

amount of a penalty. Therefore, the comment concludes, TNRCC can bring and has brought civil enforcement actions that seek less than the economic benefit and can thereby block civil enforcement actions brought by citizens or EPA.

*Response:* On page 2 of its July 27, 1998, comments, TNRCC states that the TNRCC statutory and regulatory authority as interpreted in its policy for penalties (included in its TPDES application as Appendix 6) ''does consider and account for all the factors required by state and federal law, including the economic benefit gained through noncompliance.'' TNRCC also asserts that, although the TNRCC does not use the same method of penalty calculation as EPA, under its policy, the actual penalties assessed will be appropriate, will not be generally or consistently less than those assessed by EPA, and will be consistent with federal law. EPA believes that the TNRCC's penalty authority does not prevent the program from satisfying the requirement in 402(b) of the Act and 40 CFR 123.27 that States have enforcement authority, including civil and criminal penalties, adequate to abate violations of a permit or the permit program.

As noted in the **Federal Register** notice (63 FR at 33664), Texas is not required to follow EPA's penalty policy. The comment did not argue that the statutory and regulatory requirements for approval require that TNRCC's statutory and regulatory procedures for assessing penalties be identical to EPA's. Accordingly, the comment has not provided any specific reasons why the TNRCC's authority imposes an inappropriate limitation on citizen access to CWA § 505.

The same response also applies to the extent that the comment is arguing that TNRCC's statutory and regulatory penalty authority imposes an inappropriate limitation on EPA ability to bring an enforcement action. In addition, as noted in the **Federal Register** notice, EPA may over-file as necessary to assure that appropriate penalties are collected nationwide. EPA reserves the right to over-file if a state has taken enforcement action but assessed a penalty that EPA believes is too low, consistent with CWA §§ 309 and 402(i).

5. Issue: Texas Audit Privilege Act Limits Access to Audit Documents in Citizen Suit Proceedings

A comment maintained that the Texas Audit-Privilege Law could be used to block EPA or a citizen from getting an audit through discovery. More generally, the comment noted that there

is no case law holding that a more restrictive State evidentiary rule would apply in a federal action brought under the CWA.

*Response:* EPA does not agree that the Texas Audit-Privilege Law may apply to EPA enforcement actions or citizen suits that raise federal questions under the CWA in federal court. The law is an evidentiary rule that applies to administrative and judicial actions under State law. EPA believes that this rule would not apply in a federal action, brought by EPA or a citizen's group, and that under Federal Rule of Evidence 501, federal procedural requirements would be controlling. EPA's information-gathering authority under federal law, including CWA 308, is broad and allows the Agency to obtain information as required to carry out the objectives of the Act. There is nothing in section 308 or 309 of the Act that suggests a State evidentiary rule could be used to block EPA's use of this information.

There is no reason to think that if the issue came before a federal court, the court would apply a more restrictive State evidentiary rule rather than the federal rule. EPA believes it unlikely that the Texas Audit-Privilege Law will be held applicable in federal enforcement actions, and the mere ''possibility'' cited by the comment is therefore not a sufficient basis upon which to deny authorization of the Texas program. If in the future EPA were to receive an adverse decision on this issue, the Agency could consider its options at that time, including requesting Texas to revise its law.

6. Issue: Public Comment on Inspections

A comment expressed the concern that by deferring negotiation of the annual inspection plan, the public has no opportunity to comment, thereby ''deny[ing] Texas citizens due process of law.''

*Response:* EPA does not believe that the regulations define, with no flexibility, a precise number or type of inspections that must occur. Rather, as explained elsewhere, the regulations require States to show that they have ''procedures and ability'' to inspect all major discharges and all Class I sludge management facilities, where applicable. 40 CFR 123.26(e)(5). Thus, the regulations require a showing of capacity and a commitment to a level-of-effort for inspections, reserving discretion to the two sovereign governments to decide what number of inspections to undertake, and the identity of the facilities to be inspected. These judgments are matters of enforcement discretion, which are not

reviewable, and the exercise of which do not raise due process issues. (See *Heckler* v. *Chaney,* 470 U.S. 821, 832 (1985))

7. Issue: Overview of Public Participation Issues

EPA received comments from seven different individuals or groups, concerning the public participation aspects of the proposed Texas NPDES authorization. Four similar comments expressed the opinion that Texas had established regulations and procedures that provided extensive public participation and, in fact, provided more opportunity to participate than required by the federal rules. One comment stated that there were extensive deficiencies in the State's statutes and rules in a number of separate areas regarding public participation requirements. These included issues regarding State standing not being as broad as federal standing, inadequate rules and procedures governing notice and comment for permitting and enforcement actions, and the State's inability to provide adequate information in a timely manner when claimed confidential by a permittee. Two additional comments raised concerns about the State failing to adequately address complaints and respond to comments, and one was concerned about the adequacy of the Texas standing statute and regulations.

*Response:* Responses are provided in the sub-issues below.

8. Sub-issue on Public Participation: Inadequate Notice and Comment of Permitting Actions

Several comments expressed concern that Texas' requirements for public notice and comment of permitting actions were not adequate for program assumption.

*Response:* EPA believes that they are adequate. EPA has carefully reviewed, based on the issues raised by the comments, Texas' requirements for public notice and comment of permitting actions found at 30 TAC Chapters 55 and 80. These provisions were enacted to ensure that Texas could meet the requirements of 40 CFR 123.25. As several comments asserted, TNRCC has enacted several revisions to its notice and comment procedures and EPA has found that the Texas regulations in this area meet the requirements of 40 CFR 123.25. One comment stated that there were differences between EPA's rules and TNRCC' rules concerning notice and comment in this area but did not identity what those differences were, and EPA in its review of the matter

could not identify any such differences. One comment also noted that TNRCC had streamlined its public participation procedures so as to "get government off the back of industry," thereby eliminating public participation. Once again, there was no specific TNRCC rule or policy identified and no statement as to what specific authorization requirement of EPA's is not being met. Our review of Texas rules has not identified any such conflict and TNRCC's rules, as identified above, meet CWA requirements.

9. Sub-issue on Public Participation: TNRCC Consideration of Public Comments on Permitting Actions

Several comments expressed doubt that TNRCC will sincerely consider public comments on permitting actions.

*Response:* TNRCC is clearly required by § 55.25(c) to consider and, where appropriate, make changes to proposed permitting actions based on public comments. If an aggrieved party feels that TNRCC does not act appropriately, the party can often appeal the decision to the appropriate civil court (TWC § 5.351). In addition, EPA will be providing oversight of the Texas NPDES program, as it does every authorized program, to help ensure compliance with the authorization requirements.

10. Sub-issue on Public Participation: Adherence to Federal Requirements for Notice and Comment of Permitting Actions

One comment stated that Texas' program was deficient because the Texas program does not strictly adhere to all elements of EPA's policy or provisions of 40 CFR Part 25 involving public participation.

*Response:* EPA disagrees Texas is deficient in this area. Requirements on public participation for authorized programs are included in 40 CFR Part 123, State Program Requirements, including requirements for permitting, compliance evaluation and enforcement efforts. Neither the early 1981 EPA policy statement nor the full content of 40 CFR Part 25 cited in the comment constitute requirements for state programs.

11. Sub-issue on Public Participation: Opportunities for Public Participation in Enforcement Actions

One comment stated that Texas law does not provide the required opportunities for public participation in enforcement actions.

*Response:* EPA disagrees. Texas has elected, in accordance with 40 CFR 123.27, to provide for public participation in enforcement actions by providing assurances that it will (1) investigate and provide written responses to all citizen complaints, (2) not oppose permissive intervention, and (3) provide 30 days' notice and comment on any proposed settlement of an enforcement action. (See 40 CFR 123.27) TNRCC has procedures and/or enacted regulations to implement all of these requirements. (See 30 TAC 80.105, 109, and 254; see also Texas Water Code Ann. § 5.177 for complaint process)

12. Sub-issue on Public Participation: Definition of Settlement in Enforcement Actions

One comment stated that the above rules failed to define "settlement" and therefore were too vague to provide effective public participation.

*Response:* EPA does not find this to be a defect in the Texas program. First, it should be noted that the term "settlement" is not defined in EPA regulations. EPA also notes that both EPA and TNRCC regulations state that there will be notice and comment upon "settlement of enforcement actions." (See, 40 CFR 123.27(d)(2)(iii) and 30 TAC 80.254) EPA believes this provides a sufficient definition of the type of settlement covered (i.e., any agreement between parties resolving an agency enforcement action). Also, TNRCC stated in its preamble in adopting 30 TAC 80.254 that, while "settlement" was not defined in the regulations, it believed that settlement has a well known meaning and stated settlement means "the resolution of issues in controversy by agreement instead of adjudication." EPA does not find this definition to be at odds with the intent of its authorization criteria in this area. EPA does note that the comment did not state what kind of "settlement" of an enforcement action the TNRCC was failing to notice and comment, but it is clear the proper regulation is in place and TNRCC's interpretation of the rule is acceptable.

13. Sub-issue on Public Participation: Publication of Notices Only in the Texas Register

One comment noted that TNRCC's decision to publish notice and ask for comments on proposed settlements of enforcement actions in the "Texas Register only" does not provide effective notice.

*Response:* EPA believes that the use of the Texas Register provides adequate notice and meets the intent of the authorization criteria. While the comment does not explain reasons for this view that the Texas Register is not adequate, EPA finds notice in the Texas Register to be acceptable and, indeed,

EPA and the Department of Justice provide for notice of its civil judicial settlements in the **Federal Register**. Registers provide a place where all citizens may go to inform themselves of actions proposed by various governmental bodies. TNRCC's use of this system is appropriate and provides effective public participation by using this statewide method to inform its citizenry of its proposed settlements.

14. Sub-issue on Public Participation: Permissive Intervention in Enforcement Actions

Some comments stated that the permissive intervention provision in 80 TAC 109 was inadequate because the rule stated that intervention would not be allowed where it would unduly delay or prejudice the adjudication.

*Response:* EPA disagrees with this assertion. Rule 24(b) of the Federal Rules of Civil Procedure contains the very same language. In addition, EPA's own rules on intervention found at 40 CFR 22.11(c) contain the very same language. It is important for administrative law judges and officers to have the ability to protect the rights of all parties and ensure that cases are administrated appropriately. Contrary to the comment's assertion, undue delay or prejudice have well-defined meanings in the case law. EPA does not feel that the use of these two terms creates a public participation problem. EPA fully expects that the state administrative law officers will appropriately apply these standards.

15. Sub-issue on Public Participation: TNRCC Executive Director's Control Over Enforcement Petitions

A comment expressed concern about the provision in the Texas regulation that states only the Executive Director may amend or add to the violations alleged in the petition. See 80 TAC 115.

*Response:* EPA disagrees with the comment that this prevents effective and meaningful public participation. As seen above, permissive intervention may have certain justifiable restrictions. It would seem that TNRCC seeks to reserve its enforcement discretion in determining which violations it will pursue with its enforcement resources. In addition, an intervening party has full rights to present evidence, especially as to the appropriate penalty amount and, even more importantly, the appropriateness of any required compliance or corrective action that may be included in a settlement or order issued to bring the facility into full compliance with the regulations. In addition, CWA § 505 allows a citizen to bring suit in federal court with regard to

any violation of the approved state program which the state is diligently prosecuting. This ensures an effective process whereby violations not addressed by the state agency may be resolved.

16. Sub-issue on Public Participation: TNRCC Authority to Promulgate Regulations Affecting Public Participation in Enforcement Actions

Two comments also raised the issue that TNRCC did not have statutory authority to promulgate the regulations and that there were certain procedural defects in the promulgation of some of its regulations. There was a specific concern regarding the state regulation allowing permissive intervention in enforcement actions.

*Response:* TNRCC has broad authority under the Texas Water Code §§ 5.102, 5.103, and 5.112 and Chapter 26 to promulgate state rules to protect the waters of the State and to provide for public participation in carrying out this legislative purpose. Clearly it was TNRCC's intent, when it added the permissive intervention rule, to meet EPA's requirement for public participation in enforcement actions. The Texas Attorney General has issued an opinion stating that TNRCC has the authority to implement the federal NPDES program. Promulgations are entitled to a presumption of regularity and EPA accepts the state's assurances that they were valid. Further, these regulations have been fully promulgated and are currently effective, and, therefore, this could not be a basis on which to deny authorization. If the State is challenged in court on this matter and receives an adverse ruling striking down the permissive intervention regulation or any other state regulation required to maintain this federally authorized program, the State would be required to remedy any defect in order to maintain program authorization.

17. Sub-issue on Public Participation: Public's Right to Appeal Settlement of an Enforcement Action

A comment stated the State did not provide a right to appeal a settlement of an enforcement action subsequent to the notice and comment period.

*Response:* EPA does not believe this raises an authorization problem. 40 CFR 123.27(d)(2)(iii) does not require the state to provide an appeal procedure based on public comment in the settlement of an enforcement action. Nor does EPA provide such an appeal right in its administrative cases. In fact, EPA does not provide for notice and comment on CWA administrative case settlements at all, much less a right to

appeal a settlement on that basis. EPA believes as a policy matter that it is important for the public to be able to raise concerns and issues regarding the settlement of enforcement cases so as to give the prosecuting agency an opportunity to reconsider its settlement decision if new, significant and material facts are brought to light. Having said this, an enforcement settlement agreement is significantly different from a permitting action. The safeguards to ensure public participation also can be different. 40 CFR 123.27(d)(2)(iii) regarding administrative enforcement settlements does not require that an appeal process be available. In 40 CFR 123.30, EPA specifically requires that civil judicial appeals of permitting decisions be provided by authorized states. There are other safeguards or public participation avenues available such as the right to permissive intervention and anyone who intervenes clearly has a right to appeal the settlement decision in a case to which he or she is a party. The Agency believes that another significant safeguard that provides assurances that comments will be properly considered is that prior to final entry of the settlement a judge (in a civil action) or the administrative law officer or commissioners must approve a settlement. (See TWC § 7.075) These officials normally have broad authority to take notice of any fact or information, including public comments, to ensure that any settlement they recommend or sign is in the public interest and not contrary to law or statute. This is certainly the case in the federal courts. *Citizens for a Better Environment,* 718 F.2d 1117, 1128 (D.C. Cir.) 1983, *cert. denied* 467 U.S. 1219 (1984).

It should also be noted that CWA civil judicial settlements are not required by statute to be subject to notice and comment, but notice and comment is provided for in accordance with 28 CFR 50.7 and this Department of Justice regulation does not provide for an appeal process.

18. Sub-issue on Public Participation: Texas "Standing" Requirements

Several comments expressed concern that Texas' requirements for "standing" in permitting and enforcement procedures limited public participation.

*Response:* As one comment pointed out, EPA has been concerned with state standing requirements and EPA believes that "broad standing to challenge permits in court is essential to meaningful public participation in NPDES programs." (61 FR 20976, May 8, 1996) EPA issued a rule providing the standard for States that administer

NPDES programs regarding "judicial review of approval or denial of permits." 40 CFR 123.30, as follows:

"States * * * shall provide an opportunity for judicial review in State Court of the final approval or denial of permits by the State that is sufficient to provide for, encourage, and assist public participation in the permitting process. * * * *A State will meet this standard if State law allows an opportunity for judicial review that is the same as that available to obtain judicial review in federal court of a federally-issued NPDES permit* [see § 509 of the Clean Water Act]. A State will not meet this standard if it narrowly restricts the class of persons who may challenge the approval or denial of permits. * * *"

*Id.* (emphasis added) EPA was concerned during its review of Texas' draft NPDES submissions that the State law governing citizen standing in Texas judicial proceedings would not meet the applicable standard. In response to issues, the State Attorney General examined applicable law and gave his opinion that Texas law is substantially equivalent to the federally-prescribed standard. This opinion can be found in the Statement of Legal Authority by the Texas Attorney General. The Texas Attorney General has stated that civil judicial standing in the Texas courts is the same as associational standing in the Federal courts and very similar to the federal requirement for individual standing. The AG has supported his opinion by reviewing the Texas case law in this area. Considering the current state of the case law, EPA finds the AG's evaluation sufficient to support the Agency's conclusion that the program meets the requirements of 40 CFR 123.30, and gives the evaluation deference. According to the Attorney General, an Attorney General Opinion carries the weight of law unless and until it is overruled by a state court. (Attorney General Dan Morales, "Legal Matters" (last modified July 1998)) —http://www.oag.state.tx.us/WEBSITE/NEWS/LEGALMAT/9807opin.htm—An Attorney General Opinion is entitled to great weight in courts. See *Jessen Assoc., Inc.* v. *Bullock,* 531 S.W.2d 593, 598 fn6 (Tex. 1975); *Commissioners' Court of El Paso County* v. *El Paso County Sheriff's Deputies Ass'n,* 620 S.W. 2d 900, 902 (Tex. App.-El Paso 1981, writ ref.n.r.e.); *Royalty* v. *Nicholson,* 411 S.W. 2d 565, 572 (Tex. App.-Houston [14th Dist.] 1973, writ ref. n.r.e. The Attorney General's authority to issue legal opinions is governed by the Texas Constitution, Article 4, section 22, and the Texas Government Code §§ 402.041–045.

It should be noted that State law provides two avenues of appeal of an NPDES permit: (1) the evidentiary hearing process, which is subject to appeal in accordance with Texas Administrative Procedure Act (APA), Texas Government Code Ann. § 2001.001 et. seq. and (2) a direct appeal to state court based on comments TWC § 5.351. The "affected person" provisions of TWC § 5.115(a) and 30 TAC 55.29 apply only to evidentiary

hearings and not to an appeal of an NPDES permit directly to state court based on comments. The court would decide standing based on State case law; therefore, EPA is determining approval of this element of the Texas program on the basis that at a direct appeal to civil judicial courts is provided for permitting actions under Texas law and the civil courts will determine standing based on the common law. The public is not required to file for an evidentiary hearing. Therefore, there is a direct avenue of appeal via the public comment process (TWC section 5.351), and EPA is basing its evaluation of standing on that appeal right.[5]

As part of EPA oversight of this program, we will be carefully reviewing any state court rulings in this area that may be handed down to ensure that standing and the appeal process continue to meet the requirements of 40 CFR 123.30. Should the Texas Supreme Court, which has not yet directly addressed the question of individual standing, ultimately articulate a test that is more restrictive than the federal standard, EPA will need to reconsider the adequacy of the public participation elements of the Texas NPDES program.

19. Issue: Impediments to Public Access to Permitting and Enforcement Information

One comment asserts that public access to permitting and enforcement information may be impaired where confidentiality claims or state agency information processes slow access or prevent access to information.

*Response:* The comment correctly asserts that "Texas law for public access to information is generally equivalent to the federal law," and instead complains about perceptions of information mismanagement. These are not issues which impede authorization of the state program (TPDES), but do present matters which state and federal environmental officials will want to monitor during program implementation. The comment asserts that the state environmental agency is unwilling to summarily deny claims of business confidentiality or, in some cases, fails to do so in a timely manner. EPA has determined that Texas Open Records Act and EPA's regulations (40 CFR Part 2) are substantially equivalent.

In both agencies, confidentiality decisions are made by the legal office, not the permit program. The permitting authority has little control over how or when this determination will be made. This issue has arisen from time to time during EPA's permitting process and EPA, where it is reasonable to do so, has suspended permit issuance during the resolution of claims of business confidentiality for permit application data. The facts surrounding these claims should be reviewed carefully by permit issuing entities. Actions should be taken to ensure information is made available to the public and that confidentiality claims do not prevent the public from being able to make informed comments. TNRCC can and should examine the equities of doing so, but this is not a program authorization issue. Similarly, the comment correctly asserts that "on paper TNRCC's central records system could be adequate," but then complains that in fact it is not, noting "a history of problems with the management of files" by that agency. The comment asserts that TNRCC has implemented a record "retention" policy, a feature of most public record systems, including EPA's (e.g., see 40 CFR 2.105(b)). We agree with the comment that TNRCC has made recent efforts to improve its record's management, filing, and public responsiveness and EPA will continue to review this process during program oversight to ensure that any barriers which might arise to timely public access to information are addressed.

*Texas' Regulatory Flexibility Under Texas Water Code 5.123*

20. Issue: Texas' Regulatory Flexibility under Texas Water Code 5.123 (Senate Bill 1591)

EPA received several comments indicating that TWC § 5.123 (Senate Bill 1591) does not affect EPA's ability to approve the TPDES program. TWC § 5.123 gives TNRCC flexibility to exempt from State statutory or regulatory requirements an applicant proposing an alternative method or alternative standard to control or abate pollution. EPA also received two comments claiming that § 5.123 would prevent EPA from approving the TPDES program. One comment in support of approval believes that the assurances from the Texas Attorney General and TNRCC are sufficient to address EPA's concerns, and that implementation of § 5.123 should not interfere with the approval of Texas' application to administer the NPDES program in Texas. The two other comments expressed belief that the MOA language is unnecessary, but support its addition

if EPA believes that it will clarify the issue.

Of the two comments opposed to approval on the basis of TWC § 5.123, one alleges that because § 5.123 allows TNRCC to waive any state standard or requirement, including water quality standards and reporting requirements, EPA cannot approve the Texas program. The comment also states that EPA cannot approve a program that includes § 5.123 because the regulatory flexibility given to TNRCC makes it impossible for EPA to determine what standards TNRCC will apply in any situation. The comment also notes that the phrase "not inconsistent with federal law" is not defined in TWC § 5.123. Furthermore, the comment claims that the assurances given by the Texas Attorney General and TNRCC are insufficient to repeal or nullify the clear language in a Texas law. The other comment opposes approval because of the flexibility given to TNRCC to exempt firms from State statutory and regulatory requirements.

*Response:* In the **Federal Register** Notice, EPA discussed the implications of TWC § 5.123, which, as discussed above, gives TNRCC flexibility to exempt from State statutory or regulatory requirements an applicant proposing an alternative method or alternative standard to control or abate pollution. As part of its application, Texas submitted a supplemental statement from its Attorney General stating that TWC § 5.123 does not authorize TNRCC to "grant an exemption that is inconsistent with the requirements for a federally approved program." This statement of the Attorney General is persuasive and entitled to consideration. See *Jessen Associates, Inc.* v. *Bullock*, 531 S.W. 2d 593 (TX 1975). TNRCC also submitted a letter from TNRCC Commissioner Ralph Marquez, clarifying TNRCC's position that TWC § 5.123 does not authorize TNRCC to grant permits or take other actions that vary from applicable federal requirements. Because TNRCC is charged with implementing TWC § 5.123, its interpretation is also entitled to great weight. (*Yates Ford, Inc.* v. *Ramirez*, 692 S.W.2d 51 (TX 1985)).

In MOA Section III.A.22, TNRCC states that "The regulatory flexibility authority in Senate Bill 1591 will not be used by TNRCC to approve an application to vary a federal requirement or a State requirement which implements a federal program requirement under § 402(b) of the Clean Water Act, EPA regulations implementing that Section, or this MOA, including but not limited to inspection, monitoring or information collection requirements that are

---

[5] Although it was not necessary for EPA to review the standing requirements of the evidentiary hearing process, the Agency notes with approval the recent Texas Court of Appeals decision in *Heat Energy Advanced Technology, Inc. et al.,* v. *West Dallas Coalition for Environmental Justice,* 962 S.W.2d 288 (1998 Tex. App.) regarding standing in the evidentiary hearing process under the "affected person" provisions of 30 TAC section 55.29.

required under § 402(b) of the Clean Water Act, EPA regulations implementing that Section or this MOA to carry out implementation of the approved federal program.'' Failure to comply with the terms and conditions of the MOA is grounds for withdrawal of the NPDES program from Texas (40 CFR 123.63).

Based on the foregoing, EPA believes that the assurances and interpretations given by the Texas Attorney General (the chief law officer of the State) and TNRCC are sufficient to assure that TNRCC will not use TWC § 5.123 to approve an application to vary a federal requirement or a State requirement which implements a federal program requirement under section 402(b) of the Clean Water Act, or the EPA regulations implementing section 402(b). If TNRCC's ability to vary state statutes and regulations does not include those statutes or regulations which encompass the federally approved TPDES program, there would be no effect on the federally approved TPDES program. If there would be no effect on the federally approved TPDES program, there is no reason to disapprove the Texas application on this basis.

Furthermore, both the Texas Senate and House Committee Reports for S.B. 1591 (TWC § 5.123) support this conclusion. According to these Reports, the purpose of S.B. 1591 was to give TNRCC the authority to exempt companies from those state requirements *which exceed federal requirements* (emphasis added). The alternative requirements would have to be at least as protective of the environment and public health as current standards. As the Reports state:

> ''This legislation provides specific statutory authorization for state programs which exceed federal law to serve as models for regulatory flexibility. This authorization is important for delegation of the federal Title V air-permitting program to Texas, so Texas can allow flexibility in those areas where Texas law exceeds federal law.'' (Senate Committee Report—Bill Analysis (S.B. 1591)—4/4/97; House Committee Report—Bill Analysis (S.B. 1591)—4/29/97)

Because the language and the legislative history of TWC § 5.123 do not support an argument that this provision would allow the State to waive federal requirements, we conclude that TWC § 5.123 does not render the TPDES program unapprovable.

In addition, TNRCC recently published regulations implementing TWC § 5.123 (23 TexReg 9347, September 11, 1998). In the preamble to those regulations, the TNRCC addressed the issue of whether the regulations could be interpreted to allow TNRCC to vary federally approved programs without EPA approval as follows:

The commission * * * reiterates that orders entered under the authorizing statute, Water Code § 5.123, and this rule will not conflict with legal requirements for federally delegated or authorized programs. Neither the authorizing statute nor this rule authorizes the commission to grant an exemption that is inconsistent with the requirements for a federally approved program. The attorney general of Texas has so informed EPA, in his letter dated March 13, 1998, concerning the commission's application for NPDES authorization. As EPA points out in its comment, to vary the required elements of a federally authorized program without federal approval would violate (that is, be inconsistent with) federal law. As the attorney general noted, the authorizing statute does not authorize this.

This interpretation by TNRCC is also entitled to great weight. *Yates Ford, Inc.* v. *Ramirez,* 692 S.W. 2d 51 (TX 1985). While it may have been clearer to the public and the regulated community had the TNRCC included in the regulations EPA's suggested language on this point, EPA is satisfied that the State's interpretation is consistent with EPA's. As part of our oversight function, EPA will ensure that the Texas Regulatory Flexibility Rules are implemented in a manner that fully conforms to the interpretation set out in the preamble to those rules, and in the letters to EPA referenced above.

*Texas' Defense to Liability for Acts of God, War, Strike, Riot, or Other Catastrophe*

21. Issue: Texas' Defense to Liability for Acts of God, War, Strike, Riot, or Other Catastrophe

Section 7.251 of the Texas Water Code provides that if an event that would otherwise be a violation of a statute, rule, order or permit was caused solely by an act of God, war, strike, riot, or other catastrophe, the event is not a violation of that statute, rule, order, or permit. One comment asserts that Texas law creates defenses to violations that are not compatible with EPA's minimum legal requirements for state NPDES programs. Specifically, the comment argues that States must have authority to seek injunctions for violations and to assess or seek civil penalties appropriate to the violation. The comment argues that the affirmative defense in TWC § 7.251 creates a barrier to that enforcement authority, and is therefore prohibited.

The comment also asserts that the State application violates 40 CFR 123.27(b)(2), which requires that ''the burden of proof and degree of knowledge or intent required under State law for establishing violations under paragraph (a)(3) of this section, shall be no greater than the burden of proof or degree of knowledge or intent EPA must provide when it brings an action under the appropriate Act.'' In other words, State law should not include additional elements of proof for civil violations.

The comment further suggests that approving a Texas program that includes TWC § 7.251 contravenes an EPA interpretation set out in a 1982 settlement agreement with NRDC. Finally, the comment suggests that the defenses under Texas law will restrict citizens' ability to file citizen suits for violations.

*Response:* The comment's major concern appears to be that the defenses in TWC § 7.251 are ''inconsistent with federal requirements for holding a permittee responsible for the release of pollutants.'' EPA raised similar questions during its review of the TNRCC program authorization package. In response to those concerns, the State provided two clarifications: an addendum to its Attorney General's statement and a letter from TNRCC Commissioner Ralph Marquez, both of which are included in the administrative record to this action.

As interpreted by the Texas Attorney General, TWC § 7.251 provides an affirmative defense under State law only if the event causing the discharge was completely outside the control of the person otherwise responsible for the discharge, and only if the discharge could not have been avoided by the exercise of due care, foresight, or proper planning, maintenance or operation. Section 7.251 does not shield a party from liability if that party's action or inaction contributed to the violation, and it would not prevent the imposition of penalties for a violation persisting after the original force majeure event ceases to be the sole cause of the discharge (e.g., in the case of a continuing discharge).

Under State law, the State of Texas would have the ability to bring an enforcement action to address violations when the facility owner or operator should have taken steps to prevent the discharge by care and foresight, proper planning, or maintenance. For example, if the event could have been anticipated—such as a 50-year flood in a 50-year flood plain, or the need to provide training on pollution control equipment for replacement workers used during a strike— and the owner did not take proper precautions, then the failure to have done so could subject the owner or operator to an enforcement

action.[6] The Agency disagrees with the comment's statement that ''vandalism can be used as a defense, apparently, even if such an action could have been anticipated or if the entity responsible for the discharge did not take an appropriate response to the risk of vandalism to minimize the size or impact of the discharge.'' Such a scenario contemplates a discharge that could have been prevented through proper planning and foresight, and the owner or operator's failure to exercise that planning or foresight would render the defense unavailable to him.

The State has also demonstrated that TNRCC has the authority to enjoin any discharges or to order the cleanup of those discharges. As discussed in EPA's **Federal Register** notice, the Attorney General's Statement explains that TWC § 7.251 does not affect a court's authority to issue an injunction to enforce any TWC requirement or prohibition, including the requirement that a party comply with any permit, rule or order issued by the TNRCC. The TNRCC can enjoin by suit in state court any violation or threat of violation of a statute, rule or permit under the TPDES program. Thus, the Agency believes that the State had demonstrated adequate authority to seek injunctions as required in 40 CFR 123.27.

TWC § 7.251 applies only to actions brought under state law, but does not provide a defense to enforcement actions brought by EPA or citizens pursuant to the federal CWA. As discussed in the **Federal Register** notice of the TPDES application (63 FR 33662), the federal CWA is a strict liability statute recognizing as a defense to liability only the federal upset defense (at 40 CFR 122.41(n)), which is a very narrow affirmative defense for violations of technology-based effluent limitations.

EPA does not view TWC § 7.251 as a defense to liability under the federal CWA, and indeed, the Attorney General has stated that the language of § 7.251 will not be placed into TPDES permits. EPA also does not view § 7.251 as affecting the burden of proof for establishing a violation under State law. The burden of proof is unchanged from the federal system, and the elements of proof are unchanged. Rather, § 7.251 merely establishes a potential affirmative defense under State law. The person asserting the defense must assume the burden to plead and prove the defense. This means showing that

---

[6] These general comments should not be construed as an opinion on any specific set of facts, such as in the Crown Central case cited in the comment.

the discharge was caused entirely by other persons or by factors over which they had no control, and that the discharge was not reasonably foreseeable or preventable. As noted in the **Federal Register** notice, even EPA would rarely seek penalties in such cases.

As to the comment's assertion that the Texas law is inconsistent with an alleged EPA interpretation set out in a 1982 settlement agreement with NRDC, without more specific information, EPA has been unable to locate this reference. However, as discussed above, the interpretation of Texas laws by the Attorney General recognizes that the federal CWA is a strict liability statute, and the Texas statute does not affect that standard of liability.

EPA also disagrees that the defenses under Texas law will restrict citizens' ability to file citizen suits for violations. As noted above, the affirmative defense language of TWC § 7.251 will not be incorporated into NPDES permits. Texas could not allow discharges disallowed by federal law; accordingly, TWC § 7.251 would not remove violations of federal law from the scope of CWA § 505(a). Thus, the CWA's citizens suit provision affords those in Texas the same right and opportunity to bring citizens suits as those in other States.

*Inspections*

22. Issue: Inspection Commitments

Some comments expressed support for the TNRCC inspection strategy, stating that inspections should be focused on those facilities not meeting permit limitations, and on impaired watersheds. However, others State that TNRCC should be required to perform inspections on 100% of the ''majors'' and Class I sludge facilities annually. They also state that TNRCC does not have adequate resources to inspect the required universe of facilities. In addition they State that TNRCC has failed to allocate resources to inspect enough CAFOs, pretreatment programs, ''92–500 minors'' (smaller municipal wastewater treatment plants built with federal construction grants authorized under Public Law 92–500), and to adequately respond to citizen complaints.

*Response:* In Chapter V of the MOA TNRCC states it has the procedures and ability in place to inspect the facilities of all major dischargers and Class I sludge facilities. TNRCC's statement is consistent with 40 CFR 123.26(e)(5). However, EPA's guidance on inspection coverage recognizes that minor Permittees may also cause significant risks to the environment and human

health, and some resources may be shifted to inspect them. Any shift in resources must be negotiated and agreed upon between EPA and TNRCC annually.

Under the terms of the proposed MOA, the TNRCC will develop an annual inspection plan that establishes priorities, lists the major and minor dischargers to be inspected, and demonstrates that the plan is substantially equivalent to the annual inspection of all major dischargers and Class I sludge management facilities, where applicable. The TNRCC will have to inspect majors at some regular interval while expending resources on minors equivalent to 100% of the majors annually. As discussed in more detail below, the TNRCC will also have to demonstrate environmental benefits of inspecting other facilities, such as, improved compliance of targeted facilities in priority watersheds and decreased loadings of pollutants of concern. Under the proposed MOA, if EPA and the TNRCC are unable to reach agreement on the universe of majors/minors to be inspected under the annual inspection plan by the beginning of the following fiscal year, TNRCC agrees to inspect 100% of the majors and all Class I sludge management facilities.

EPA has reviewed the resource allocation for inspections, and believes that the 27 existing FTEs (full time equivalent, e.g., one person working 40 hours per week or two people working 20 hours per week), 12 new FTEs which will be hired following authorization, and 14 (nine existing and five additional) inspectors dedicated to sludge, CAFOs and pretreatment, will be adequate. In discussions with TNRCC regarding their July 27, 1998, submittal, TNRCC staff stated that the 30 inspections referenced assumes there are other activities that the staff must perform annually. If these factors were not taken into consideration, then inspectors would be able to perform more than the indicated 30 inspections per year. The federal regulations do not require a State to make specific commitments for CAFO, pretreatment or minor inspections. Additionally, in its July 27, 1998, submittal providing additional detail, TNRCC indicated that they would inspect approximately 24% of the pretreatment facilities in the first year and 38% in the second year. As part of annual inspection negotiations EPA will further discuss the adequacy of these inspection numbers.

23. Issue: Potential Misuse of Annual Inspection List

Some comments oppose a proposed annual agreement between EPA and

TNRCC regarding inspection commitments in which an inspection plan would be developed that would list the facilities to be inspected annually. They believe that such a list would allow the regulated community to know which facilities would be inspected annually, thereby reducing the incentive for compliance.

*Response:* EPA and TNRCC annually work together in developing a list of major and minor dischargers which will be inspected. The Agencies will continue to do so as described in Chapter V of the MOA. TNRCC currently has and will continue to have a notification policy under which a facility is notified one to two weeks prior to a State inspection. However, any facility that will be inspected by EPA or inspected jointly by EPA and TNRCC will not be notified. Further, EPA does not agree that the list of facilities to be inspected will be known prior to the inspections. Texas Government Code, Chapter 552, describes the circumstances under which information can be withheld under the Texas Public Information Act. The Texas Attorney General makes this decision. This is addressed on Page 6 of the MOA. Under the Federal Freedom of Information Act, the list of inspections to be performed are considered enforcement confidential and are not released to the public.

24. Issue: Discrepancy between MOA and Federal Register Notice Regarding Inspection Plan

One comment noted that there was a discrepancy between the **Federal Register** notice and the MOA regarding the proposed inspection plan. Specifically, the **Federal Register** notice indicated TNRCC would have to demonstrate water quality improvements as a result of shifting resources from major inspections to minor inspections. The MOA does not specifically State this.

*Response:* The inspection plan discussed in the MOA will be the framework for annual negotiations of a comprehensive enforcement agreement between the two agencies regarding the number and type of inspections, type of facilities to be inspected, location of facilities (watersheds) etc. If TNRCC proposes to shift some inspection resources from major to minor dischargers, it must demonstrate to EPA that this strategy—in conjunction with other water program efforts set forth in their plan—will result in environmental benefits over time, such as improved compliance rates of targeted facilities in priority watersheds and decreased loadings of pollutants of concern. If over

time, these efforts do not show such improvements, then EPA and the TNRCC will reassess the proper allocation of inspection resources between major and minor dischargers as part of the annual inspection plan negotiations.

*Timely and Appropriate Enforcement*

25. Issue: Timely Enforcement

Some comments assert that TNRCC will not complete enforcement actions in a timely manner and has only committed to initiating such actions in a timely fashion. While some comments assert that TNRCC does have a program that will ensure that timely and appropriate actions will be taken, they also note that EPA does not in all cases take timely and appropriate action.

*Response:* EPA encourages States to adopt its guidance on timely and appropriate enforcement actions, however, the federal regulations do not require States to adopt EPA guidance. To address EPA's concerns with TNRCC in these areas, language is included in the MOA that states that in cases where TNRCC cannot meet the timely and appropriate criteria in EPA's Oversight Guidance, TNRCC agrees to notify EPA. EPA reserves its right to take timely and appropriate enforcement if TNRCC fails to finalize its actions in a timely manner (see MOA Part V.E.). In cases where EPA believes a formal action must be taken, EPA initiates timely and appropriate action. However, there are instances when formal action is not appropriate, e.g., facility has returned to compliance, facility is on a long-term construction schedule and is compliant with the schedule, etc.

26. Issue: Enforcement on Small Businesses

One comment states that TNRCC has ''not committed to enforce adequately against small businesses, given the limitations in Chapter 2006, Subchapter A of the Texas Water Code.''

*Response:* Chapter 2006, Subchapter A of the Texas Government Code requires a state agency that is considering adoption of a rule that would have an adverse economic effect on small businesses to reduce that effect if doing so is legal and feasible. EPA does not find this subchapter limits TNRCC's ability to enforce against small businesses. Subchapter A of Chapter 2006 does not apply to enforcement actions brought against ''small businesses'' as defined by the Texas Government Code. There is nothing to indicate the TNRCC is not committed to enforcing its statutes, rules, orders,

permits, and other authorizations no matter the size of the permitted entity.

27. Issue: TNRCC Commitment to Use EPA's SNC Criteria

One comment stated that TNRCC has not committed to use EPA's significant noncompliance criteria (SNC), and has not developed the procedures or ability to utilize the national database, the Permit Compliance System in a timely manner.

*Response:* TNRCC has committed to prepare the Quarterly Noncompliance Reports (QNCR) in accordance with the federal regulations at 40 CFR 123.45. In order to prepare the QNCR, TNRCC will be required to report facilities in reportable noncompliance (RNC), per 40 CFR 123.45. The more serious (due to magnitude or duration) Significant Noncompliance (SNC) violations make up a subset of RNC violations. As a result, TNRCC will have to use the SNC definition as SNC facilities in Texas will be automatically flagged by PCS. Training of TNRCC staff on the operation of PCS has been ongoing, and the Region 6 offices will continue to provide necessary training and support after program assumption by TNRCC.

*TPDES Penalties*

28. Issue: Adequate Penalties

Some comments expressed belief that TNRCC does not have the procedures to assess adequate penalties and to collect economic benefit gained through the violations. Others state that the TNRCC penalty authority is adequate and does ensure that no party gain an unfair economic advantage by avoiding noncompliance, but support EPA's right to over-file.

*Response:* Although EPA urges the states to implement penalty authority in a manner equivalent to EPA's, it is not required by the regulations or the Clean Water Act. While authority to collect economic benefit exists, TNRCC's policy allows for mitigation of penalties to zero in some instances. Therefore, there is no guarantee that economic benefit, at a minimum, will be collected by TNRCC in all cases. Through its oversight role EPA will work with the TNRCC to ensure that the penalties collected under the TPDES program are consistent with those required by the NPDES program including, where appropriate, the collection of an economic benefit. In cases where EPA believes appropriate penalties have not been assessed, EPA has reserved its right to over-file in accordance with CWA §§ 309 and 402(i).

29. Issue: TNRCC SEP Policy

One comment implied that TNRCC's Supplemental Environmental Project (SEP) Policy is inconsistent with EPA's policy.

*Response:* TNRCC is not required by regulation or statute to have a SEP policy that is equivalent to the EPA policy. In any event, on pages 6–14 of the TPDES Enforcement Program Description, TNRCC has cited potential SEP projects that are comparable to projects that would be approved under the EPA policy. In cases where TNRCC approves an inappropriate SEP that results in an inadequate penalty, EPA reserves its right to over-file in accordance with CWA 309 and 402(i).

30. Issue: Appropriate Penalties

One comment stated that EPA penalties against builders and developers are excessive. In addition they are concerned with EPA's ability to over-file because they would "never really know" what the penalty amounts would be for specific violations.

*Response:* The Clean Water Act sets statutory maximum penalties that would be used in litigation, and EPA utilizes its Clean Water Act Settlement Penalty Policy to calculate the minimum penalty for which the Agency would be willing to settle a case. If the policy has provisions for addressing type of violation, duration, size of business, and ability of business to pay a penalty. This penalty policy is applied equally to all CWA enforcement including the construction "industrial activity" category (x) as found at 40 CFR 122.26(b)(14)(x). Due to EPA retaining administration of EPA-issued MS4 and storm water general permits, TNRCC responsibility for enforcement of the bulk of the storm water program will not begin for approximately two years (when the first of these permits expires). At that time, EPA will review the penalties assessed in these actions as part of its oversight authority, to assure that the penalty amounts are adequate to abate violations of a permit or permit program (40 CFR 123.27), EPA has reserved its right to over-file if they believe an adequate penalty has not been assessed.

31. Issues: Improper Barrier to Recovery of Penalties Where Violator Gained Economic Benefit From Violation

One comment alleged that the Texas audit privilege act establishes an improper barrier to recovery of penalties for violations where the violator gained an economic benefit from the violations.

*Response:* 40 CFR 123.27(a) and (c) require the State to have the authority

to recover civil penalties for violation of any NPDES permit condition, filing requirement, regulation, or order as well as to assess civil penalties which are appropriate to the violation. Section 10(d)(5) of the Texas Audit privilege act [Tex. Civ. Statute art. 4447cc (1998)] allows recovery of civil or administrative penalties for "substantial economic benefit which gives the violator a clear advantage over its business competitors." This language will enable Texas to obtain civil penalties appropriate to the violations, including those resulting in a substantial economic benefit. For those dischargers engaged in business competition, the law would also require proof of clear advantage deriving from that economic benefit. Under section 10(g) of the law, the enforcement authority does not bear the burden of proof concerning exceptions to immunity stated in section 10(d).

32. Issue: Improper Barrier to Recovery of Penalties for Continuous and Repeat Violations

One comment expressed concerns that the Texas audit privilege act would impose barriers to recovery of penalties for continuous and repeat violations.

*Response:* There is no civil or administrative penalty immunity under Texas Civil Statutes Article 4447cc if the disclosure "has * * * repeatedly or continuously committed significant violations, and * * * not attempted to bring the facility or operation into compliance, so as to constitute a pattern of disregard of environmental [law]." To show a "pattern," the entity must have "committed a series of violations that were due to separate and distinct events within a three-year period at the same facility or operation." By its terms, this provision provides Texas with authority to address continuous violations and repeat violations. Texas also retains authority to address all violations by issuing administrative or judicial consent orders and by seeking penalties for any subsequent violation of such orders.

*Independent Applicability of Water-Quality-Based Limits*

33. Issue: Application of Water Quality Standards for Discharges Not Subject to a Technology-Based Effluent Guideline

Several comments supported EPA's conclusion that TNRCC had the authority, and had actually committed to apply water-quality based effluent limitations regardless of whether or not there was a promulgated technology-based effluent guideline for a particular discharge. However, these comments

also stated that there was no objection to EPA and TNRCC clarifying this issue in the MOA.

*Response:* EPA appreciates the support expressed by the comments and repeats the Agency's position for the benefit of those members of the public that did not review the June 19, 1998, **Federal Register** notice. In a brief filed February 12, 1998, in the U.S. Court of Appeals for the Fifth Circuit on behalf of the State of Texas and the Texas Railroad Commission in *Texas Mid-Continental Oil & Gas Association* v. *EPA* (No. 97–60042 and Consolidated Cases), the Texas Attorney General took the position that EPA did not have the authority to include water quality-based effluent limitations in an NPDES permit unless technology-based effluent guidelines had been developed (emphasis added). EPA vigorously disagrees with this position and continues to maintain that under the CWA, technology-based and water quality-based effluent limitations are independently applicable in determining appropriate effluent limitations for an NPDES permit.

While confident that the Texas Attorney General's position on EPA's authority to independently require compliance with water quality standards will not be upheld by the courts, EPA also believes it was not necessary to wait for a final ruling by the courts before acting on the TPDES program proposed by TNRCC. The Texas Attorney General's statement confirms that TNRCC has full authority under State law to impose effluent limitations for any discharge as necessary to insure compliance with approved water quality standards. In addition, the following language is included in Section IV.B of the MOA:

"Water quality based effluent limitations are part of the federally approved program and the State will impose such limitations in TPDES permits unless technology-based effluent limitations are more stringent."

Therefore, the proposed TPDES program will function in a manner consistent with EPA's interpretation of the requirements of the CWA and its implementing regulations.

*TPDES Resource Needs*

34. Issue: Generic Comments on Adequacy of TNRCC Resources

Some comments stated belief that TNRCC had provided adequate information to address funding issues. Other comments expressed concern over TNRCC's ability to run their TPDES program without the use of federal funds. They also claimed that TNRCC had not adequately demonstrated that

they had sufficient resources or staffing to assume the program on the day of program assumption.

*Response:* Pursuant to the requirements of 40 CFR 123.22(b), the State of Texas submitted a description of the cost of establishing and administering the proposed TPDES program for the first two years after program approval in Chapter 7 of its application. That submittal indicated that 217 full time employees would be tasked with different aspects of the program, and that $12.3 million in funding would be available to run the program. Prior to the comment period on the proposed TPDES program, the Agency received letters from two concerned parties suggesting that more detail was needed to fully understand how the personnel and funds set out in the Texas application were to be used. EPA agreed that it would be helpful to understand more fully such information and, thus, asked the State to provide additional detail (63 FR 33664).

The State did so in comments submitted at the public hearing on the proposed State program approval on July 27, 1998, and made copies available to many of the attendees. The State's comments were also made available on July 28, 1998, at both the TNRCC and EPA offices. EPA further took the step of sending copies of the State submittal to all persons who had attended the public hearing or who had commented on the State program. To allow time for any additional comment on the resource question, the Agency extended the comment period on that single issue from August 10 until August 24, 1998.

Chapters 2, 6, 7, and Appendix 7–A, of the Program Description provided detailed information on TNRCC's organizational structure, positions, projected costs, and sources of funding, including a projection of enforcement resource needs. TNRCC has acknowledged, on page 8 of the MOA, that it is their responsibility after program approval to run and manage the TPDES, Pretreatment and Sewage Sludge programs with or without the assistance of Federal funding. The Federal regulations require States seeking program approval to submit an itemization of the sources and amounts of funding, "including an estimate of Federal grant money," expected to be available for the first two years of program administration (40 CFR 123.22(b)(3)); the State of Texas has provided this information.

EPA has reviewed the resources TNRCC will devote to the TPDES program, the staffing requirements and qualifications, and the training necessary to utilize existing staff to operate the program on day one, and determined that TNRCC has the capacity to administer the program upon assumption. As part of EPA's oversight responsibilities, the agency will monitor the resources TNRCC is devoting to the TPDES program to ensure compliance with the regulatory requirements for a state-run program.

**35. Issue: Under-Funding of TNRCC's Permitting Program**

Several of the comments contend that the water quality permitting program is woefully underfunded. In its August 27th comments, the State provided an explanation of how the resources dedicated will be marshaled to administer the NPDES program.

*Response:* In its July 27 letter, the TNRCC discussed with great specificity why the resources described in Chapter 7 of its application would be sufficient to administer the NPDES program in Texas. In Exhibit A of that letter, the TNRCC used "the number of [permit] applications processed" as the most accurate measure of the work they could process. Looking at the prior ten-year period, the TNRCC found that an average of 727 applications were processed each year, not including NPDES permits processed for EPA under a Federal grant. While noting that permit applications in some areas of the State (principally central Texas) had increased, TNRCC expected the total number of permits required state-wide would remain relatively constant. TNRCC pointed to the workload-leveling effect of its basin permitting rule and its intent to expand use of general permits as justification for this assumption. Based on the total number of permits, they estimate approximately 651 permit renewals per year. Using these figures, the TNRCC concludes that it has adequate staff to handle the needs of the NPDES program:

"Assuming that the permitting universe will remain static at 3256 permits [given the movement toward issuing general—rather than individual—permits and other reasons set out by TNRCC], TNRCC predicts that an average permit writer would need to be responsible for processing 30 renewal permits each year (651÷21.5). Ample staffing is available to additionally process incoming new or amendment requests, since an existing staff of 18.5 has historically processed an average of 39 permits/person/year (727÷18.5)." (July 27, 1998, letter, Exhibit A.)

The TNRCC went on to explain that new personnel positions in several categories have been funded in order to carry out the NPDES program. Taken together, the information provided by the State appears to demonstrate adequate resources to implement the NPDES program in Texas.

As a sub-point, a comment expresses concern that the application does not account for the resources necessary to process the approximately 3,000 NPDES applications now pending at EPA Region 6 that are to be transferred to the State. In response, as the comment concedes, it is somewhat unfair to ask the State to show readiness to pick up an entire program prospectively and to demonstrate that it can eliminate a backlog not of its own creation; other states seeking authorization have not been asked to make such a showing. However, it is EPA's understanding that Texas does plan to eliminate the backlog over the course of one permitting cycle (five years). Under the status quo pre-authorization, every discharger that has (or should have) a Federal NPDES permit has (or should have) a water permit under State law. Thus, as the State proceeds to renew or issue permits (in accordance with the State watershed priority system approved by EPA), it will in effect replace two permits (one State and one Federal) with one State-issued TPDES permit. The TNRCC explained its plan to address the EPA backlog as follows:

"In effect, EPA has allowed a situation where a significant number of discharges were never authorized under NPDES. These applications are to be passed to TNRCC for processing. This load of applications is assumed to equate to applications for the same discharges also received by the state. As TNRCC works on its own applications, it will also be combining the workload and eliminating EPA's backlog." (July 27 letter, Exhibit A., p.2)

**36. Issue: Workload Analysis**

Some public comments argued that States must provide a detailed workload analysis as required by EPA guidance.

*Response:* EPA agrees that its guidance asks that States set out their resources in the form of a workload analysis; however, this is not a requirement of statute or regulation. In any event, the State provides a workload analysis in response to EPA's request for additional detail on the application. (See July 27 letter, Exhibit D.)

**37. Issue: Future Resources for Storm Water Program**

One comment expressed concern that TNRCC does not currently have resources to operate the storm water program in Texas and has not "laid out any clear plan for obtaining them over a specified period of time." This comment also expressed concern that TNRCC would not immediately have adequate resources for inspection of

storm water permittees they will administer upon authorization. In response to EPA's request for public input on future resource needs, TNRCC submitted comments that contained an acknowledgment that additional resources will be needed when EPA-issued storm water general permits and municipal separate storm sewer system permits expire and administration transfers to the State. TNRCC pointed out that the Texas legislature has already authorized increases in permit fees, contingent upon NPDES authorization. TNRCC also stated in its comments that "* * * appropriations for the storm water permitting program elements initiated in fiscal year 2001 will be an exceptional item request in the TNRCC LAR [legislative appropriations request] for 2000–2001."

*Response:* At the time of program assumption, EPA will only transfer administration of those storm water discharges included as part of an individual industrial permit to TNRCC. EPA will continue to administer discharges authorized under municipal separate storm sewer permits and storm water general permits for some time after program authorization. Administration of discharges covered by EPA's multi-sector storm water general permit transfers by October 1, 2000. Administration of discharges covered by EPA's construction storm water general permit transfers by July 6, 2003. Administration of discharges covered by EPA's permits for the nineteen municipal separate storm sewer systems in Texas starts to transfer in 2000, but most of these permits will not expire until 2003. Therefore, TNRCC will not need additional resources for permitting and enforcement on storm water-only discharges right away. Since administration passes at the time each storm water permit expires, or earlier if TNRCC issues a replacement permit, TNRCC's permit fee program would be available to provide resources. Under TNRCC's current procedures for conducting inspections, storm water outfalls at industrial facilities (the permits that would transfer to TNRCC at program authorization) are routinely included in the overall inspection of the facility.

EPA also notes that while, as with any governmental agency, TNRCC is dependent on funding by a legislature that has sole power on appropriations, it has committed to seek additional resources for these resource needs. On August 19, 1998, the TNRCC formally adopted its Legislative Appropriations Request (LAR) for the 2000–2001 biennium. Included is a request for additional appropriation authority for

full State implementation of the NPDES storm water program using the existing permitting options available to TNRCC. For FY 2000, TNRCC has requested $3.4 million and 58 additional positions. For FY 2001, the request increases to $4.2 million and a total of 80 positions. These staffing levels and budget estimates are based on the existing limitations in State law regarding the use of general permits for storm water discharges (which could easily exceed the current 500,000 gallons per day cap allowed for a general permit issued by TNRCC under TWC § 26.040). Both agencies understand that this initial request is subject to change if the current statutory limits on the use of general permits are removed or modified.

38. Issue: Statements to the Legislature

Several comments assert that TNRCC's statements seeking additional funding for deficient parts of the Water Quality Program (which the comment describes as "core elements of the NPDES/TPDES program") demonstrate that the proposed TPDES program is underfunded.

*Response:* In TNRCC's letter of July 27, the TNRCC explains that wastewater permitting is only one of the State's water resource programs, and that permitting discharges covered by NPDES is only part of the wastewater permitting program (other water programs include the development of surface water standards, water quality assessment, modeling, etc.). According to TNRCC, the legislative initiative referred to by the comments "related to other aspects of the [the State's] water programs," other than TPDES.

With specific regard to the NPDES program, the State indicated that "the funding and positions (44 FTEs) had already been determined and authorized by the Legislature"; the reference to the NPDES program, and the 44 new FTEs associated with it, was included to make clear that the resource needs for the water quality programs were in addition to the resources already authorized for NPDES.

The TNRCC letter also points out that the testimony before the State legislature expressed a lack of financial support that affects the agency's ability to fulfill its statutory responsibilities at "optimal levels," not its ability to run its water programs at levels that meet federal standards. Virtually all agencies—including EPA—frequently make the case for additional resources without implying that they are not performing their duties on an acceptable level.

39. Issue: Resources Beyond 2 Years

Some comments assert that more detail is required on those resources that will be required to run the storm water program, administration of which will pass to Texas in the fall of the year 2000. Others allege that despite the fact that TNRCC has not yet submitted its legislative appropriations request for 2000–2001, the TNRCC should have submitted at least reasonably detailed projections of wastewater permitting, data management and field inspection resource needs for FY 2000, which the comment sees as the second year of any TPDES program that could be authorized at this point.

*Response:* The federal regulations only require the State to provide information on the first two years of the program—i.e., FY 1999 and FY 2000. See 40 CFR 123.22. The State submitted a complete package on May 5, 1998, triggering EPA's statutory review period which was to end on August 3, 1998.[7] The State provided resource information for the two fiscal years running from September 1, 1998 to August 31, 1999, and from September 1, 1999 to August 31, 2000. The federal regulations do not require States to submit resource data for more than two years.

For the "out years" (more than two years after approval), as EPA noted in the June 19 **Federal Register** notice, the State will need to provide adequate resources for this period in a timely manner, and the State (in its July 27 letter) expressed the intention to do so. Specifically, the TNRCC indicated that it would seek—above and beyond the base budget of FY 1999, which already includes some increases—appropriation authority for administration of storm water permits in FY 2001. (If a state were to fail to ensure adequate resources to administer an authorized program, there could be potential grounds for program withdrawal under 40 CFR 123.63.)

40. Issue: Resources for Laboratory Chemists

One comment stated that TNRCC does not have an adequate number of laboratory chemists to perform TPDES program functions, and provides no details on the personnel and positions.

---

[7] By letters dated July 10, 1998, and July 28, 1998, EPA and TNRCC agreed to extend the deadline by which EPA must make a final decision on the State's request for approval of the TPDES program until September 1, 1998. In an August 31, 1998, letter from Jeffery Saigas, TNRCC Executive Director, to Gregg Cooke, EPA Regional Administrator, the TNRCC agreed to give EPA additional time (until September 14, 1998) to complete its approval review.

*Response:* TNRCC provided information on the allocation of resources for the laboratory in Figure 2–1, Tables 1 and 2, of the Program Description, which shows the staffing level for the laboratory will be nine chemists, one laboratory manager, and one Quality Assurance Specialist. The description of these personnel and positions are included in Appendix 7–A and 7–B of the Program Description. EPA finds that this level of laboratory support does not prevent the TPDES program from functioning, especially since laboratory services could also be contracted out, if necessary due to intermittent surges in demand.

41. Issue: Comparisons with Other State's Program Resources

One comment states that TNRCC has a much higher facility to FTE ratio than either Louisiana or Oklahoma, and that this indicates the TPDES program is underfunded.

*Response:* As discussed above, EPA does not agree that the TPDES program is underfunded at this time. In addition to the facility to FTE comparison, EPA also reviewed the resource allocations for the enforcement program by job functions such as inspections and compliance monitoring. As stated in the response to comments regarding inspection commitments, EPA believes that the 27 existing FTEs for inspections, the 12 new FTEs which will be hired following authorization, and 14 inspectors dedicated to sludge, CAFOs, and pretreatment, will be adequate to run the NPDES inspection program. EPA did however, have some concerns regarding the adequacy of FTEs allocated for compliance monitoring activities and as a result, requested additional information from TNRCC. In TNRCC's July 27, 1998, submittal of additional detail, TNRCC indicated that in addition to the seven FTEs already available for compliance monitoring, they had three FTEs that could provide additional support if needed. EPA agrees with the comment that the facility to FTE ratio is higher in Texas than in Louisiana and in Oklahoma, but based on the original submittal, the July 27, 1998 clarification, and the fact that only about 54.5% of the minors, 94.6% of the 92–500 minors, and 52.7% of the major facilities will be transferred to TNRCC within the first two years, EPA believes that TNRCC will have the capacity to administer the program for the first two years.

42. Issue: Adequacy of Resources for Compliance Monitoring

One comment alleges that TNRCC analyzed the adequacy of its resources for ''compliance monitoring'' on the basis of only doing reporting for majors, significant minors and 92–500s, or approximately 718 facilities. The comment notes that compliance monitoring functions must be performed, however, for all NPDES permits for which TNRCC takes action, and that TNRCC, therefore, seriously understated the universe of facilities that the reporting staff must cover.

*Response:* NPDES states are only required to track majors, 92–500 minor facilities, and significant minors in PCS. TNRCC has indicated in their July 27, 1998, submittal that they have three additional positions available that can be used for compliance monitoring functions. Based on the July 27, 1998, submittal and the original package, EPA has determined that TNRCC has the capacity to perform compliance monitoring on those facilities which they will receive during the first two years.

*Funding Sources Available for the TPDES Program*

43. Issue: Funds Raised From Increased Permit Fees

Some comments indicate encouragement regarding the State Legislature's support for increased funding for the TPDES Program through an increase on the annual cap related to wastewater fees. Others commented that any increases in fees should be related to services actually rendered to that permittee.

*Response:* EPA can only require that the TPDES program be adequately funded. Choices as to the sources of the fund, e.g., general revenue taxes, permit fees, etc., are at the discretion of the Texas Legislature. It would be neither appropriate, nor constitutional, for the federal government to dictate exactly how a State government must fund its State programs. TNRCC also has the authority to raise fees assessed on numerous permittees who currently pay a fee far below the $25,000/year cap set by the Texas Legislature, should federal grant funds decrease substantially.

44. Issue: Funds for Water Quality Programs

Some comments also expressed concerns that a permit fee-based funding mechanism would not adequately account for increased funding needs related to general water quality programs which are not tied directly to a single permit.

*Response:* The TPDES application and associated supplemental documentation is reflected in TNRCC's application for FY 99 funding in support of its overall water quality program. Much of this funding is expected to be obtained through TNRCC's Performance Partnership Grant (PPG). Commitments associated with the PPG are included in TNRCC's FY 99 Performance Partnership Agreement (PPA). The PPA is a carefully negotiated document which is designed to be consistent with all statutes, regulations, and formal agreements associated with affected programs. Accomplishment of commitments included in the PPA and achievement of environmental results related to those commitments is reported by TNRCC and tracked by an oversight team at EPA. Any identified problems are addressed through renewed negotiation and appropriate follow-up actions.

*Environmental Justice*

45. Issue: Concerns Regarding Environmental Justice in Implementation of the TPDES Program

A few comments raised the issue of environmental justice. One comment asserted that EPA has failed to carry out its legal responsibilities under the President's Executive Order on Environmental Justice (E.O. 12898) in that EPA did not consider the impacts of approval of Texas' application on minority and low-income communities. This same comment also noted E.O. 12898 is based on Title VI of the Civil Rights Act, and that EPA has promulgated regulations implementing Title VI. Another comment asserted E.O. 12898 requires EPA to reject Texas' NPDES application, unless TNRCC can demonstrate that it has ''made environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health and environmental effects of its programs, policies, and activities on minority populations and low-income populations. * * *'' (E.O. 12898, § 1–101).

*Response:* EPA is committed to upholding the principles of environmental justice contained in the President's Executive Order on Environmental Justice and to ensuring compliance with Title VI of the Civil Rights Act, as amended, by recipients of EPA assistance. EPA believes that it has carried out its legal responsibilities and maintains that it has advocated environmental justice to the full extent of its legal authority in this action. EPA notes that nothing in the Clean Water

Act, E.O. 12898, or Title VI of the Civil Rights Act requires the Agency to reject Texas' application for lack of an environmental justice program. As one comment noted, the Clean Water Act and EPA's implementing regulations do not require that a State have a specific program or method for addressing environmental justice issues. Thus, EPA may approve a program that lacks an environmental justice program entirely. EPA has encouraged TNRCC to include an environmental justice program as part of its proposed TPDES program. In a letter dated February 6, 1998, TNRCC indicated that it did have an environmental justice program, although that program is not a part of the TPDES application.

Additionally, EPA notes that the obligations of E.O. 12898 to make "environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health and environmental effects of its programs, policies, and activities on minority populations and low-income populations * * *" apply to Federal agencies, not the TNRCC, as was suggested by one comment. (E.O. 12898, § 1–101). Furthermore, the obligations of E.O. 12898 are to be implemented in a manner consistent with, and to the extent permitted by, existing law. The Executive Order does not, by its own terms, create any new rights, benefits, or trust responsibility. (E.O. 12898, §§ 6–608, 6–609). Thus, EPA cannot go beyond the authority granted to it by the Clean Water Act in making its decision to approve or reject Texas' proposed program.

Finally, as one comment noted, EPA has promulgated Title VI implementing regulations that prohibit the recipients of EPA assistance from using criteria or methods of administering federally funded programs in a manner that results in discriminatory effects based on race, color, or national origin. See, 40 CFR Part 7. Also, EPA can provide TNRCC help in complying with the non-discrimination provisions of Title VI of the Civil Rights Act. These implementing regulations also set forth the process by which aggrieved parties may file complaints with the EPA. This is the proper process to by which to address individual claims under Title VI.

**Other Statutory and Legal Issues**

Issue: TNRCC Authority Over Discharge of Pollutants

One comment asserted that Texas lacks the authority to prohibit the range of discharges that are prohibited under federal law. In particular, the comment argues that Section 26.121(a) of the Texas Water Code does not enable TNRCC to prohibit discharge of pollutants that do not (1) qualify as sewage or recreation, agricultural, or industrial wastes or (2) qualify as "other waste," within the meaning of Section 26.121(b), because they do not meet the definition of "pollution" found in Section 26.001 of the Texas Water Code. Section 26.001 defines "pollution" to mean "the alteration of physical, thermal, chemical, or biological quality of, or the contamination of, any water in the State that renders the water harmful, detrimental, or injurious to humans, animal life, vegetation, or property or to the public health, safety or welfare, or impairs the usefulness or the public enjoyment of the water for any lawful or reasonable purpose." The comment argues that the showing of harm, detriment, or injury required by this definition impermissibly renders the scope of the Texas discharge prohibition less expansive than required by federal law.

*Response:* EPA agrees that the definition of "pollution" found in Section 26.001 of the Texas Water Code renders the prohibitions found in Section 26.121(a) of the Code less expansive than federally required; however, Texas has resolved this problem by enacting revised Sections 26.001 and 26.121 that take effect upon NPDES program authorization. The revised Section 26.121 contains a subsection (d) that states:

"Except as authorized by the commission, no person may discharge any pollutant, sewage, municipal waste, recreational waste, agricultural waste, or industrial waste from any point source into any water in the state."

While the sewage and waste definitions remain unchanged, the revised Section 26.001 adds a definition of "pollutant" (as opposed to "pollution") that matches, almost word-for-word, our definition of "pollutant" found at 40 CFR 122.2. Accordingly, Section 26.121(d) of the Texas Water Code enables Texas to prohibit the full scope of pollutants that Texas must be able to prohibit under federal law.

46. Issue: Conflicts of Interest

One comment contended that "Texas does not meet the requirements for conflicts of interests and other ethical limitations for TNRCC decision-makers for NPDES programs." The comment also specifically asserted that the appointment of Rafael B. Marquez as Commissioner of the Texas Natural Resource Conservation Commission by Governor George Bush on May 1, 1995, was not, or is not, in compliance with Federal requirements for State programs.

*Response:* Section 304(i)(2)(D) of the Clean Water Act and 40 CFR 123.25(c) constitute the Federal authorities for the proposition that no State board or body with authority to approve permit applications shall include (or will include at the time of approval of the State permit program) as a member any person who receives, or who has received during the past two years, a significant portion of his income directly or indirectly from permit holders or applicants. Specifically, 40 CFR 123.25(c) states:

"State NPDES programs shall ensure that any board or body which approves all or portions of permits shall not include as a member any person who receives, or has during the previous two years received, a significant portion of income directly or indirectly from permit holders or applicants for a permit."

EPA's analysis of the Texas Water Code, specifically Sections 5.052, 5.122, 5.053, 5.054, 5.059 and 5.060, as well as 30 TAC 50.33 satisfies the Agency that the State has met the Federal conflict of interest requirements. Specific attention was given to the appointment of Rafael B. Marquez as Commissioner of the Texas Natural Resource Conservation Commission. TWC § 5.053(b), which is effective upon authorization of NPDES permit authority, states:

"In addition to the eligibility requirements in subsection (a) of this section, persons who are appointed to serve on the Commission for terms which expire after August 31, 2001, must comply at the time of their appointment with the eligibility requirements established under 33 U.S.C. Sections 1251–1387, as amended."

The terms of all Commissioners currently appointed to the TNRCC expire on or before August 31, 2001. However, only Commissioner Marquez was not subject to the current conflict of interest rule at the time of his appointment. Commissioner Marquez was appointed and confirmed in May, 1995 and during that calendar year received a significant portion of his income from Monsanto Company, his former employer and a permit holder. Since 1995, Commissioner Marquez has received no portion of his income from a permit applicant or a permit holder. Therefore, more than two years have passed since a potential conflict of interest could have existed. Accordingly, we believe the provisions of Section 304(i) of the Clean Water Act have been satisfied in that more than two years have passed since Commissioner Marquez last received

significant income from a permit holder. His first participation in the TPDES process will take place after a two-year period in which he received no portion of his income from a permit applicant or a permit holder. Furthermore, since his term expires prior to August 31, 2001, the provisions of Section 5.053(b) of the Texas Water Code regarding compliance "at the time of * * * appointment" are inapplicable as to Mr. Marquez. It should also be noted that, under Section 5.054, Commissioners may be removed for failure to maintain the qualifications required for their appointment.

The State of Texas has provided other assurances that the Federal conflict of interest provisions will be carried out. Commissioners' standards of conduct are set forth in Chapter 572 of the Texas Government Code, which requires personal financial disclosure and prohibits conflicts of interest. These safeguards closely resemble Federal standards of conduct and set forth similar procedures for oversight and reporting.

EPA Region 6 has also received the Texas Attorney General's opinion regarding conflict of interest issues associated with the contemplated assumption of NPDES authority by the State of Texas. Based on this opinion, and our own assessment, we are satisfied that no conflict of interest exists.

47. Issue: Improper Partial Phased Program

Some citizens and organizations commented that the proposed TPDES partial program is improperly "phased." The comments reach this conclusion by arguing that (1) the Texas program, although partial, would not be a "major category partial program" within the meaning of subsection 402(n)(3), and (2) the program, although not a "major component partial program" within the meaning of subsection 402(n)(4), would still be phased.

The comments first assert that the program would be partial because it would not cover those discharges regulated by the Texas Railroad Commission. Nonetheless, the comments contend that the program would not meet the requirements of subsection 402(n)(3) because it would not cover all discharges within the jurisdiction of TNRCC. In particular, the contention is that the proposed Texas program does not cover discharges from CAFOs into play as, certain Municipal Separate Storm Sewer System (MS4) discharges, and storm water discharges associated with industrial activity.

Next, the comments contend that the program would not meet the requirements of 402(n)(4) because TNRCC does not commit to assume jurisdiction over the discharges regulated by the Texas Railroad Commission. Nonetheless, the comments also assert that the Texas program would still be phased. They contend that various alleged inadequacies in TNRCC authority and resources leave the agency with no choice but to phase-in parts of the proposed program.

*Response:* CWA § 402(n)(3) allows EPA to approve a "major category partial permit program," while authorization of a "major component partial permit program" is permissible under CWA § 402(n)(4). A major category partial permit program is commonly called a "partial program" and CWA 402(n)(3) describes that a State (or agency of a state) may apply for that portion of the NPDES program for which it has jurisdiction, as long as it reflects all of that agency's jurisdiction, and includes a significant number of the point source categories regulated under NPDES. A major component partial permit program [CWA 402(n)(4)] is commonly called "phased" because it allows a State to take that portion of the NPDES program for which it has jurisdiction, so long as it commits and sets forth a plan for obtaining authority to regulate (consistent with CWA) the rest of the point source categories under the CWA within a 5-year period. These two options were included in the CWA to allow states like Texas, with more than one agency regulating categories of point sources, to apply for NPDES program authorization for at least one of its agencies, and follow, either in the phased approach, or completely separately, its other regulatory agencies. Since the program described by Texas in its application covers all discharges subject to the NPDES program that are under the authority of the TNRCC, the TPDES program is a "major category, partial permit program" (i.e., partial) and not a "major component partial program" (i.e., phased).

The Texas application does describe a program for the regulation of CAFO, storm water, and all wastewater discharges under the authority of the TNRCC. Texas describes the processes for issuing and enforcing all permits in the program description and makes the necessary commitments to issue needed general and individual permits in the MOA (see Part III.A of the MOA). Moreover, the Texas program would not categorically exclude coverage of any class of CAFO discharges. The language in the **Federal Register** Notice

describing the Texas program application was merely intended to indicate that EPA believed that there was the potential (discussed in the response to specific comments on this issue) that certain CAFOs that began operation prior to July 10, 1991, could fall outside the authority of the TNRCC. The Agency's intent was merely to provide notice to the public that any such CAFOs would remain under the jurisdiction of EPA. Accordingly, the Agency believes that the program described in the TPDES application covers all discharges within the jurisdiction of the TNRCC and, therefore, qualifies as a major category partial permit program under subsection 402(n)(3).

Nonetheless, the comments assert that the Texas program would be impermissibly phased because TNRCC allegedly (1) lacks the resources and staff, and (2) has failed to issue general permits necessary to administer parts of the described program. Subsection 402(n)(4) of the Act provides that a State regulatory agency may phase into its program permitting authority for those types of point source discharges over which it does not yet have jurisdiction. While the TNRCC has agreed under 40 CFR 123.1(d)(1) that EPA would retain jurisdiction to administer particular storm water permits that have already been issued, TNRCC proposes to immediately assume permitting authority over all types of point source discharges within its jurisdiction. The fact that the EPA has retained jurisdiction to administer certain storm water permits that have already been issued does not mean that the State Program is "phased" within the meaning of subsection 402(n)(4) only if it proposed to assume jurisdiction to issue permits for an entire class of point source discharges at some date after program approval. Under 30 TAC 281.25, Texas adopted by reference 40 CFR 122.26, requiring NPDES permits for storm water discharges. As noted above, TNRCC would have the authority to issue permits for all types of point source discharges within its jurisdiction on the date of program approval; accordingly the program, although partial, would not be phased.

48. Issue: TNRCC Emergency Orders and Temporary Orders

One comment included examples of how TNRCC has, and uses, the authority to issue temporary or emergency orders under TWC Chapters 5 and 26 to authorize discharges in excess of permit limitations or where there is no permit to authorize a discharge. The comment

noted that under federal law, a discharge cannot be made except in compliance with the authorization granted by a permit. The comment expressed concern that such orders would authorize what would otherwise be a violation of an existing permit and could be used to authorize a discharge without following the procedures and requirements for permits (including requiring compliance with technology and water quality standards). The comment further indicated that such actions by Texas would eliminate reporting requirements for violations of the original permit (limiting availability of information to the public) and would also "immunize" a violator from a citizen suit for the violation.

*Response:* On July 3, 1998, Texas proposed regulations implementing TWC, Chapter 5, Subchapter L, concerning temporary and emergency orders (23 TexReg 6899). EPA has reviewed these proposed regulations and has found them to be consistent with requirements to authorize the TPDES program. Specific restrictions on the use of temporary and emergency orders to anticipated bypasses in the TPDES program, consistent with CWA requirements, have been continued in the proposed revisions to 30 TAC 35.303. Under 30 TAC 305.21 (Consolidated Permits), TNRCC would also have the authority to allow temporary or emergency orders for discharges to waters—subject to the restrictions of the 30 TAC 35.303 section on water quality permits. TNRCC will only use emergency orders to provide authorization for bypasses which meet the conditions of 40 CFR 122.41. Any other use of emergency or temporary orders would be outside the scope of an approved program.

The comments may have been the result of concerns related to provisions in the proposed regulations, which provide TNRCC authority in other programs, to "* * * by these orders issue temporary permits or temporarily suspend or amend permit conditions." Also, in the past, temporary and emergency orders have been used, or proposed for use, in the pre-TPDES State water quality permitting program for purposes such as an emergency order authorizing discharge of contaminated non-process wastewater at pollutant levels exceeding permit limitations from an ammonium phosphate and ammonium thiosulfate fertilizer manufacturing plant in Pasadena (TNRCC Docket No. 98–0320– IWD); and a temporary order authorizing the discharge of storm water associated with industrial activity from a steel manufacturing and fabrication facility in Morris County (TNRCC Docket No. 97–0746–IWD). As a result of the specific restrictions in 30 TAC 35.303 that become effective upon TPDES program authorization, TNRCC is aware that its authority to issue emergency and temporary orders cannot be used under the TPDES program in all situations allowable under the pre-TPDES State permitting program. While TNRCC has used temporary and emergency orders in the past to authorized discharges in ways that could not be allowed under the NPDES program, EPA and TNRCC agree that procedures under the new TPDES program must be consistent with federal requirements. EPA therefore believes that the existing rules and finalization of the proposed rules, and use of temporary and emergency orders by TNRCC in the context of the TPDES program will be consistent with the CWA.

With regard to the comment's expressed concerns regarding the 40 CFR 123.29 (and CWA § 402(a)(5)) prohibition on a State issuing a permit when EPA objects, EPA would like to point out that emergency orders authorizing bypasses of TPDES facilities will not be permits, but temporary emergency exceptions to the enforcement of some TPDES permit conditions. EPA agrees that the State may not issue a TPDES permit over the objection of EPA, but as discussed above, TNRCC will not have the authority to issue permit-type discharge authorizations via emergency or temporary orders under the TPDES program.

**49. Issue: Identification of Discharges Not Under TNRCC Jurisdiction**

One comment stated that TNRCC must provide identification of discharges not in TNRCC jurisdiction. The comment insisted that TNRCC list all permitted facilities which EPA permits but the State does not, and further explain why each such facility is not permitted under TNRCC's program. It was stated that this information is necessary to understand the division of jurisdiction between EPA and TNRCC with respect to CAFO discharges, discharges from oil and gas related industries, and radioactive waste.

*Response:* TNRCC is not required to provide such lists for approval of the TPDES program, and in fact EPA believes the request to be onerous and unnecessarily burdensome. The MOA clearly states which Standard Industrial Classification (SIC) codes are not within the regulatory authority of TNRCC (regulated by the Texas Railroad Commission). As previously stated, neither EPA nor TNRCC is aware, at this time, of a CAFO facility which is not subject to TNRCC authority. Additionally, EPA has very limited authority over radioactive wastes under NPDES. TNRCC has at least the same authority to regulate those wastes now addressed in the NPDES permits. TNRCC's authority in this area is discussed in the MOA and in Chapter II, page 2–5, of the TPDES application. EPA believes TNRCC's authority over CAFOs, oil and gas facilities and radioactive waste discharges is adequately described. In order to ensure that permittees are not confused about their NPDES regulatory authority after this authorization, EPA is providing separate notice by letter to the regulated facilities affected by this authorization, notifying each of its status under either EPA or transfer to TNRCC authority. EPA does not believe there is any matter of division of authority that must be resolved before TNRCC can be approved.

**50. Issue: TNRCC Using EPA Guidance and Policy Only to Extent it Does Not Conflict With State Law or Policy**

One comment expressed concern that Section III.A.7 of the MOA states that "TNRCC will utilize EPA national and regional policies and guidance to the extent there is no conflict with Texas statutes, a specific State policy, or guidance adopted by TNRCC." The comment stated that this was backwards in that Texas was required to demonstrate equivalency with the federal requirements.

*Response:* Since policies and guidance are not legal requirements, TNRCC's is not bound to follow them exactly. For example, EPA has a policy that the application requirements for large and medium municipal separate storm sewer systems contained in 40 CFR 122.26(d) were intended to apply only to first-time permit issuance, and less information is required for permit re-issuance. While TNRCC will be following this EPA policy, if State law separately and specifically requires all this information, TNRCC could not legally ignore State law simply to follow an EPA policy. A State's right to have requirements more stringent or extensive than those of in the federal NPDES program is recognized in 40 CFR 123.1(i).

**51. Issue: TNRCC Authority To Assume Existing NPDES Permits**

One comment indicated that TNRCC had no authority to assume or enforce EPA's permits and particularly had no authority to adopt or enforce an EPA-issued general permit that did not limit

**51182** **Federal Register** / Vol. 63, No. 185 / Thursday, September 24, 1998 / Notices

discharges to the 500,000 gallons per day limit imposed on TPDES general permits.

*Response:* 30 TAC 305.533 specifically provides for the State to adopt EPA-issued permits and pretreatment programs upon assumption of the TPDES permit program. This conforms with common practice in the NPDES State authorization process for a State and EPA to make arrangements in the MOA for the State to assume responsibility for EPA-issued permits. (See 40 CFR 123).

EPA does agree that the current limitations on maximum discharges that can be authorized under a general permit issued by TNRCC could affect the manner in which NPDES general permits transferred to the State for administration will be handled at their expiration. TNRCC will be notifying dischargers authorized under the EPA-issued general permits it assumes that their authorization to discharge in excess of 500,000 gallons per day will not be available under the replacement TPDES general permit, when it is issued, and they will need to apply for coverage under an individual permit should they need authorization for discharges over that amount. The general permits with the most potential to be authorizing discharges exceeding 500,000 gallons per day are the storm water general permits that EPA will be administering until they expire (or earlier if replaced by a TPDES permit). As discussed in responses to comments on program resources for the storm water program, TNRCC has requested the additional resources to administer the storm water program using individual permits due to the 500,000 gallons per day limitation on its authority regarding general permits.

52. Issue: Appropriateness of EPA's Completeness Determination

Several comments asserted that additional information provided in comments submitted by TNRCC on July 27, 1998, indicate that the TPDES application was not complete at the time of EPA's completeness determination on May 7, 1998.

*Response:* Contrary to the assertion of these particular comments, EPA does not view the supplemental detail provided by the State to call into question the completeness of the State's application. There is a distinction between the ''completeness'' of the application and the ''approvability'' of the application. On May 7, 1998, the Agency determined that Texas' February 5, 1998 program approval request (as supplemented by additional information received on February 12, March 16,

April 15, and May 4), constituted a complete package under 40 CFR 123.21, i.e., one containing all the element necessary for EPA to make a decision on approvability. That package included a chapter on resources to run the program (Chapter 7), with numbers of State employees and funds that would be devoted to the running of the program. Thus, there was information on resources, but members of the public (and then EPA) asked for additional detail on the source of those funding resources and the precise use of personnel so that a more informed decision could be made about the sufficiency of those resources—the approvability question.

The structure of the federal regulations themselves makes clear that the completeness determination is distinct from the approvability determination. The regulations first require a decision as to whether or not a package has been received that includes all required elements (the Governor's letter, program description, Attorney General's statement, applicable State laws and regulations, etc.), as required at 40 CFR 123.21(a). Once EPA decides that the State Program submission is complete, the statutory review period ''for formal EPA review of a proposed State Program under CWA'' shall be deemed to have begun (40 CFR 123.21(b)(1)). EPA then embarks on a second decision as to whether the complete package should be approved. This distinction between the completeness determination and the approvability determination is also discussed in EPA guidance.

The regulations go on to provide that if, during the statutory review period, there is a ''material change'' in a package previously determined to be complete, then the statutory review period shall begin again upon receipt of the revised information (40 CFR 123.21(c)). This is consistent with generally accepted principles of notice-and-comment rulemaking. See Section 553(b)–(d) of the Administrative Procedure Act, 5 U.S.C.A. § 553(b)–(d); *Paralyzed Veterans of America* v. *West,* 138 F.3d 1434 (1988); *Asiana Airlines* v. *FAA,* 328 US App. D.C. 237, 134 F.3d 393 (1988); *National Electric Mfrs. Assn.* v. *EPA,* 321 US App. D.C. 319, 99 F.3d 1170 (1996); *Fertilizer Inst.* v. *US EPA, 290* US App. D.C. 184, 935 F2d 1303 (1991). However, EPA does not view the clarifications submitted by Texas as constituting a material change in the application. The additional detail provided was merely corroborative of the original application—the number of persons assigned to the proposed TPDES program did not change, and the

amount of funding did not change. The dollars specified in the tables are different, but only to reflect changes made by TNRCC (unrelated to TPDES) in initiating career ladders, etc. EPA and the public were simply afforded a deeper understanding of the direction and management of those resources by the applicant State agency.

53. Issue: Appropriateness of Basing Approval Decision on Information Received During the Public Comment Period

One comment argued that ''EPA must make its authorization decision on the materials in the application, not on some new information submitted by TNRCC after the comment period has begun.''

*Response:* EPA does not agree. On its face, the comment appears to suggest that EPA is limited in its consideration to only the application, and may not consider any information that came in during the comment period; such a reading would negate the purpose of the comment period and cannot be correct. Further, it is not correct that EPA can consider the comments of all members of the public other than the State. The State is perhaps the most directly affected member of the public on this application, and has a great deal of information and insight into the application package that might be helpful to EPA in reaching a decision and avoiding erroneous interpretations (especially of TNRCC statements); EPA believes strongly that the State, like every other part of the public, is welcome to file comments on this notice of a proposed program. Indeed, here— as in almost every such case—the Agency specifically asked the State and other interested parties to comment on the many issues at stake in the approval decision.[8]

If, as the comment suggests, the receipt of mere clarifying comments (like those provided by the TNRCC) act to require the restarting of the statutory review period and a new 45-day public comment period, then the Agency and the public would be faced with a never-ending do-loop of notice and comment periods. As the courts have recognized in the context of notice-and-comment rulemakings, an agency must be able to learn from the comments it receives without facing the peril of starting a new round of comment. *International*

[8] See, e.g., 63 FR at 33662 (''EPA will consider all comments on the TPDES program and/or its approval in its decision''); 63 FR at 33664 (''EPA intends to seek clarification from the TNRCC regarding certain aspects of the information provided. Any additional comments by the public will also be considered * * *.'').

*Harvester Co.* v. *Ruckelshaus,* 478 F.2d 615, 632 n. 51 (D.C. Cir. 1973); *City of Stoughton, Wis.* v. *U.S. EPA,* 858 F.2d 747, 753 (D.C. Cir. 1988). Here, the Agency concluded that the clarifying information was not a material change in the application; however, because the Agency had alerted the public that the additional details might be important to the final decision, EPA did provide interested parties an additional opportunity to provide comment to the Agency on that information. Whereas a 45-day comment period had been provided for public review of the entire 4106-page application, members of the public had up to 27 days (for those at the public hearing) or up to 14 days (those notified only by mail) in which to submit comments on the 20 pages of detail provided by the State. EPA believes that this procedure gave all interested parties a fair and ample opportunity to review the State's clarifying information on resources.

54. Issue: Use of Surface Waters as Treatment Units Under State Law

Several comments contend that EPA should disapprove the TPDES program because the universe of surface waters protected by Texas law is allegedly narrower than the universe protected by CWA. According to these comments, TNRCC allows some operators to use impoundments of naturally occurring waters and isolated waters (e.g., playa lakes for waste treatment purposes). They contend that the CWA prohibits such uses of ''waters of the United States'' and that Texas's permitting practices allow dischargers to avoid imposition of appropriate regulatory controls. They claim EPA should require TNRCC to adopt enforceable regulations prohibiting the use of waters of the United States for waste treatment systems and procedures for identifying and correcting its past errors in allowing such use; several specific examples of such alleged errors were provided.

*Response:* As a practical matter, all NPDES permitting agencies must distinguish between waste treatment systems and protected waters. Otherwise, they could not identify the physical location at which effluent limitations apply. For this reason, EPA's definition of ''waters of the United States'' at 40 CFR 122.2 excludes ''waste treatment systems'' even though some of those systems have characteristics similar to protected waters. With one exception identified below, the comment's description of TNRCC's regulatory practices appears consistent with that exclusion.

The comment incorrectly assumes CWA affirmatively prohibits conversion

of waters of the United States to waste treatment systems, perhaps because a portion of 40 CFR 122.2, as codified, appears to prohibit such conversions. That portion of the regulation has been long suspended. *See* 45 FR 48680 (July 21, 1980). Currently, nothing in CWA § 402 or EPA's implementing regulations *per se* prohibits using impounded portions of naturally occurring surface waters as waste treatment systems or, as sometimes occurs, using an entire isolated water body as a waste treatment system. Construction of improvements to convert waters of the United States to waste treatment systems frequently requires an authorizing permit issued under CWA § 404, however, and may also be subject to regulation under State or local laws, such as TWC Chapter 11 prohibition on impoundment or diversion of State waters unless permitted.

EPA has promulgated no regulations and little guidance on distinguishing waste treatment systems from waters of the United States. Whether or not a particular discharge is to a waste treatment system or a water of the United States may occasionally thus raise issues for resolution in permit or enforcement actions under NPDES programs. In *In re Borden Inc., Colonial Sugars,* 1 EAB 895, 908–912, NPDES Appeal No. 83–8 (September 25, 1984), for instance, EPA rejected a discharger's claim that an impounded portion of a swamp was a ''waste treatment system'' in a permitting action, holding that segregation of waste from the surrounding environment during treatment was an indispensable condition for waste treatment. TNRCC has a definition of waste treatment system in 30 TAC Chapter 307. EPA has no reason to believe TNRCC's lack of detailed guidance on waste treatment systems will render it unable to resolve such issues in TPDES permit actions.

EPA acknowledges that difficult issues may arise from application of the waste treatment system exclusion to playa lakes (a.k.a. ''playas'') under both federal and State law. In their natural state, playas are frequently ephemeral and hydrologically separated from other surface waters. Under the CWA, isolated intrastate waters like playas are ''waters of the United States'' only if their ''use, degradation, or destruction could affect foreign,'' a factor which renders federal jurisdiction over them case-specific (40 CFR 122.2). Many playas possess the requisite commerce *nexus,* but those that lack it are not generally subject to regulation under the CWA. Moreover, an entire playa which would otherwise be a water of the United States may,

under some circumstances, be considered a waste treatment system, rendering discharges to that playa beyond the ambit of CWA § 301(a) (but sometimes subjecting them to regulation under other authority, e.g., the Resource Conservation and Recovery Act). Determining whether a specific playa lake is a water of the United States or a waste treatment system is thus a highly case-specific undertaking requiring substantial judgment on the part of a permitting or enforcement authority. *See, e.g.,* 58 FR 7610, 7620– 7621 (February 8, 1993).

As pointed out in the comment, there was a time when Texas viewed playas as privately owned waters not subject to regulation under TWC, even though the definition of ''waters in the State'' at TWC § 26.001 and ''Surface water in the state'' at 30 TAC 307.2(40) were (and are) plainly broad enough to encompass isolated waters. Since 1990, however, the State has interpreted its statutory definition as encompassing playas. Because Texas requires no interstate or foreign commerce *nexus,* its assertion of permit jurisdiction over playas is arguably broader than CWA's. Its current ''Playa Lake Policy Statement'' (Appendix 3–E of the Program Approval Request), moreover suggests TNRCC will not regard ''new discharges of industrial and municipal wastewater to playa lakes not previously authorized to be used as wastewater treatment or retention facilities before July 10, 1991'' as discharges to waste treatment systems, a factor which arguably renders the State's policy more protective of the ecological values and functions of natural playas than CWA and EPA regulations.

In one somewhat limited situation, however, TNRCC may be able to afford less permit protection to playas than EPA. As pointed out by the comment, TWC § 26.048 prohibits TNRCC from regulating animal feeding operation discharges to playas which commenced before the State asserted jurisdiction over them, an apparent legislative attempt to minimize potential disruption arising from changes in the State's jurisdictional views. EPA considers such State laws in its own case-specific decisions on whether or not a given playa is a waste treatment system, but they are not necessarily a controlling factor. *See* 58 FR 7621. Hence, TNRCC may be statutorily prohibited from regulating some animal feeding operation discharges to playas which EPA would find subject to regulation under CWA. Section III.B.8 of the EPA/TNRCC MOA addresses this potential problem, essentially providing that EPA will continue to regulate

**51184**    **Federal Register** / Vol. 63, No. 185 / Thursday, September 24, 1998 / Notices

discharges from concentrated animal feeding operations to playa lakes which are waters of the United States when TNRCC lacks jurisdiction to apply the TPDES program to them. Regulation of such discharges is not a part of the TNRCC program EPA has approved in accordance with CWA § 402(n)(3). The comment provided examples of specific situations in which TNRCC has apparently applied a waste water treatment exclusion. In this response, EPA Region 6 is not determining whether or not those specific applications are consistent with CWA or TWC. They may warrant further consideration in future TPDES actions, however.

55. Issue: Statutory Limitations on TPDES General Permits

Both the regulated community and public interest groups expressed concerns over the impact of TNRCC's current lack of authority to issue general permit authorizing more than 500,000 gallons per day. Those in the regulated community were primarily concerned with the impact this would have in effective and timely permitting of storm water and CAFO discharges, which, depending on rainfall and size of a facility, could easily require authorization for more than 500,000 gallons of runoff in a single day. The lack of resources to write individual permits for storm water discharges and larger CAFOs and the resulting impact on TNRCC's other permitting activities was a major concern for public interest groups. Other limitations on TNRCC's current general permit authority, especially the requirement for 30 days advance notice of intent to be covered by a TPDES general permit was a particular concern for developers and the construction industry.

*Response:* EPA agrees that the current limitations on TNRCC's general permit authority placed on it by statute could hamper effective implementation of especially the storm water program. This is one of the primary reasons that EPA agreed to retain administration of storm water permits that it had already issued at least until they expire. This will give Texas the time to choose how to best administer the storm water permitting program. For example, Texas could choose to provide TNRCC with the resources that would be required to issue individual permits to the large number of storm water discharges in a timely manner. Alternatively, Texas could choose to change the statutes limiting TNRCC's general permit authority; creating the option to reduce the resources that TNRCC would need for the large number of storm water

discharges by allowing the use of the typically more efficient and faster general permit mechanisms.

While EPA prefers to handle storm water discharges with general permits, Texas is not required to do so, provided all discharges are regulated one way or the other. Once Texas has assumed administration of the NPDES program, it is required to fully implement and adequately fund the approved program. Texas has made this commitment in Section III.B.1. of the MOA which states: ''It is recognized that it is the TNRCC's responsibility after program approval to run and manage the TPDES, Pretreatment, and Sewage Sludge Programs with or without the assistance of federal funding.'' So long as these objectives are fully met, EPA has no authority to tell Texas that it cannot choose to use individual permits in lieu of general permits. Likewise, EPA cannot preclude TNRCC from requiring a shorter (i.e., more restrictive) Notice of Intent period for its general permits (see 40 CFR 123.1(i)(1)).

56. Issue: Failure to Require Texas To Acknowledge EPA Interpretations of the Audit Privilege Act in its Application for NPDES Authorization

One comment asserted that EPA should have required TNRCC to explicitly agree to EPA's interpretation of the Texas Audit privilege act in its application for NPDES authorization.

*Response:* This comment does not make clear what EPA interpretations of the Texas audit privilege act [Tex. Civ. Statute art. 4447cc (1988)] the State must acknowledge in its NPDES authorization application. Texas has submitted a Statement of Legal Authority for the Texas National Pollutant Discharge Elimination System Program (including the March 13, 1998, supplement) (Texas Legal Statement) and related program implementation documents. These documents describe the content of the Texas audit privilege act as well as the process by which EPA and the State discussed needed changes to the 1995 Texas audit privilege act, which were ultimately enacted by the Texas Legislature in 1997. The Texas Legal Statement certifies that Texas law (including the audit privilege act) provides the State with adequate authority to operate the NPDES program, and EPA agrees that the state law can reasonably be read as providing the State with such authority. Further, EPA can correct any problems which may arise in the implementation of needed authorities through its oversight role once an NPDES program is authorized. Under federal law, as explained above, EPA can take independent action to address any

violations that are dealt with inadequately by the State, and can reconsider its approval of any program should the state prove unable to enforce federal requirements.

57. Issue: Improper Barrier to Criminal Enforcement/Investigations

One comment asserted that Texas law placed an improper barrier on criminal enforcement and investigation.

*Response:* 40 CFR 123.27(a) and (b) require the State to have specific authority to seek criminal remedies, including criminal fines. The amended Texas law does not impose barriers to criminal enforcement or impair the State's ability to use audit information in a criminal investigation or proceeding. The 1995 Texas audit privilege act was specifically amended in 1997 to limit application of the privilege to ''civil or administrative proceedings,'' which cannot reasonably be read as encompassing criminal investigations. Furthermore, new section 9(b) of the law removes any limit on the state's ability to review any information that is required to be made available under federal or state law prior. Those requirements encompass virtually all information that is relevant to program operation, leaving the state with ample authority to conduct both civil and criminal investigations without the encumbrance of a prior hearing to determine whether or not the material can be viewed.

58. Issue: Improper Barrier to Emergency Orders/Injunctive Relief

One comment asserted that Texas law established an improper barrier to emergency orders and injunctive relief.

*Response:* 40 CFR 123.27(a) requires the State to have the authority to restrain immediately unauthorized activities which are endangering or causing damage to public health or the environment and to seek in court to enjoin any threatened or continuing violation of any program requirement. Neither the original 1995 Texas law nor the 1997 amendments have any impact on the State's ability to issue emergency orders or obtain injunctive relief. Section 10 of the law provides immunity from administrative and civil penalties, and the definition of ''penalty'' in section 3(a) excludes the concept of injunctive authority. Furthermore, section 10(b) does not extend immunity to situations which pose an imminent and substantial risk of serious injury or harm to human health or the environment, as provided. As noted above, Texas can obtain access to all information required to be made available.

**59. Issue: Limits on TNRCC's Ability to Review of Certain Audit Documents (No Authority to Copy or Use Information)**

One comment asserted that the Texas Audit privilege act improperly limited the ability of TNRCC to copy or use information in audit documents.

*Response:* Section 402(b) of the Clean Water Act, 33 U.S.C. 1342(b), requires the State to have the authority to inspect, monitor, enter, and require reports to the same extent as EPA under section 308 of the Clean Water Act, 33 U.S.C. 1318. See also 40 CFR 123.26. Section 8(a)(1) of Texas's law provides that privilege does not apply to ''information required by a regulatory agency to be collected, developed, maintained, or reported under a federal or state environmental * * * law.'' This exclusion applies to information, including data, required to be collected, developed, maintained, or reported to the State or the public. Section 9(b) of the Texas statute also gives the State the opportunity ''to review information that is required to be available under a specific state or federal law * * *'' The review does not waive the existing privilege for this information. The Texas law, however, also contains relevant constraints on this narrow privilege. Section 7(a)(3) makes the privilege unavailable where ''appropriate efforts to achieve compliance with the law were not promptly initiated and pursued with reasonable diligence after discovery of noncompliance'' so that access is provided to information needed to verify such compliance. Section 5(d) also allows persons who participate in the audit and observe physical events of noncompliance to testify about those events.

Thus, in general under the Texas law, the State may review, obtain, and use required information. In limited circumstances, however, where the information is not required to be collected, developed, maintained, or reported, but is otherwise required to be made available, the State may still obtain access to that information.

**60. Issue: Improper Barrier To Access Evidence To Determine Whether Violations Have Been Corrected**

One comment asserted that the Texas Audit privilege act placed improper barriers to accessing evidence to determine whether violations discovered during a self-audit had been corrected.

*Response:* Section 402(b) of the Clean Water Act, 33 U.S.C. 1342(b), requires the State to have the same authority to inspect, monitor, enter, and require reports to the same extent as EPA under section 308 of the Clean Water Act, 33 U.S.C. 1318. In particular, section 308 provides EPA with broad authority to inspect, monitor, enter, and require reports to verify compliance with Clean Water Act effluent limitations and standards. In addition, 40 CFR 123.25(a) requires the State to have the authority to issue and to administer the program consistent with specific permitting requirements, including requirements of 40 CFR 122.41 to allow the permitting authority access to determine compliance. See also 40 CFR 123.26. Section 8(a)(1) of Texas's audit privilege act provides that privilege does not apply to ''information required by a regulatory agency to be collected, developed, maintained, or reported under a federal or state environmental * * * law.'' Section 9(b) of the statute gives the State the opportunity ''to review information that is required to be available under a specific state or federal law * * *.'' The Texas Legal Statement also certifies that the State has the authority to apply recording, reporting, monitoring, entry, inspection, and sampling requirements. (See page 15 and following.) These aspects of Texas law provide the State with adequate authority to access evidence to determine whether or not violations have been corrected.

**61. Issue: Improper Barrier to Public Participation in State Enforcement Due to Privilege Afforded to Information Required To Be Made Public**

One comment asserted that the Texas audit privilege act's limitations on what information regarding the audit was required to be made public placed improper barriers to public participation in State enforcement actions.

*Response:* As discussed above, section 8(a)(1) of Texas's law provides that privilege does not apply to ''information required by a regulatory agency to be collected, developed, maintained, or reported under a federal or state environmental * * * law.'' This exclusion applies to information, including data, required to be collected, developed, maintained, or reported to the State or the public. Section 9(b) of the Texas statute also gives the State the opportunity ''to review information that is required to be available under a specific state or federal law * * *.'' The review, however, does not expressly waive the existing privilege for this information. The Texas law, however, also contains relevant constraints on this narrow privilege. Section 7(a)(3) makes the privilege unavailable where ''appropriate efforts to achieve compliance with the law were not promptly initiated and pursued with

reasonable diligence after discovery of noncompliance.'' Section 5(d) also allows persons who participate in the audit and observe physical events of noncompliance to testify about those events. Section 9(c) of the Texas law gives the public the right to obtain any information in the State's possession required to be made available under federal or Texas law, irrespective of whether or not it is privileged under Texas law.

**62. Issue: TNRCC Has Not Determined Who Has Used the Law or How it Has Affected TNRCC Enforcement**

One comment asserted that TNRCC had not determined who had used the Texas Audit privilege act or assessed its effect on TNRCC enforcement.

*Response:* A condition precedent to obtaining immunity from civil penalty, is to provide notice to the TNRCC of the intent to conduct an audit. This notice must precede the audit. TNRCC then makes a record of this notice and makes this information available to the public upon request. Furthermore, when a company intends to disclose violations discovered in an audit, this is provided to TNRCC in the form of a second notice. TNRCC also records this information and makes this available to the public if requested. TNRCC maintains an inventory of these two notices in the form of an ''Environmental Audit Log'' which is updated monthly and, upon request, is mailed to individuals who ask to be added to the mailing list for this log.

EPA does not receive information specific to how TNRCC is or is not tracking the impact of this law on enforcement. The State is, however, conducting an audit of general enforcement and has included steps to review impacts of the audit privilege act. Caroline Maclay Beyer of the TNRCC is the contact for this audit in the Office of Internal Audit. This audit should be complete and a report should be available for public review in early September 1998. This is an issue which EPA may address, as appropriate, in oversight of the Texas NPDES program.

**63. Issue: TNRCC Direction to Employees to Not Seek Audits Due to Risk of Criminal Sanctions**

One comment alleged that TNRCC had instructed its employees not to seek access to audits because of fears that such request would result in criminal liability under the Texas Audit privilege act.

*Response:* The TNRCC guidance document on audits states that no employee should request, review, accept, or use an audit report during an

inspection without first consulting the Legal-Litigation Division.

### 64. Issue: Limitations on Whistleblower Protections

One comment asserted that the Texas Audit privilege act restricted whistleblower protection afforded employees under Federal Law.

*Response:* Section 6(e) of the Texas audit privilege act, as added in 1997, provides as follows: ''Nothing in this section shall be construed to circumvent the protections provided by Federal or state law for individuals that disclose information to law enforcement authorities.'' Thus, it preserves all employee disclosure protections currently afforded under state or federal law. Federal law protects individuals who report violations or illegal activity, or who commence, testify or assist in legal proceedings from liability, criminal prosecution, or adverse employment actions. See 33 U.S.C. § 1367 (CWA). In addition, federal disclosure protection provisions have been interpreted so broadly as to include employee disclosures to local authorities, the media, citizens' organizations, and internal employee disclosures to the employer. *See e.g., Dodd* v. *Polysar Latex,* 88–SWD–4 (Sec'y Sept. 22, 1994); *Helmstetter* v. *Pacific Gas & Electric Co.,* 91–TSC–1 (Sec'y Jan.13, 1993); *Nunn* v. *Duke Power Co.,* 84–ERA–27 (Sec'y July 30, 1987); *Poulos* v. *Ambassador Fuel Oil,* 86–CAA–1 (Sec'y Apr. 27, 1987); *Wedderspoon* v. *City of Cedar Rapids, Ia.,* 80–WPC–1 (Sec'y July 28, 1980). Thus, under section 6(e), all of these federal protections remain.

### 65. Issue: Improper Procedures for Review of the Texas Application

Some comments contend that EPA violated the procedures set forth in the CWA and EPA regulations by engaging in predecisional negotiations with the TNRCC over certain aspects of the State Program. The comments argue that these predecisional negotiations created an unreasonable barrier to public participation in the authorization process.

*Response:* Section 402(b) of the CWA requires EPA to approve a State's request for NPDES authorization provided the State has appropriate legal authority, procedures, and resources to meet the requirements of the Act. The regulatory requirements for State Program approval, including the procedures EPA must follow in approving or denying a State's request, are set out at 40 CFR Part 123. 40 CFR 123.21 requires a State to submit to EPA a program submission containing certain specified elements. Within 30 days of receiving such a submission, EPA is required to notify the State as to whether or not the State's submission is complete (any material change in the States' submission restarts the clock). If EPA declares the submission complete, EPA has 90 days from the date of receipt of the State's submission to make a decision as to whether to approve or disapprove the program. Once a submission is declared complete, 40 CFR 123.61 requires EPA to publish notice of the State's request for program approval in the **Federal Register**, provide a comment period of not less than 45 days, and provide for a public hearing to be held within the State not less than 30 days after notice is published in the **Federal Register**. EPA must approve or disapprove the State's program based on the requirements of the CWA and Part 123, and taking into consideration all comments received.

EPA has followed all of the procedures set forth by the CWA and EPA regulations in making a decision on the State of Texas' application for approval of the TPDES program. EPA finished its completeness review within 30 days of receipt of the last material change in the State's application, published the proposed program for a 45-day public comment period in the **Federal Register**, and held a public hearing in Austin, Texas, on July 27, 1998, more than 30 days after publication of notice of the hearing in the **Federal Register**. It is true that, following the State's submittal of the program approval application, EPA continued to ask questions of the State (e.g., citations to State law) and seek clarifying information (e.g., further details on the management of dedicated resource), and as a result, clarifications have been provided by the State to EPA. However, there is nothing in either the CWA or 40 CFR Part 123 which prohibits such an ongoing exchange of information between EPA and a State seeking NPDES authorization. Open communication between EPA and the State regarding questions of State law or policy is critical to EPA's ability to make an informed and accurate decision on authorization. Such communication also plays an essential role in helping States meet the requirements of the CWA and 40 CFR Part 123, thereby enabling EPA to authorize states in accordance with Congress' intent that states be primarily responsible for administering the NPDES program. The procedures followed by EPA Region 6 in reviewing the State of Texas' application were consistent with the procedures used by the Region in reviewing applications submitted by the States of Arkansas, Louisiana and Oklahoma, and did not preclude the public from participating in the process. The State's final application, including any changes or supplements submitted as a result of discussions with EPA, was noticed in the **Federal Register**, and the public was given ample opportunity to comment, both in writing and at the public hearing held on July 27, 1998. Moreover, as discussed earlier, interested parties were given an additional opportunity of up to four weeks to comment on the State's July 27th clarifications regarding information on programmatic resources.

### 66. Issue: Improper Conditional Approval

Some comments note that States are required to have the statutory and regulatory authority necessary to implement the NPDES program in place and lawfully adopted at the time of authorization, and argue that EPA should disapprove the TPDES program because the TNRCC does not currently have the regulatory authority to administer the program for which it seeks authorization. The comments contend that EPA does not have the authority to ''conditionally approve'' the program, contingent on promises of future legislation.

The comments base this argument on a contention that although Texas indicates that it intends to regulate some discharges by general permit or rule, it does not currently have in place any general permits or adequate permits by rule. In addition, these comments argue that because TNRCC has the authority to issue general permits only for discharges less than 500,000 gallons in any 24-hour period, TNRCC cannot assume administration of EPA-issued general permits. Further, the comments contend that even if TNRCC did have the authority to assume administration of EPA-issued permits, it would not have authority to enforce those permits.

*Response:* EPA does not propose to ''conditionally approve'' the TPDES program, contingent on promises of future legislation. Section 402(b) of the CWA requires that all of the authorities listed under that section must be in full force and effect before EPA may approve a State Program. The authorities listed under Section 402(b) include, among other things, the authority to issue permits which apply, and insure compliance with, applicable requirements of the CWA. As noted on page 4 of the Texas Attorney General's Statement, State law gives the TNRCC the authority to issue permits for the discharge of pollutants by existing and

new point sources to the same extent as the permit program administered by EPA, with the exception of those discharges not within the TNRCC's regulatory jurisdiction. See TWC § 26.027 (Text of section effective upon authorization of NPDES permit authority), which provides that the TNRCC may issue permits for the discharge of waste or pollutants into or adjacent to water in the state, and TWC § 26.121(d) (Text of section effective upon authorization of NPDES permit authority, which provides that any such discharge not authorized by the Commission is a violation of the Code).

In addition, as discussed on pages 6 and 7 of the Attorney General's Statement, TWC § 26.040 gives TNRCC authority to issue general permits. Section 26.040 also allows the TNRCC to continue to authorize some discharges by permits by rule. The fact that TNRCC states in the MOA that it may exercise this general permitting authority at some point in the future is not, in EPA's view, a violation of CWA § 402(b). If for some reason, the permitting of these discharges by general permit turns out to be inappropriate, TNRCC still has the authority, as required by § 402(b), to issue individual permits for these discharges (See Attorney General's Statement at page 7). Nothing in the CWA requires a State to permit by general permit.

With regard to the contention that TNRCC cannot assume administration of EPA-issued general permits because TNRCC has the authority to issue general permits only for discharges less than 500,000 gallons in any 24-hour period, EPA disagrees. 30 TAC 305.533 specifically provides that TNRCC adopts all EPA permits. While it is true that Texas Water Code 26.040 precludes TNRCC from issuing general permits for discharges of more than 500,000 gallons in any 24-hour period, this does not preclude TNRCC from assuming EPA's general permits covering discharges over 500,000 gallons as part of the assumption of the NPDES program. After the EPA-issued permits expire, TNRCC will be required to issue individual permits to those facilities that are not eligible for TNRCC-issued general permits.

Finally, as to the comments' argument that, even if TNRCC did have the authority to assume administration of EPA-issued permits, it would not have authority to enforce those permits, the TNRCC's authority to enforce EPA-issued permits is discussed in detail later in EPA's response to comments.

67. Issue: Authority to Regulate Discharges Such as Storm Water by Individual Permit

Some comments contend that TNRCC does not have the regulations necessary to regulate discharges such as storm water by individual permit.

*Response:* In 30 TAC 281.25(4), TNRCC adopted by reference EPA's storm water regulations found at 40 CFR 122.26.

68. Issue: Authority To Enforce EPA-Issued Permits

Some comments argue that EPA should disapprove the TPDES program because the TNRCC lacks the authority to enforce EPA-issued NPDES permits. The comments argue that the Texas Water Code gives the TNRCC the authority only to enforce permits "issued by the commission," and that, as a result, TNRCC does not have the authority to assume primary enforcement authority over certain permits already issued by EPA, as provided for in the proposed MOA. These comments also contend that TNRCC cannot enforce the federal general permits for CAFOs and storm water, which EPA assumes to be the same issue.

*Response:* 30 TAC 305.533 states that on the date of TNRCC's assumption of the NPDES permit program, the State adopts all EPA permits, except those over which EPA retains jurisdiction as specified in the MOA. Section 305.533 was adopted under the authority of TWC § 26.121, under which discharges to surface water are prohibited except by authorization of the TNRCC. Such "authorization of the TNRCC" is not limited to permits issued by the TNRCC. Sections 5.102 and 5.103 of the Texas Water Code authorize the TNRCC to adopt rules necessary to carry out its powers and duties and to perform any act necessary and convenient to exercise its powers under the Water Code and other laws. This includes permits issued by EPA, including federal general permits for CAFOs and storm water. The TNRCC has authority under Chapters 7 and 26 of the Texas Water Code, specifically sections 7.001 (Definitions), 7.002 (Enforcement Authority), 7.032 (Injunctive Relief), 7.051 (Administrative Penalty), 7.101 (Violation), 7.105 (Civil Suit), 7.145 (Intentional or Knowing Unauthorized Discharge), 7.146 (Discharge from a Point Source), 7.147 (Unauthorized Discharge), 7.152 (Intentional or Knowing Unauthorized Discharge and Knowing Endangerment), 7.153 (Intentional or Knowing Unauthorized Discharge and Endangerment), 7.154

(Reckless Unauthorized Discharge and Endangerment), and 26.121 to enforce any license, certificate, registration, approval or other form of authorization issued under any statute within the TNRCC's jurisdiction or a rule, order or permit issued under such a statute. Therefore, the TNRCC has authority to enforce EPA-issued permits adopted by the TNRCC.

69. Issue: Added Burden of Proving Harm to Receiving Waters

Some comments argue that EPA should disapprove the TPDES program because Texas law limits the ability of the TNRCC to enforce against certain unpermitted discharges, because of the added burden of proving harm to the receiving waters.

*Response:* EPA assumes the comments are concerned with the text of TWC § 26.121(a) (Text of section effective until authorization of NPDES permit authority), which prohibits certain discharges that by themselves or in conjunction with other discharges or activities, cause, continue to cause or will cause pollution of any water in the state. This section would be problematic if it were to remain in effect after NPDES authorization. However, the Texas legislature amended TWC § 26.121 in 1977 to include subsections (d) and (e) effective upon authorization of the NPDES program. Subsection (d) of Texas Water Code 26.121 (Text of section effective upon authorization of NPDES permit authority) provides that no person may discharge any pollutant, sewage, municipal waste, recreational waste, or industrial waste from any point source into any water of the state, except as authorized by the TNRCC. As discussed in the Attorney General's Statement, pp. 4–5, the definitions of "pollutant" and "point source" are found at TWC § 26.001(13) and (21), and those definitions track the definitions found in CWA § 502 and 40 CFR 122.2. Therefore, given the amendments to TWC § 26.121 that became effective upon authorization of the NPDES program, EPA does not believe that Texas law provides for an added burden of showing harm to the receiving waters.

70. Issue: Reporting and Enforcement for Spills more Limited under State law

Some comments argue that EPA should disapprove the TPDES program because reporting and enforcement for spills in Section 26.039 is linked to a determination of harm (i.e., cause pollution) and is therefore more limited than EPA's minimum federal requirements for State NPDES programs.

*Response:* TWC § 26.039 does speak to and provide reporting requirements

for accidental discharges or spills that cause or may cause pollution. However, this provision does not limit the TNRCC's authority to enforce against those who violate the Texas Water Code, a TNRCC rule, permit, order or other authorization. Section 26.039(d) states, "nothing in this section exempts any person from complying with or being subject to any other provision of this chapter." The TNRCC can still enforce against a person who violates Texas Water Code 26.121. TWC § 26.121(d) provides that no person may discharge any pollutant, sewage, municipal waste, recreational waste, or industrial waste from any point source into any water of the state, except as authorized by the TNRCC. All point sources regulated under the NPDES program and within the regulatory jurisdiction of the TNRCC are subject to this provision, and thus may discharge only in compliance with authorization from the TNRCC. 30 TAC 305.125 sets out standard permit conditions for permits issued by the TNRCC, which include requirements, including reporting requirements, consistent with the minimum federal requirements found at 40 CFR 122.41. All TPDES permittees would be subject to these reporting requirements, which are not linked to a determination of harm and are therefore not more limited than EPA's minimum federal requirements for State NPDES programs.

71. Issue: Legal Authority or Procedures To Assess and Collect Adequate Penalties

Some comments argue that Texas has not shown that it has the legal authority or procedures to assess and collect adequate penalties because TNRCC's authority to seek civil and criminal penalties for violations by federal facilities and cities does not appear to be resolved.

*Response:* EPA is not aware of any outstanding concerns over TNRCC's authority to seek civil and criminal penalties for violations by federal facilities or cities. Due to the vagueness of the comment, EPA can only surmise that the comments may be concerned about TWC § 26.121(a)(2)(B), which provides that except as authorized by the TNRCC, no person may discharge certain wastes meeting certain conditions, unless the discharge complies with a person's "water pollution and abatement plan approved by the Commission." A question has been raised in the past as to whether or not this provision acts to shield persons discharging in compliance with an approved water pollution and abatement plan from enforcement under the TPDES program. The short answer is

no. TWC § 26.121(d) (see text effective upon authorization of NPDES permit authority) provides that no person may discharge, among other things, any pollutant from any point source into any water of the state, except as authorized by the TNRCC. This subsection was added by the Texas legislature to address discharges under the NPDES program, and is controlling over all point sources regulated under that program and within the regulatory jurisdiction of the TNRCC. Point source dischargers discharging in violation of Section 26.121(d) would be subject to civil and criminal penalties under the TPDES program regardless of whether or not they were acting in compliance with an approved water pollution and abatement plan.

72. Issue: State Law Controlling Over Federal Law

Some comments contend that the MOA impermissibly states that, in case of inconsistency, State law controls over federal law. The comments base this argument on Section III.A.7 of the MOA, which provides that "TNRCC will utilize EPA national and regional policies and guidance to the extent there is no conflict with Texas statutes, a specific State policy, or guidance adopted by TNRCC."

*Response:* Section 402(b) of the CWA requires a State seeking NPDES authorization to have statutory and regulatory authority at least as stringent as the federal requirements set out under that section and 40 CFR 123.25. The State of Texas has demonstrated the required statutory and regulatory authority. Also, in cases where both State and federal permits are effective for the same discharge or where generally State and federal law apply, the State assures that TNRCC will fulfill the requirements of the CWA and federal regulations and any other State provisions that are more stringent. See, e.g., MOA, Chapter 1, p. 13 (Section III.C.2. b). Although for the sake of national consistency EPA strongly encourages States implementing an NPDES program to do so in accordance with EPA policies and guidance, there is nothing in either the CWA or 40 CFR Part 123 that requires them to do so. Therefore, TNRCC's statement in the MOA that it will utilize EPA's policies and guidance only to the extent they do not conflict with Texas law or policy or TNRCC guidance is not in conflict with the requirements for NPDES authorization.

73. Issue: TNRCC Has Promulgated Invalid Rules

One comment argues that TNRCC has promulgated invalid rules regulating water and air pollution under the requirements of Texas law. The comment contends that TNRCC failed to index its rules to the statutes upon which they are based as required by Texas Government Code, Section 2001.004, and as a result, that most of the regulations referenced in the TPDES program are invalid under State law and thus do not satisfy the requirements for State permit programs.

*Response:* Since the TNRCC rules that are referenced in the TPDES application have not been ruled to be invalid in a court of law, they may be relied on to meet the statutory requirements of a State permit program. According to TNRCC, all rules adopted by the TNRCC cite the statutory authority under which they are adopted in the preamble to the rule (published in the Texas Register) and this citation serves as an index to the statutory basis.

74. Issue: Unconstitutional Delegation of Texas Legislative Power

One comment contends that the legislative authority TNRCC cites under the Texas Water Code and the Texas Health and Safety Code is so broad and ill-defined as to constitute an unconstitutional delegation of legislative power. The comment references Attorney General Opinion DM474 (1998) as providing that the Texas Legislature may delegate its powers to State agencies, but only if it establishes "reasonable standards to guide the entity to which the powers are delegated." The comment argues that the delegated authority cited by the TNRCC (e.g., § 5.103 of the Texas Water Code, which states that "[t]he Commission shall adopt any rules necessary to carry out its powers and duties under this code and other laws of this state") does not establish such reasonable standards. As a result, the comment contends that the TNRCC has limited standing to promulgate the regulations necessary to satisfy the requirements for approval.

*Response:* The Texas Attorney General has opined in his Statement of Legal Authority for the TPDES application that Texas laws provide the required legal authority to administer the program. Neither TNRCC nor EPA have the authority to determine the Constitutionality of laws passed by the Texas Legislature. These laws are in effect until either ruled unconstitutional in a court of law or repealed by the Texas Legislature.

## Program Element—Specific Issues

### Storm Water

**75. Issue: Storm Water Program Not Specifically Mentioned in Scope of Authorization**

One comment expressed concern that the TPDES application did not specifically identify the NPDES storm water program in the Scope of Authorization section of the MOA.

*Response:* The NPDES storm water program under CWA § 402(p) (40 CFR 122.26) is simply a subset of the basic NPDES permitting program established by CWA § 402 (40 CFR 122). By requesting authorization to administer the NPDES permitting program, TNRCC by definition included a request for authorization for the storm water component of NPDES. The MOA (e.g., Section II.A.2.d), permit program description (e.g., Section I.A.), and the statement of legal authority (e.g., page 3) of the TPDES application all contain numerous references to TNRCC's authority and procedures to regulate storm water discharges and how NPDES storm water permits will be transferred to TNRCC for administration. TNRCC adopted EPA's 40 CFR 122.26 storm water regulations by reference at 30 TAC 281.25(4).

**76. Issue: TNRCC's Authority Over MS4s**

One comment noted that Texas has authority to regulate municipal separate storm sewers from municipalities with as few as 10,000 population and requested an explanation of the reason of this apparent inconsistency with the NPDES storm water program. Another comment noted that while TNRCC has the authority to regulate municipal storm water discharges under State law, the regulatory process under TWC § 26.177 was not consistent with NPDES requirements. An explanation of how the two programs would integrate was requested. The comment also questioned whether or not TNRCC's authority extended to municipalities under 10,000 population.

*Response:* First, EPA would like to eliminate any misunderstandings regarding NPDES authority over municipal separate storm sewer systems. In 1987, Congress added section 402(p) to the CWA, specifically requiring EPA to move forward, in phases, with permitting of point source discharges of storm water under the NPDES program. Section 402(p)(1) outlined the discharges that would be required to be permitted in Phase I, but section 402(p)(2)(E) specifically provides the authority to require

permits at any time for any storm water discharge determined to be contributing to violation of a water quality standard or to be a significant contributor of pollutants to waters of the United States CWA § 402(p)(6) required EPA to promulgate regulations identifying which of the remaining storm water discharges would be regulated in order to protect water quality. Regulations for this ''Phase II'' of the storm water program were proposed January 9, 1998, (63 FR 1536) and are expected to be finalized in March 1999.

Nowhere does the CWA totally exempt smaller municipal separate storm sewer systems from NPDES permit requirements; it only delays when applications are due and requires EPA to issue regulation defining the universe of dischargers that will be regulated under Phase II. Municipal Separate Storm Sewer Systems, as defined at 40 CFR 122.26(b), may be owned or operated by one or more municipal entities, including some that are under the 100,000 population cutoff, provided the population served by the entire system is 100,000 or more. Therefore, EPA and NPDES-authorized states have always had full authority to regulate any size of municipal separate storm sewer systems and any storm water point source discharges on a case-by-case basis.

As specifically provided in 40 CFR 123.1(i), a State is not precluded from adopting or enforcing requirements that are more stringent than those required under the NPDES program. The State is also not precluded from operating a program with a greater scope of coverage than the NPDES program. EPA's decision on program approval can only be based on whether or not minimum criteria for a State Program have been met, and the fact that a State may have the authority to regulate discharges not regulated by the NPDES program is immaterial. TNRCC has committed to implement the TPDES program in a manner consistent with Federal requirements and has adopted the NPDES storm water regulations at 40 CFR 122.26 by reference via 30 TAC 281.25(4).

TWC § 26.177(a) provides that the TNRCC may require a city of more than 10,000 population to establish a water pollution control and abatement program for ''water pollution that is attributable to *non-permitted* sources * * *.'' (emphasis added). Thus, any source of water pollution that is required to be permitted is outside the scope of the municipal water pollution control and abatement program implemented by TNRCC under TWC § 26.177.

**77. Issue: TPDES Permit Application Requirements for Storm Water Discharges**

One municipality asked whether TPDES application requirements for individual permits for storm water discharges and TNRCC's processing program for these permits would be reviewed and approved by EPA and whether or not there would be opportunity for public comment.

*Response:* As stated in the TPDES permitting program description (Chapter 3, Section A.1), TNRCC will utilize EPA's existing application format for Municipal Separate Storm Sewer System (MS4) applications from medium or large municipal systems. Any permit application forms used by TNRCC, while not necessarily identical to the forms used by EPA, will require the same information required by 40 CFR 122.26. TNRCC will update its regulations (required by 40 123.62) and application forms (as needed) after promulgation of new NPDES regulations, including those for Phase II of the storm water program. Failure of the State to update regulations to conform to new Federal statutes or regulations is one of the grounds for withdrawal of program authorization under 40 CFR 123.63(a)(1)(ii).

TNRCC has adopted 40 CFR 122.26 by reference at 30 TAC 281.25(4). Therefore, application requirements for TPDES individual storm water permits are the same as those for NPDES permits. TNRCC's application forms are found in Appendices 3–A and 3–B of the TPDES application. Both sets of documents were provided for EPA review and for public comment as part of the TPDES application. Revisions of an approved State Program, including those necessary to respond to future changes in controlling statutes or regulations are subject to the EPA approval, public notice, and public comment requirements of 40 CFR 123.62.

There is no special processing program for storm water permits. All TPDES permits follow the processing, EPA review, and public comment procedures described in the MOA and the permitting program description (Chapter 3 of the TPDES Application).

**78. Issue: TPDES Regulation of State and Federal Storm Water Discharges**

A municipality asked whether federal and State facilities engaged in industrial activities normally regulated under the federal NPDES storm water program would also be required to obtain permits under the TPDES program.

*Response:* All facilities subject to regulation under the NPDES program

that are under the jurisdiction of TNRCC will require TPDES permits. There is no special exemption for federal or State facilities under the TPDES program. (See 30 TAC 281.25(4) and 40 CFR 122.26)

79. Issue: TPDES Public Education and Outreach

One comment asked whether TNRCC would provide some type of education and outreach program focused on the TPDES regulated community?

*Response:* While EPA certainly supports outreach and public education, such programs are not a required element of a State Program. However, TNRCC does have a Compliance Support Division which is responsible for hosting technical assistance related workshops and conferences to those regulated by the TNRCC and for manning a technical assistance hotline to assist local government. TNRCC's Enforcement Division also provides technical assistance. (TPDES Chapter 2, page 2–13). EPA recommends contacting TNRCC directly with requests for public education and outreach programs to meet specific needs of the regulated community.

80. Issue: Access to Storm Water Notice of Intent Databases

One comment asked whether TNRCC would maintain a TPDES database [on facilities authorized under a storm water general permit] accessible to the public, such as the Region 6 storm water Notice of Intent database.

*Response:* EPA will continue to administer the multi-sector general permit for storm water associated with industrial activity and the construction general permit for runoff from construction projects until they expire in September 2000 and July 2003, respectively (or earlier if replaced by a TPDES permit). EPA will continue to maintain and make available its NOI database during this period and will provide TNRCC with updates of the database periodically. All information on TPDES permits will generally be available from TNRCC under the Texas Public Information Act (Local Government Code Chapter 552) and 30 TAC 305.45–305.46. EPA recommends contacting TNRCC directly with requests for setting up procedures for accessing any TNRCC NOI databases that may be created in the future. TNRCC currently has a mechanism for permit databases to be provided to the public, through its Information Resources Division.

*CAFOs*

81. Issue: Concentrated Animal Feeding Operations (CAFOs) Not Within TNRCC's Jurisdiction

Some citizens and TNRCC question EPA's assertion that it (EPA), will retain jurisdiction over CAFOs for which TNRCC may not have authority. Citizens have expressed concern that the MOA is unclear on this point. They also express concern over parts of the MOA (Section III.C.4.) in which the State commits to making only those changes to Subchapter B and K rules consistent with NPDES requirements. The comment expresses the opinion that EPA and the State have proposed a scheme which will allow the State to adopt equivalent regulations after program assumption.

*Response:* EPA agrees that the portions of the MOA which describe TNRCC's jurisdiction over CAFOs may not be clear to persons who are unfamiliar with Texas statutes which ''grandfather'' older CAFOs discharging into playa lakes under certain conditions. Pursuant to State statute (see TWC Section 26.048), CAFOs that before July 10, 1991 (the effective date of TNRCC's adoption of related revisions to the Texas Surface Water Quality Standards, 30 TAC Chapter 307) were authorized by TNRCC to use, and actually used, a playa lake, that does not feed into any other surface water in the State, as a wastewater retention facility are not subject to water quality standards or other requirements for discharges to waters in the state. This statute effectively restricts TNRCC's authority over these discharges. On the other hand, regardless of the historical use as a treatment system, some playa lakes are considered to be waters of the United States Therefore, under the CWA, CAFOs may not have unpermitted discharges to such playas. EPA and Texas were aware that, if one of these ''grandfathered'' CAFOs is found to be discharging to a playa lake that is also considered to be a water of the U.S., TNRCC may not have the authority to take permitting or enforcement action with respect to those discharges to the playa. While neither EPA nor TNRCC are aware of any grandfathered CAFOs which fit this exemption, and both agencies hope that no CAFO is discharging to a water of the U.S. in violation of the CWA, both agencies determined to err on the side of caution and clearly outline that EPA would have jurisdiction over any CAFO discharges that were not legally within the jurisdiction of TNRCC.

With regard to MOA provisions in Section III.C.4., the State district court

has invalidated the State's Subchapter K rules, a potential outcome of the litigation cited by the State in this portion of the MOA. Although EPA is concerned that the State has lost one of its regulatory mechanisms to provide facilities with coverage under their State Program, it is not an impediment to TNRCC adopting EPA's CAFO permit for these point sources. If any facility believes it would have discharges totaling 500,000 gallons in a 24-hour period it would still be eligible for the EPA CAFO permit administered by TNRCC. When the EPA-issued general permit expires, these facilities should notify TNRCC and obtain individual TPDES permit coverage.

State programs are dynamic and are always changing in accordance with changes to NPDES regulations and needs of the State. Changes in State programs must be reviewed and approved by EPA. This provision in the MOA describes a mechanism to ensure that any changes would be appropriate under the CWA. EPA believes it is clear from this provision that any changes to the Subchapter B and K rules would have to be approved by EPA as consistent with NPDES requirements before it would be implemented in the TPDES program.

82. Issue: Invalidated Subchapter K Rules

Several comments express concern that Texas requirements under Subchapter K were invalidated by the court, and therefore, the program cannot be fully effective at the time of authorization.

*Response:* Subchapter K is a TNRCC authorization by rule which allows animal feeding operations to meet their State requirements, but it is not a TPDES permitting action. In the MOA, TNRCC agreed to assume and administer the Region 6 CAFO general permit, when finalized, and may modify this permit to include State provisions that are more stringent than EPA general permit provisions. Individual facilities will be required to seek either an individual permit or authorization by rule if the facility is not included as part of the category of discharges allowed under the general permit. As to authorizations by rule, Subchapter K was the subject of litigation pending in State district court, and has been invalidated by judicial order.

EPA has proposed an NPDES CAFO general permit for the State of Texas and TNRCC will take over administration of the permit when it becomes effective in accordance with sections III.C.3.c and III.C.7. of the EPA/TNRCC MOA. This will provide an appropriate NPDES

mechanism for facilities in Texas. The state may also issue individual site-specific permits for facilities it determines are not appropriately addressed by a general permit. In the event TNRCC amends Subchapter B and K with the intent to authorize facilities under the approved TPDES program, those rules will be subject to EPA review to insure they are consistent with CWA requirements (see MOA Section III.C.4).

83. Issue: Exceptions for CAFOs

A comment from several public interest groups expressed concern that statutes adopted and proposed TNRCC regulations provide an exemption for CAFOs which would have an established water quality management plan developed by the Texas State Soil and Water Conservation Board (TSSWCB). They express the opinion that these facilities would not be considered point sources. This same comment expressed concern that CAFO facilities with less that 1000 animal units would be exempted from applying for a permit with the TNRCC if they obtain an "independent audit."

*Response:* Although the comment did not supply specific references to the regulations or statutes of concern, EPA believes it refers to a statute, which was adopted in 1993 as Senate Bill 503 (Texas Agricultural Code 201.026), that describes regulation of agricultural and silvicultural nonpoint source discharges of pollution. The statute notes that facilities which may contribute nonpoint source pollution, and which have an established water quality management plan developed by the Texas State Soil and Water Conservation Board are exempted from regulation by TNRCC unless the TSSWCB or TNRCC determines they are a point source. Since this applies only to those facilities classified by the State as NPS, it is not inconsistent with EPA regulations found at 40 CFR 122.23 (regulations applying to point sources of pollution). (i.e., applies to TWC 26.121(b) and not to 26.121(d) or (e)). The exemption is not available for facilities defined in CWA § 502 (14).

Although the comment again did not specify the statute or regulation to which it is referring, EPA can find only one provision in the State's regulations that correlates to the comment about an "independent audit'; which refers to CAFOs under 1000 animal units (30 TAC 321, Subchapter B). This is "authorization by rule" for coverage under State requirements and will not (cannot) be used by TNRCC after approval of the TPDES program. Coverage under this rule is not an

NPDES authorization. TNRCC will adopt the EPA CAFO general permit when it is finalized. This rule was not submitted by TNRCC as part of the TPDES program. This provision, as it applies to the state permitting program prior to TPDES approval, is not considered in the approval decision.

84. Issue: Senate Bill #1910 (Chicken Litter Bill) and Subchapter O Rules

One comment stated that Senate Bill #1910 was "torn to pieces" prior to being passed by the Texas legislature and that TNRCC did nothing to keep the bill intact. The comment appeared to be expressing concern that TNRCC would not actively regulate animal waste such as chicken litter. Comments received by EPA early in the process (prior to the comment period) expressed concern about exemptions in TNRCC rules for aquaculture (30 TAC 321, Subchapter O).

*Response:* As mentioned above, when TNRCC assumes authorization of the NPDES program, the Agency retains oversight authority. Part of EPA's oversight role includes review of TPDES permits for industrial (i.e., poultry processing plants) and municipal operations proposed by the TNRCC, to ensure compliance with applicable regulations and guidelines as established in the Clean Water Act. EPA has reviewed Subchapter O and finds it is consistent with EPA's regulations at 40 CFR 122.24 and 122.25.

*Sludge*

85. Issue: Statutory Requirements for Sludge Permitting Are More Stringent Than the TNRCC Rules

One comment expressed concern that the TPDES program plan provides for permitting and registration for sewage sludge disposal. The comment stated that the statutory basis for sludge regulation is found in the Texas Water Code, which allegedly provides for sludge permitting only, not sludge registration. The comment asserted that, since the statutory requirements for sludge permitting are more stringent than the TNRCC rules promulgated for a sludge site registration and the TNRCC has no authority to adopt less stringent program requirements, there is no valid statutory basis under Texas law for rules regulating registration of sludge sites. Consequently, the comment contended that the TPDES program plan on this point does not provide for adequate authority as required by 33 USC 1342(b).

*Response:* 30 TAC 312.4(a) states permits are required for *all* sewage sludge processing, storage, disposal, and

incineration activities. Further clarification is provided by 40 CFR 503.3(a)(1) which Texas adopted and is referenced in the Continuing Planning Process. This regulation requires all "treatment works treating domestic sewage" be permitted. Treatment works are defined as all TPDES facilities discharging to waters of the United States and those facilities generating sewage sludge but without a discharge to waters of the United States. In addition, it covers facilities changing the quality of sewage sludge. These operations include blending, stabilization, heat treatment, and digestion. The definition of "treatment works" also includes surface disposal site owners/operators, and sewage sludge incinerator owners/operators.

The TNRCC's authority over solid waste disposal, including beneficial use of sewage sludge, is found in Chapter 361 of the Texas Health and Safety Code (THSC). 30 TAC 312.4(c) and 312.12 provide requirements to be followed in the registration of land application sites. The Texas program is more stringent than the minimum program required by the Federal regulations. Texas requires registrations be obtained by persons responsible for the land application operations and the sites onto which the sewage sludge or domestic septage is land applied for beneficial reuse. The Part 503 regulations do not automatically require land appliers of sewage sludge to obtain any type of official authorization for land application operations unless specifically requested to do so by the permitting authority to protect human health and the environment.

*Continuing Planning Process-Implementation Procedures-Water Quality Standards*

86. Issue: Lowering Stream Standards of East Texas

One comment alleges that the three appointed commissioners of the TNRCC, and others, conceived the policy of lowering the stream standards of East Texas in order to accommodate polluting wastewater facilities. The comment asserts that due to citizens' outcry and "EPA's logic," the policy was overruled by the EPA. The implication of the comment was that TPDES authorization would allow TNRCC to take such actions in the future.

*Response:* After state program authorization, EPA maintains program oversight authority to ensure compliance with requirements and regulations of the Clean Water Act. The Agency also maintains the authority for

review and approval of any revisions to water quality standards and/or criteria to listed and unlisted waterbodies of Texas (CWA §§ 303(c)(2)(A) and 303(c)(3)).

87. Issue: No Approvable Continuing Planning Process

One comment states that the (NPDES Program) application may not be approved because TNRCC does not have an approved, or approvable Continuing Planning Process (CPP).

*Response:* EPA approved the Texas CPP on September 10, 1998. The CPP and Water Quality Standards Implementation documents do contain certain procedures which EPA has determined are not consistent with, or do not fulfill the requirements of the Clean Water Act, as interpreted by EPA Region 6. However, these issues have been resolved to EPA's satisfaction via the MOA, which was signed by both TNRCC and EPA concurrently with TPDES program authorization.

88. Issue: No Prior Approval of the Continuing Planning Process (CPP)

A comment raised concerns that Texas did not have a CPP that was approved prior to consideration of the application for permit program approval. Specific issues raised in the comment included the length of time for public review of the three documents and ''conditional approval'' of the CPP by EPA.

*Response:* EPA regulations do not require approval of the CPP prior to the date a State submits an application for program authorization. Regulations at 40 CFR 130.5(c) state that ''[t]he Regional Administrator shall not approve any permit program under Title IV of the [Clean Water] Act for any state which does not have an approved continuing planning process.'' The Texas CPP was approved on September 10, 1998—before the decision on program authorization was made.

The primary elements of the CPP addressed in this section of comments, the Water Quality Standards and the IP, were adopted by TNRCC and submitted to EPA for approval on March 19, 1997 and August 23, 1995, respectively. Thus, both of these documents have been in use and available for public review for over a year. The MOA was made available for public review and comment on June 19, 1998. The official comment period for the package was 45 days, and was subsequently extended by one week. The MOA does contain nine changes to the IP, all identified and listed at Section IV.B., Permit Development, pages 24–27 of the MOA. These changes supersede certain

requirements in the IP and were required by EPA to make the IP approvable. The changes were:

a. Procedures to suspend the use of biological surveys in the IP.

b. Procedures for cessation of lethality during a Toxicity Reduction Evaluation.

c. Conditions for use of alternate test species.

d. Calculation of Dioxin/Furan permit limits.

e. Development of water quality-based effluent limitations for discharges into the Rio Grande.

f. Final Limitations in TPDES permits—consistency with the EPA-approved Water Quality Management Plan (including any applicable Total Maximum Daily Loads).

g. No variance from water quality standards will be used to establish an effluent limitation for a TPDES permit until the standards variance has been reviewed and approved by EPA.

h. TNRCC evaluation of TPDES general permits for compliance with water quality requirements, including whole effluent toxicity.

i. Water Quality Standards Implementation Procedures subject to EPA review and approval after program assumption and while TNRCC is authorized to administer the NPDES program.

EPA does not believe it has circumvented or frustrated the public review and comment process by its approval process. The changes to the implementation procedures listed above are mechanisms that will result in permits more protective than what the state program previously required. Prior to program authorization, all aspects of the CPP, IP and MOA reflected a program that contains all the elements necessary to fulfill all of the requirements of the Clean Water Act for NPDES permitting.

89. Issue: Changes to CPP Not Validly Adopted by TNRCC

One comment stated that the proposed changes to the CPP set out in the proposed MOA, even if they were otherwise adequate, were not validly adopted by TNRCC.

*Response:* As stated above, the MOA and the changes to the IP therein were available for public review and comment for a period of 52 days beginning June 19, 1998.

90. Issue: CPP Is Not Approvable Because of Inadequate Process for Effluent Limitations

One comment states that the CPP does not provide an adequate process for developing effluent limitations, citing the CWA requirements for the CPP to

address the process for developing technology-based effluent limits, effluent limits at least as stringent as those required by CWA Section 301 (b)(1) and (b)(2), and 33 U.S.C. 1311 (e)(3)(A). The comment further states that the MOA does not describe a process for developing effluent limitations and schedules of compliance.

*Response:* Series 21 of the CPP states: ''[t]echnology-based permit limits will be at least as stringent as Best Practical Control Technology Currently Available (BPT), Best Available Technology Economically Achievable (BAT), and Best Conventional Pollutant Control (BCT) limits in accordance with Effluent Limitations and Standards as promulgated for categorical industries and found in federal regulations (40 CFR Parts 400 to 471), as referenced in 30 TAC 305.541. Production-based limitations will be based on a reasonable measure of actual production levels at a facility. Mass limitations for concentration-based guideline limits will be developed using the appropriate wastewater flows as required by regulations. Municipal permit limits will be consistent with Wasteload Evaluation/Allocations, the Water Quality Management Plan, Watershed Protection Rules (30 TAC Chapter 311), and at least as stringent as requirements found in 30 TAC 309.1–4 (secondary treatment).'' Additional requirements for secondary treatment are specified by 30 TAC 305.535(d). This outlines what technology based effluent limitations must be considered and what variables must be used to calculate effluent limitations.

In addition, Series 18 provides an outline of the Texas Water Quality Standards. This includes describing the General Criteria found in 30 TAC 307.4 which defines the general goals to be attained by all waters in the State. It also lists the procedure to address and permit facilities discharging to those waterbodies that are unclassified and therefore do not have site-specific criteria established at the time the permit is developed.

Regarding schedules of compliance, Series 21 of the CPP states that permits will be developed to be consistent with State statutes including Title 30 TAC 307.2(f). This statute allows the TNRCC to establish interim discharge limits to allow a permittee time to modify effluent quality in order to attain final effluent limits. The duration of any interim limit may not be longer than three years from the effective date of the permit issuance.

**91. Issue: Inadequate TMDL Program**

One comment asserts that the CPP does not include an adequate process for developing Total Maximum Daily Loads (TMDLs) and individual water quality based effluent limitations in accordance with Section 303(d) of the CWA. Indeed, TMDL development is only addressed in the CPP in the context of toxic parameters. See Series 20. Even for toxic pollutants, that discussion is grossly inadequate because it fails to establish a process for developing a list of waters for which technology-based limitations are not adequate, fails to establish a process for ranking those waters by priority, fails to establish a process for submission of such lists to EPA, and fails to establish a process for developing a schedule for preparation and implementation of TMDLs. See 33 U.S.C. 1313(d) (setting out requirements for the TMDL process); 40 CFR 130.7. The CPP fails even to address the TMDL issue with respect to other pollutants.

*Response:* In a letter from TNRCC Executive Director Jeffrey Saitas to EPA Region 6 Administrator Gregg Cooke dated September 4, 1998, TNRCC has recently modified its TMDL program, and assures that the approved process applies to all pollutants, not just toxics (attached to CPP). The modified program meets all EPA requirements and addresses the concerns stated in the comment. The information has been submitted as an attachment to the CPP, and will be incorporated into the next revision of the CPP. TNRCC developed guidance for screening and assessing state waters (attached to CPP). This information was presented at three Texas Clean Rivers Program (CRP) Basin Steering Committee meetings during December 1997. Subsequently, criteria and guidance for listing and prioritizing waterbodies was developed (attached to CPP) and distributed January 23, 1998, for review via the TNRCC Internet website, the Texas CRP and various meetings across the state. After comments and revisions, the second draft list was similarly advertised. After further comment, the final draft list was approved by the Commissioners and sent out for a 30-day formal public comment period (March 13—April 13, 1998). Written responses to public and EPA comments were prepared and distributed (attached to CPP). The 1998 303(d) list and methodology (attached to CPP) were finalized and approved by the Commissioners, and the final list was submitted to EPA for approval on April 23, 1998 (attached to CPP). The final list was available on the TNRCC website on June 26, 1998 and approved by EPA on July 27, 1998. Thus, the revised TMDL development has been through an extensive public participation process to generate the 1998 303(d) list.

**92. Issue: Inadequate Process for Establishing Implementation of New or Revised Water Quality Standards**

Comments raised three sub-issues regarding implementation of new or revised quality standards.

*Response:* Responses to each of the three sub-issues raised in comments are provided below.

**93. Sub-Issue on Water Quality Standards: The IP Purports To Apply Tier Two protection * * * Only to Waters Classified as High or Exceptional Aquatic Life, Based Almost Exclusively on Dissolved Oxygen Levels**

*Response:* The TX WQS presume a high quality aquatic life use for all perennial water bodies. An intermediate or limited aquatic life use may only be adopted for a specific water body only when justified with a Use Attainability Analysis (UAA). The focus of a UAA is to determine what is the attainable use based on the physical, chemical and biological characteristics of the water body. As part of a UAA, data collected for a specific water body is compared with a reference (un-impacted) segment. This ensures that the designated use is based on the attainable use rather than based on the conditions with existing sources of pollution. The intermediate and limited aquatic life uses are considered to be existing uses and are also subject to antidegradation review.

EPA has not mandated whether States/Tribes apply "Tier 2" on a parameter-by-parameter basis or on a waterbody-by-waterbody approach as Texas does. This issue is open for discussion in the Advanced Notice of Proposed Rule-Making (ANPRM) for the Water Quality Standards Regulation (see 63 FR 36742). EPA will accept comment on the ANPRM through January 4, 1999. The ANPRM is a separate action from Texas's assumption of the NPDES program.

The antidegradation review may initially focus on dissolved oxygen; however, all pollutants are subject to review.

**94. Sub-Issue on Water Quality Standards: With Regards to Antidegradation, the IP Fails To Set Out a Process for Assuring the Application of the Highest Statutory and Regulatory Requirements for All New and Existing Point Sources and all Cost-Effective and Reasonable Best Management Practices for Nonpoint Source Control**

*Response:* Antidegradation is discussed at 30 TAC 307.5 of the 1995/1997 Texas Water Quality Standards, which have been fully approved by EPA, in accordance with the federal regulation. In particular, items (b)(2), (b)(4) and (b)(5) of Section 307.5 directly address the comment's issues:

(b)(2)—No activities subject to regulatory action which would cause degradation of waters which exceed fishable/swimmable quality will be allowed unless it can be shown to the commissioner's satisfaction that the lowering of water quality is necessary for important economic or social development. Degradation is defined as a lowering of water quality to more than a de minimis extent, but not to the extent that an existing use is impaired.

Water quality sufficient to protect existing uses will be maintained. Fishable/swimmable waters are defined as waters which have quality sufficient to support propagation of indigenous fish, shellfish, and wildlife and recreation in and on the water.

(b)(4)—Authorized wastewater discharges or other activities will not result in the quality of any water being lowered below water quality standards without complying with federal and state laws applicable to water quality standards amendment.

(b)(5)—Anyone discharging wastewater which would constitute a new source of pollution or an increased source of pollution from any industrial, public, or private project or development will be required to provide a level of wastewater treatment consistent with the provisions of the Texas Water Code and the Clean Water Act (33 United States Code 1251 *et seq.*). As necessary, cost-effective and reasonable best management practices established through the Texas water quality management program shall be achieved for nonpoint sources of pollution.

Therefore, under the TPDES program, implementing the approved water quality standards includes implementing the prohibitions on degradation of water quality contained therein.

95. Sub-Issue on Water Quality Standards: The IP Fails To Address Implementation of Narrative Standards * * * and Storm Water Discharges

*Response:* Narrative criteria (both conventional and toxics) are addressed in permit actions. Page 6 of the IP states:

New permit applications, permit renewals, and permit amendments will be reviewed to ensure that permitted effluent limits will maintain in stream criteria for dissolved oxygen and other parameters such as fecal coliform bacteria, phosphorus, nitrogen, turbidity, dissolved solids, temperature, and toxic materials. Assessment of appropriate uses and criteria for unclassified waters will be conducted in accordance with the previous sections.

This evaluation will also include a determination of any anticipated impacts from ambient or baseline conditions, in order to implement antidegradation procedures (see following section). Conditions for the evaluation of impacts will be commensurate with ambient or baseline conditions * * *

Extensive requirements for total toxicity testing are found on pages 40–56 of the IP and pages 24–26 of the MOA. These requirements address protection of narrative water quality standards for toxics and other pollutants through the Whole Effluent Toxicity program. Storm water is not differentiated from other wastewater discharges in the permit limitation derivation procedures.

96. Issue: No Process for Assuring Controls Over All Residual Waste From Water Treatment Processing

One comment expressed the opinion that EPA rules and the Clean Water Act require that a CPP include a process for assuring adequate controls over the disposition of all residual waste from any water treatment processing. The TNRCC CPP fails even to acknowledge this issue.

*Response:* Series 21 of the CPP states the TNRCC will require all industrial wastewater permits (including water treatment plant permits) to contain conditions for the safe disposal of all industrial sludges, including hazardous waste, and that it be managed and disposed of in accordance with 30 TAC Chapter 335 and any applicable requirements of the Resource Conservation and Recovery Act. This includes the adopted regulations 40 CFR Part 257 and 258 referenced below which regulates non-hazardous water treatment plant residual wastes. Series 21 of the CPP further outlines that permits will be developed to be consistent with state and federal statutes, regulations and rules and also incorporate state and federal policies regulating the safe disposal and reuse of

municipal sewage sludge. The regulations listed in the CPP which Texas will follow regarding the permitting of all residuals follows: (1) 30 TAC Chapter 312—Sludge Use, Disposal, and Transportation; Texas Health and Safety Code Chapter 361; 30 TAC Chapters 330, 332—Disposal in a Municipal Solid Waste Landfill; and (2) 40 CFR Parts 122, 257, 258, 501, and 503.

30 TAC 312.4(a) states permits are required for *all* sewage sludge processing, storage, disposal, and incineration activities. Further clarification is provided by federal regulations 40 CFR 503.3(a)(1) which Texas adopted and is referenced in the Continuing Planning Process. This regulation requires all ''treatment works treating domestic sewage'' be permitted. Treatment works are defined as all TPDES facilities discharging to waters of the United States and those facilities generating sewage sludge but without a discharge to waters of the United States In addition, it covers facilities changing the quality of sewage sludge. These operations include blending, stabilization, heat treatment, and digestion. The definition of ''treatment works'' also includes surface disposal site owners/operators, and sewage sludge incinerator owners/operators. 30 TAC 312.4(c) and 312.12 provide requirements to be followed in the registration of land application sites. The Texas program is more stringent than the minimum program required by the Federal regulations. Texas requires registrations be obtained by persons responsible for the land application operations and the sites onto which the sewage sludge or domestic septage is land applied for beneficial reuse. The Part 503 regulations do not automatically require land appliers of sewage sludge to obtain any type of official authorization for land application operations unless specifically requested to do so by the permitting authority to protect human health and the environment.

97. Issue: No Process for Determining Priority Issuance of Permits

One comment indicated that EPA rules require that a CPP include a process for determining the priority of issuance of permits, but the TNRCC CPP fails to even acknowledge this issue.

*Response:* EPA believes TNRCC has addressed the priority of permit issuance via its watershed approach to permitting. This approach identified and prioritized the Texas drainage basins, and requires all permits in a particular basin be issued during the same year. Permitting activities for all

dischargers in a basin then rotate on a five-year basis. The Basin Permitting Rule is found at 30 TAC 305.71. The process is also referenced in the CPP, under Series 21—Point Source Permitting.

98. Issue: Use of EPA Test Methods for TPDES Program

The comment requested clarification concerning Item IV.B.3 in the proposed memorandum of agreement between TNRCC and EPA Region 6 concerning the use of alternate test methods and alternate test species for measurement of Whole Effluent Toxicity (WET). The comment expressed concern about terminology in the memorandum of agreement, specifically, the term ''EPA-approved'' tests and species, which permittees could use if TNRCC approved such use during the permit application process. The comment provided a specific example of allowance for an ionic adjustment of an effluent sample under certain circumstances.

*Response:* NPDES State program regulations applicable to permitting cross reference to certain, specific NPDES regulations that apply to EPA-issued permits, including the regulations that require the use of analytic test procedures approved at 40 CFR Part 136 (40 CFR 123.25(a)(4), (12) & (15); 40 CFR 122.21, 122.41 & 122.44). Recently, EPA approved testing methods to measure WET and published those methods at 40 CFR Part 136.

EPA acknowledges the existence of WET testing protocols that use other test species, or that differ from the procedures in the WET tests that EPA published at Part 136. Those regulations, at 40 CFR 136.4 (b), provide that:

''When the discharge for which an alternative test procedure is proposed occurs within a State having a permit program approved pursuant to Section 402 of the Act, the applicant shall submit his application through the Regional Administrator through the Director of the State agency having responsibility for issuance of NPDES permits within such State.

These procedures are designed to optimize coordination in the approval process between the applicant, the State, and EPA. Item IV.B.3. of the proposed memorandum of agreement, therefore, merely formalizes the State of Texas' role in the process for approval of alternative test procedures (and alternative test species). Through this process, the Commission will determine the acceptability of any alternative test procedures prior to forwarding the proposal to EPA Region 6 for review and approval.

In response to the comment's specific example regarding ionic adjustment of effluent samples, EPA refers the public to: Short-Term Methods For Estimating The Chronic Toxicity Of Effluents And Receiving Water To Marine And Estuarine Organisms (EPA–600–4–91–003) in Section 8.8 and Methods for Measuring the Acute Toxicity of Effluents and Receiving Waters to Freshwater and Marine Organisms (EPA/600/4–90/027F) in Section 9.5. These provisions describe the appropriate use of salinity adjustments for whole effluent toxicity testing for WET testing for discharges into marine waters.

Consistent with the requirements and recommendations in the Part 136 WET testing methods, EPA Region 6 has provided technical support to TNRCC regarding ionic manipulation of effluent samples. The approved manipulations apply only to samples used for the 24-Hour $LC_{50}$ WET test. Under Texas Water Quality Standards (30 TAC 307.6(e)(2)(B)), TNRCC requires a 24-Hour $LC_{50}$ WET test under certain circumstances. The WET tests that EPA published in Part 136 do not include a 24-Hour $LC_{50}$ test. Under CWA section 510, however, States may impose water quality requirements that are more stringent and/or more prescriptive than those required by EPA.

EPA notes that Texas law does not allow for ionic manipulations of effluent samples when pollutants listed in Table 1 of 30 TAC 307.6(c) are present in the effluent or source waters. Finally, EPA notes that 30 TAC 307.4 (g)(3) provides that "Concentrations and their relative ratios of dissolved minerals such as chlorides, sulfates and total dissolved solids will be maintained such that attainable uses will not be impaired." Therefore, while Texas law does allow for adjustments to the 24-hour $LC_{50}$ test conditions under some circumstances, if the discharge causes the relative ratios of dissolved solids to be changed sufficient to impair the attainable uses, the discharge would also have to be evaluated for whether or not changing the relative ratios of dissolved solids in fact would impair the attainable uses.

**Other Specific Issues**

99. Issue: Overlapping EPA/TNRCC Requirements

One comment raised the question of how TNRCC and EPA will address duplicate efforts regarding permit reporting/inspection requirements.

*Response:* When EPA retains enforcement authority, the facilities will continue to report to EPA and TNRCC. Where EPA retains enforcement

authority over a municipality, all NPDES permits associated with that municipality will be retained by EPA. Where a municipality also owns an industrial facility (public utility) those facilities will not be considered as part of the municipality, but will be considered as an individual facility. Facility inspections will continue to be coordinated between the two agencies to ensure minimum duplication of effort.

100. Issue: Definition of Enforcement Action

One comment states the "NPDES application must clearly describe when the commission will use different types of orders." The comment asserts this information is essential to EPA's ability to determine if TNRCC will take timely and appropriate enforcement action.

*Response:* Due to the many variables of assessing violations, EPA cannot require the state to provide this level of detail. Through our oversight of the TPDES program and review of the quarterly noncompliance reports EPA will be able to determine whether or not enforcement actions are timely and appropriate.

101. Issue: Noncompliance Follow-up

One comment states that TNRCC prefers informal resolution to formal documented enforcement and also states that EPA needs to be able to track resolution of violations where no formal action was taken.

*Response:* TNRCC will be required to enter all enforcement actions into the Permit Compliance System (PCS). This will include both informal and formal enforcement actions. Informal actions can include telephone calls, site visits, warning letters, corrective action plans, etc. During EPA's semi-annual audits of the TPDES program, EPA will further evaluate TNRCC's response to noncompliance.

102. Issue: Failure To Comply With the International Treaties and Agreements

A public interest group commented that EPA had failed to carry out its legal responsibilities under international treaties and executive orders to consult with the government of Mexico and to seek input from Mexico on changes that would occur as a result of approval of the TPDES program. The comment contended that: (1) EPA failed to consult with Mexico on the impacts of NPDES authorization to Texas on the Rio Grande as required by the environmental agreements between the U.S. and Mexico; (2) EPA failed to consider what impacts the authorization will have on the ability of Mexico to comment on activities with potential

cross-border issues; (3) TNRCC has not committed to provide notice to the government of Mexico for the purpose of soliciting comments on permits and other decisions that may affect Mexico; and (4) TNRCC lacks adequate procedures to comply with Section 402 (b)(5) of the Clean Water Act as it relates to Mexico.

*Response:* It is difficult to address this overly broad and vague comment because the comment failed to identify any applicable provision within any international agreements or executive orders. Hence, we can only assume which international agreements and executive orders they are referencing.

(1) International environmental agreements, such as the La Paz Agreement, between the U.S. and Mexico require the U.S. to consult with Mexico on certain specified environmental issues. However, the environmental agreements between the U.S. and Mexico and executive orders, do not specifically require the U.S. to consult with Mexico about authorization of a program, like the NPDES program, to a state, such as Texas. Moreover, EPA retains significant oversight authority over Texas NPDES permitting activities pursuant to the Clean Water Act. Consequently, Mexico's ability to consult with the U.S. as required under current environmental agreements is not reduced concerning any NPDES environmental issues after authorization of the NPDES program to the State of Texas.

(2) There are many fora and mechanisms for the Mexican Government to raise environmental issues, involving the State of Texas, with the U.S. EPA, the U.S. Department of State and the U.S. Department of Justice. These include the Commission for Environmental Cooperation, Border Environment Cooperation Commission, meetings mandated pursuant to the La Paz Agreement, and through other bilateral, and multilateral meetings and organizations.

(3) We are unaware of any mandatory obligations on the part of the State of Texas to provide notice of an NPDES permitting activity to the Government of Mexico.

(4) Section 402(b)(5) of the Clean Water Act does not apply to foreign countries and specifically not to Mexico. The word "State" in the following provision applies to a State of the United States and does not confer upon Mexico the same right to submit recommendations, as the statute provides to a State. The following is the text of the statute.

CWA 402 (b)(5) provides that: To ensure that any State (other than the permitting State), whose waters may be affected by the issuance of a permit may submit written recommendations to the permitting State (and the Administrator) with respect to any permit application and, if any part of such written recommendations is not accepted by the permitting State, that the permitting State will notify such affected State (and the Administrator) in writing of its failure to so accept such recommendations together with its reasons for so doing.

103. Issue: Additional Documents That Should Be Added to the Administrative Record

In the **Federal Register** notice, EPA requested that the public provide input on any document relevant to EPA's decision on the TPDES program that they felt should have, but had not, been included in the official record. One comment suggested that all previous applications for NPDES authorization by Texas; all written correspondence between EPA and Texas regarding those previous applications; all documents prepared since January 1, 1990, involving grants from EPA to Texas for water pollution control including, but not limited to grant documents, contracts for grants, and evaluations of Texas actions under such grants.

*Response:* EPA's decision on approval of a State's request for NPDES authorization must be based on the State's application that has been determined to be complete, and after considering any information provided during or as a result of the public comment period. It would not be appropriate to base this decision on what was, or was not, in previous applications. Therefore, information on past applications is not a required part of the administrative record. However, information on past applications by Texas is available to the public via the Freedom of Information Act.

Information on previous grants to the State of Texas is likewise not germane to EPA's decision. Correspondence regarding the FY–1999 grants process has been added to the administrative record.

104. Issue: Availability of NPDES Files Transferred to TNRCC

A public interest group questioned how TNRCC would make the permits and enforcement files for the TPDES program (including the existing NPDES files EPA transfers to the State) available for use by TNRCC inspectors and other employees in the fifteen District offices across the State and to the public. The

comments were especially concerned that maintaining a single copy of the file in Austin would not allow timely access by TNRCC field personnel investigating complaints and doing inspections.

*Response:* TNRCC staffs have confirmed that all files transferred to TNRCC by EPA will be electronically imaged and then made available to both the public and to field personnel. EPA supports this decision by TNRCC to take advantage of opportunities current imaging and information distribution technology offer to actually improve public access to permit and enforcement information over that currently available through EPA paper-based file system. The actual paper files will be archived. According to TNRCC staff, the whole process of imaging the files and setting up the TNRCC procedures for accessing the file information is expected to be completed within two months after program authorization.

**Endangered Species**

105. Issue: ESA Requirement for EPA To Insure Protection of Threatened and Endangered Species

Some comments assert that Section 7(a)(2) of the Endangered Species Act (ESA) requires that EPA insure, in consultation with the U.S. Fish & Wildlife Service (FWS) and National Marine Fisheries Service (NMFS) (collectively, the Services), that its approval of the TPDES program is not likely to jeopardize the continued existence of threatened and endangered species. The contention is that ESA §7(a)(2) compels EPA to disapprove a state program request if FWS finds approval might result in jeopardy. These comments also assert that, if EPA approves this program, EPA would fail to carry out its obligation under section 7(a)(1) to conserve listed species.

*Response:* EPA has engaged in consultation under section 7(a)(2) of the ESA regarding its approval action. FWS has issued a biological opinion finding that the program is not likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of designated critical habitat, and NMFS has concurred in EPA's finding that this action is not likely to adversely affect listed species. Regarding section 7(a)(1), to the extent it could even be argued that this provision imposes a specific obligation on EPA to take actions in the context of this approval action, EPA has met this obligation. The very premise of the coordination procedures developed by EPA and the Services is to ensure that effects of State permitting decisions on listed species are adequately

considered, and that appropriate measures, including conservation measures, may be considered as appropriate. Facilitating communication between EPA, the Services and the State is one of the most fundamental steps that can be taken to promote the conservation of listed species. Moreover, EPA has stated that it may object to State permits that fail to ensure compliance with water quality standards which, among other things, preclude adverse toxic effects to listed species. Thus, EPA may use its objection authority, in appropriate circumstances, to address such adverse effects, even if the State permits are not likely to jeopardize the continued existence of a listed species.

106. Issue: Limitations on TNRCC's Ability To Agree to Measures for Insuring Protection of Threatened and Endangered Species

Some comments assert that EPA cannot approve the TPDES program because EPA and TNRCC cannot, consistent with *American Forest & Paper Assoc.* v. *U.S. EPA*, 137 F.3d 291 (5th Cir. 1998) (*AFPA*) and TWC §26.017, "agree to regulatory procedures necessary to insure that jeopardy and adverse modification to critical habitat are avoided...or to implement reasonable and prudent measures and alternatives." The comments identify no specific threat to listed species from program approval and recommend no specific procedures to avoid or minimize threats.

*Response:* No extraordinary procedural agreements between EPA and TNRCC are required to insure jeopardy is unlikely to arise from TPDES program approval or to minimize incidental takes anticipated in FWS' biological opinion. Texas' water quality standards require that permits be written in such a manner that would avoid jeopardy to aquatic and aquatic dependent wildlife (including listed species) and EPA will use its standard CWA procedures for review of state permit actions (including actions brought to its attention by the Services) to assure the standards are applied. EPA and the Services will use procedures that, in all the agencies' views, are adequate to ensure that listed species are not likely to be jeopardized and minimize incidental take. The State has an independent obligation to ensure that standards are applied in TPDES permits and EPA has committed, when authorized by CWA, to object to any State permit that is likely to jeopardize any listed species if the State fails to comply with that obligation and to considering carefully sub-jeopardy

**Federal Register** / Vol. 63, No. 185 / Thursday, September 24, 1998 / Notices

issues. For these reasons, EPA and the Services have concluded that approval of the TPDES program is unlikely to jeopardize listed species or result in the destruction or adverse modification of critical habitat.

107. Issue: Adequacy of Texas Water Quality Standards To Protect Threatened and Endangered Species

Some comments assert that the water quality standards that EPA would rely upon in its oversight of TNRCC permitting actions are not adequate to ensure the protection of listed species. These comments assert that ''there has never been a full consultation process on the adequacy of the water quality standards.'' They also contend EPA's reliance is misplaced because TNRCC does not implement the antidegradation policy of its standards for pollutants assigned numerical criteria and has no implementation procedures for other narrative standards, including 30 TAC § 307.6(b)(4). They also contend that EPA cannot rely on application of technology based standards in TPDES permit actions because EPA's effluent limitations guidelines are not premised on protecting listed species in Texas. In support of their assertion on nonimplementation of the antidegradation policy, the comments provided a copy of TNRCC answers to written interrogatories in a State permit adjudication (''contested case hearing'').

*Response:* This comment appears to argue that, since some of Texas' water quality standards have not been subject to section 7 consultation, then EPA is precluded from approving the State's application to administer the NPDES program. While EPA does not necessarily agree that it must, or even may, consult on the State's water quality standards, EPA believes there's simply no basis for the assertion that the state standards are inadequate to ensure that listed species will be protected. This issue has been fully evaluated by EPA and the Services. EPA provided a complete copy of TNRCC's program approval request, including copies of the State's water quality standards and continuing planning process, to the Services in the consultations on its program approval. It has moreover discussed the standards and their effect at some length with FWS and provided it with TNRCC interpretation on State standards of particular interest. EPA and the FWS both believe that EPA's action approving the State's submission is consistent with the requirements of section 7 of the ESA.

EPA will continue, however, to consult on changes to Texas' standards and to work with Services on improving

the protection afforded listed species by CWA. While the comment expresses some concerns with how TNRCC would implement some of its water quality standards, EPA is satisfied that it has the authority to ensure, through its oversight role, that water quality standards are applied in permits issued by the State, including those standards that protect listed species.

EPA agrees that TNRCC has not adopted detailed implementation procedures for all of its standards, but disagrees that such procedures are always necessary or even desirable. Although detailed implementation measures generally assure that standards are objectively applied in a manner that addresses common water quality problems, uncommon or unforseen situations may arise that require additional measures to assure protection of aquatic uses. States are thus free to supplement the criteria in their standards and the procedures of their implementation plans to accommodate the needs of specific situations. *See generally PUD No. 1 of Jefferson County* v. *Washington Dept. of Ecology,* 511 U.S. 700 (1994). Adoption of broadly narrative supplemental standards without detailed implementation procedures is one way states may provide such flexibility.

30 TAC § 307.6(b)(4) is an example of such a supplemental standard. It is one of four narrative criteria in § 307.6 (b) prohibiting toxicity in Texas waters. The three other criteria address acute and chronic toxicity from the standpoint of aquatic life and human health and their implementation relies on using standardized test methods to assure compliance with objectively calculated effluent limitations controlling specific toxic pollutants and/or whole effluent toxicity. Those test methods and limitations are in turn based on scientific knowledge on how toxicity generally affects aquatic life and humans, but do not address each and every potential effect imaginable. Potential gaps are filled by § 307.6(b)(4), which provides:

As interpreted by TNRCC, this standard requires it to impose case-specific conditions in TPDES permits to protect aquatic and aquatic-dependent species (including listed species) from the toxic effects of discharges when Texas' other toxic criteria and implementation procedures provide insufficient protection. The lack of specified implementation measures for this supplemental standard leaves TNRCC free to develop and apply *ad hoc* permit conditions specifically tailored to a specific problem. Whether or not specific *ad hoc* conditions are

themselves sufficient may be assessed only in the context of an individual permit action.

EPA is not relying on application of technology-based effluent limitations in TPDES permits to protect listed species. Section 301(b)(1)(C) of the CWA and EPA regulations require that limitations more stringent than technology-based requirements shall be imposed whenever necessary to meet water quality standards. Where such more stringent limitations are not needed, however, TNRCC's application of technology-based effluent limitations would necessarily provide some degree of additional protection to aquatic life, if any, in a receiving stream.

108. Issue: ESA § 7 Consultation Requirement for the CPP

Some comments claim that ESA obliges EPA to engage in a separate consultation with the Services on its approval of Texas' Continuing Planning Process (CPP) and that the Agency cannot approve the TPDES program until those separate consultations occur.

*Response:* Review and approval of a CPP is a necessary prerequisite to EPA's approval of a state NPDES program. *See* CWA § 303(e); 40 CFR § 130.5(c). Reviewing some elements of a CPP, e.g., an implementation plan showing how a state intends to apply its water quality standards in permit actions, may moreover be necessary to judge whether a proffered state program complies with other statutory requirements for program approval, e.g., CWA § 402(b) (1)(A). CPPs are not collections of dusty documents adopted, approved, and archived some time in the distant past, however; the states update them frequently as they adopt new ways to meet changing water quality needs. Water quality management plans, for instance, may change each time a state develops and applies a new effluent limitation in an individual permitting action. Maintaining the currency of CPPs thus requires significant administrative efforts by multiple agencies in each state and by EPA as well. EPA Region 6 reviewed and approved the most up-to-date CPP in connection with its program approval decision, thus ensuring its decision was based on the most current information.

While EPA does not concede that consultation on the CPP is required, EPA did provide to FWS and NMFS— as part of the consultation on NPDES program approval—copies of the State's program approval submission, which included CPP provisions affecting application of Texas' water quality standards.

109. Issue: Objection To Adoption of Procedures To Insure Protection of Threatened and Endangered Species

The American Forest and Paper Association states that it objects to EPA's adoption of procedures to protect endangered and threatened species. AFPA states initially that it supports the procedures contained in the draft Memorandum of Agreement between EPA and the State, which would provide that the Fish and Wildlife Service and National Marine Fisheries Service (the Services) may comment on draft State permits and coordinate with the Service to attempt to resolve the issue. If the issue is not resolved, EPA may object to the permit under any one of the grounds for EPA objections under section 402(d)(2) of the CWA. While AFPA supports these procedures as being within EPA's authority under the CWA and consistent with the *AFPA* decision, AFPA objects to procedures being developed based upon a draft MOA developed by headquarters' offices of EPA and the Services. AFPA contends that these procedures require the State to "consult" with the Services, and that they would impermissibly condition EPA's approval on the State's following procedures to protect endangered species. AFPA also asserts that the procedures are impermissible because EPA is only authorized to object to State permits based upon the specific authorities specified in the CWA. Finally, AFPA argues that EPA was not required to undergo section 7 consultation with regard to approval of Texas' program.

*Response:* The procedures ultimately adopted by EPA and the Services are reflected in [cite relevant documents]. EPA believes that these procedures are consistent with its authorities and the *AFPA* decision. Each of AFPA's assertions is addressed below.

*1. EPA Has Conditioned Its Approval on State's Agreement To "Consult" With the Services*

AFPA is incorrect in asserting that EPA has impermissibly conditioned its approval action on the State's agreement to "consult" with the Services. "Consultation" under section 7 of the Endangered Species Act is a process that imposes certain procedural obligations on the agency consulting with the Services. *See* 50 CFR Part 402. While EPA and the Services have developed procedures for ensuring the protection of endangered and threatened species, those procedures do not impose obligations, procedural or otherwise, on the State. Indeed, the agreement for coordination is between EPA and the

Services and is designed to facilitate coordination among the *federal* agencies and timely communication of information and recommendations *to* the State. The State is not, however, required to follow any particular procedures in evaluating comments from the Services, or to defer to their judgment. The State's only obligation is to issue permits that comply with the procedural and substantive requirements of the CWA and the State program approved by EPA. Indeed, The EPA/TNRCC MOA AFPA supports has not changed as a result of consultation.

Thus, it appears that AFPA may have misunderstood the coordination procedures in the draft national EPA/FWS MOA, which are the same in all material respects to the EPA/TNRCC MOA AFPA supports, and consist of the following basic elements: (1) An opportunity for the Services to comment on State permits; (2) an opportunity for the Services to contact EPA if their comments are not adequately addressed by the State; and (3) an opportunity for EPA to object to the permit if it fails to meet the requirements of the CWA. Specifically, the procedures first note that TNRCC is required under 40 CFR 124.10(c)(1)(iv) to provide copies of draft permits to the Services. This obligation is not altered or augmented under the procedures; EPA has simply made the commitment to ensure that the State carries out its CWA obligation in this regard. The procedures also state that EPA will "encourage" the State to highlight those permits most in need of Service review based on potential impacts to federally listed species; the State, however, is not obligated to provide this information. Where the Service has concerns that the draft permit is likely to adversely affect a federally listed species or critical habitat, the Service or EPA will contact the State, preferably within 10 days of receipt of the notice of the draft permit, and include relevant information to the State. If the Service is unable to resolve its comments, the Service will contact EPA within 5 days, and EPA will coordinate with the State to ensure that the permit meets applicable CWA requirements. Where EPA believes that the permit is likely to adversely affect a federally listed species or critical habitat, EPA may make a formal objection, where consistent with its CWA authority, or take other appropriate action. Where a State permit is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat, EPA will use the full extent of its CWA authority to object to

the permit. In either case, the MOA makes clear that EPA would only object where authorized by the CWA to do so.

Thus, while the procedures developed by EPA and the Services articulate how EPA and the Services will work together, and with the State, to resolve issues that arise, the State has not agreed to "consult" with the Services, or take any other actions not required by the CWA, as a "condition" for obtaining EPA's approval of its program. EPA is hopeful that the procedures will facilitate sharing of information among the Agencies with the State, so that the State will have the benefit of timely federal agency input when it makes its permitting decisions.

*2. Section 7 Consultation is Not Required for EPA's Approval Action*

AFPA argues that section 7 does not apply to EPA's action approving the State's application to administer the NPDES program. AFPA has taken this position in several cases challenging EPA's decision to consult when it approved the programs submitted by Louisiana and Oklahoma. The Fifth Circuit in *AFPA* did not address the applicability of the procedures under section 7 to EPA's approval action for Louisiana. *See* 137 F.3d 298, n.5. EPA believes that section 7 does apply to its action, for the reasons explained in its briefs in that case and in a similar case (*American Forest Paper Assoc.* v. *U.S. EPA,* No. 97–9506 (10th Cir. 1998)), which are incorporated in this response by reference. Moreover, even if EPA was not required by law to consult with the Services, EPA believes it was within its discretion to do so.

AFPA also argues that formal consultation was not required because EPA's action was not likely to adversely affect listed species, a contention with which EPA Region 6 initially agreed. Under the Service's section 7 regulations, however, formal consultation is required unless the Service concurs in writing that the action is not likely to adversely affect listed species. NMFS agreed with EPA's "unlikely to adversely affect" determination, based in part on study of sea turtle mortality in Texas waters, indicates current marine water quality in Texas is unlikely to adversely affect sea turtles in NMFS trusteeship. FWS, faced with a materially different situation for listed species it protects, declined to concur with EPA's determination. EPA thus consulted formally with FWS, which has rendered a "no jeopardy" biological opinion.

*3. EPA Does Not Have Authority To Object to a Permit for Failure to Comply With the ESA*

The MOA between EPA and TNRCC, as well as the procedures developed by EPA and the Services, make clear that EPA will only object to a State permit where doing so would be within its authority under the CWA. Section 301(b)(1)(C) of the CWA and 40 CFR 122.44(d)(1) require that any permit ensure compliance with State water quality standards. Under 40 CFR 123.44(c)(8), EPA is authorized to object to a State permit that fails to satisfy the requirements of section 122.44(d). Texas water quality standards are designed to ensure the protection of aquatic and aquatic-dependent species, including any such species that are listed as endangered or threatened. *See* Letter from Margaret Hoffman, TNRCC, to Lawrence Starfield, EPA (June 29, 1998). The State's standards include a requirement that ''Water in the state shall be maintained to preclude adverse toxic effects on aquatic and terrestrial wildlife * * * resulting from contact, consumption of aquatic organisms, consumption of water or any combination of above.'' 30 Texas Administrative Code 307.6(b)(4). Thus, if EPA were to find that a proposed state permit would allow pollutant discharges that would adversely affect aquatic life in the receiving water that happened to be listed as endangered or threatened, the Agency would have the authority to object to the permit for failure to ensure compliance with State water quality standards. If the adverse effects were so severe as to likely jeopardize the continued existence of the species, EPA intends to utilize the full extent of its CWA objection authority to avoid likely jeopardy. However, in these cases, EPA would not use its objection authority to enforce requirements of the Endangered Species Act. Instead, EPA intends to consider the needs of listed species in deciding whether to object to a State permit that fails to ensure compliance with State water quality standards and which is, consequently, outside the guidelines and requirements of the CWA. EPA will also inform FWS if it believes, based on its review of a permit action, that there may be an adverse impact on listed species.

*4. The Procedures Are Inconsistent With the Fifth Circuit Decision in AFPA*

EPA believes that the endangered species coordination procedures are fully consistent with the *AFPA* decision. The court found in that case that EPA lacked statutory authority to condition its approval of a State application to administer the NPDES program on factors not enumerated in section 402(b) of the CWA. EPA has, in fact, approved the State's program based solely on the criteria contained in section 402(b) of the CWA and implementing regulations. Moreover, as explained previously, EPA has not ''conditioned'' its approval of Texas'' application on any factors related to endangered species protection. The procedures developed in consultation consist of commitments between EPA and FWS to provide information and recommendations to each other and the State in a timely fashion, and statements by EPA regarding how it intends to exercise its oversight authority in the future. The State of Texas' obligations in administering the TPDES program consist solely of complying with the procedural and substantive obligations under section 402(b) of the CWA and relevant CWA regulations. These include the obligations to provide copies of draft permits to the Services (40 CFR 124.10(c)(1)(iv)), consider the Services' views in its permitting decisions (40 CFR 124.59(c)) and issue permits that ensure compliance with water quality standards (40 CFR 122.44(d)(1)). Nothing in the coordination procedures to which the various agencies have agreed, or in any aspect of EPA's approval action, has augmented the obligations the CWA imposes on the State. Moreover, these procedures are consistent with *AFPA* because, as explained previously, EPA would only object to State permits that EPA determines are outside the guidelines and requirements of the CWA.

**Conclusion**

The written agreements of this authorization process will formalize the partnership which has existed between EPA and TNRCC for many years, and will provide the structure for the side-by-side relationship between the two agencies. Region 6 will continue to be ready and available in its new oversight role to work with TNRCC and the citizens of Texas to ensure the environment is protected.

The TPDES program, the 44th state program to be authorized under CWA § 402, includes point source discharges, pretreatment, federal facilities and sewage sludge.

**BILLING CODE 6560–50–P**

**51200**       **Federal Register** / Vol. 63, No. 185 / Thursday, September 24, 1998 / Notices

<u>**STATE NPDES PROGRAM STATUS**</u>                                                              09/14/98

| | Approved State NPDES Permit Program | Approved to Regulate Federal Facilities | Approved State Pretreatment Program | General Permits |
|---|---|---|---|---|
| Alabama | 10/19/79 | 10/19/79 | 10/19/79 | 06/26/91 |
| Arkansas | 11/01/86 | 11/01/86 | 11/01/86 | 11/01/86 |
| California | 05/14/73 | 05/05/78 | 09/22/89 | 09/22/89 |
| Colorado | 03/27/75 | -- | -- | 03/04/82 |
| Connecticut | 09/26/73 | 01/09/89 | 06/03/81 | 03/10/92 |
| Delaware | 04/01/74 | -- | -- | 10/23/92 |
| Florida | 05/01/95 | -- | 05/01/95 | 05/01/95* |
| Georgia | 06/28/74 | 12/08/80 | 03/12/81 | 01/28/91 |
| Hawaii | 11/28/74 | 06/01/79 | 08/12/83 | 09/30/91 |
| Illinois | 10/23/77 | 09/20/79 | -- | 01/04/84 |
| Indiana | 01/01/75 | 12/09/78 | -- | 04/02/91 |
| Iowa | 08/10/78 | 08/10/78 | 06/03/81 | 08/12/92 |
| Kansas | 06/28/74 | 08/28/85 | -- | 11/24/93 |
| Kentucky | 09/30/83 | 09/30/83 | 09/30/83 | 09/30/83 |
| Louisiana | 08/27/96 | 08/27/96 | 08/27/96 | 08/27/96 |
| Maryland | 09/05/74 | 11/10/87 | 09/30/85 | 09/30/91 |
| Michigan | 10/17/73 | 12/09/78 | 04/16/85 | 11/29/93 |
| Minnesota | 06/30/74 | 12/09/78 | 07/16/79 | 12/15/87 |
| Mississippi | 05/01/74 | 01/28/83 | 05/13/82 | 09/27/91 |
| Missouri | 10/30/74 | 06/26/79 | 06/03/81 | 12/12/85 |
| Montana | 06/10/74 | 06/23/81 | -- | 04/29/83 |
| Nebraska | 06/12/74 | 11/02/79 | 09/07/84 | 07/20/89 |
| Nevada | 09/19/75 | 08/31/78 | -- | 07/27/92 |
| New Jersey | 04/13/82 | 04/13/82 | 04/13/82 | 04/13/82 |
| New York | 10/28/75 | 06/13/80 | -- | 10/15/92 |
| North Carolina | 10/19/75 | 09/28/84 | 06/14/82 | 09/06/91 |
| North Dakota | 06/13/75 | 01/22/90 | -- | 01/22/90 |
| Ohio | 03/11/74 | 01/28/83 | 07/27/83 | 08/17/92 |
| Oklahoma** | 11/19/96 | 11/19/96 | 09/11/96 | 11/19/96 |
| Oregon | 09/26/73 | 03/02/79 | 03/12/81 | 02/23/82 |
| Pennsylvania | 06/30/78 | 06/30/78 | -- | 08/02/91 |
| Rhode Island | 09/17/84 | 09/17/84 | 09/17/84 | 09/17/84 |
| South Carolina | 06/10/75 | 09/26/80 | 04/09/82 | 09/03/92 |
| South Dakota | 12/30/93 | 12/30/93 | 12/30/93 | 12/30/93 |
| Tennessee | 12/28/77 | 09/30/86 | 08/10/83 | 04/18/91 |
| Texas** | 09/14/98 | 09/14/98 | 09/14/98 | 09/14/98 |
| Utah | 07/07/87 | 07/07/87 | 07/07/87 | 07/07/87 |
| Vermont | 03/11/74 | -- | 03/16/82 | 08/26/93 |
| Virgin Islands | 06/30/76 | -- | -- | -- |
| Virginia | 03/31/75 | 02/09/82 | 04/14/89 | 04/20/91 |
| Washington | 11/14/73 | -- | 09/30/86 | 09/26/89 |
| West Virginia | 05/10/82 | 05/10/82 | 05/10/82 | 05/10/82 |
| Wisconsin | 02/04/74 | 11/26/79 | 12/24/80 | 12/19/86 |
| Wyoming | <u>01/30/75</u> | <u>05/18/81</u> | <u>--</u> | <u>09/24/91</u> |
| | | | | |
| TOTALS | 44 | 38 | 32 | 43 |

Number of Fully Authorized Programs (Federal Facilities, Pretreatment, General Permits ) = 29
Number of Fully Authorized Programs, Including Sludge = 3 (OK - 11/19/97, TX - 09/14/98, UT - 06/14/96)
* Phased Federal facility & storm water programs by 2000
** Partial Programs OK - ODEQ, TX - TNRCC

BILLING CODE 6560–50–C

**Federal Register** / Vol. 63, No. 185 / Thursday, September 24, 1998 / Notices

### Other Federal Statutes

#### A. National Historic Preservation Act

Pursuant to Section 106 of the National Historic Preservation Act, 16 USC § 470(f), federal agencies must provide the Advisory Council of Historic Preservation opportunity for comment on the effects their undertakings may have on the Nation's historic properties. EPA has provided such an opportunity in its review of the TPDES program approval request by consulting with the Advisory Council's delegate, the Texas Historical Commission. No feasible measures for further reducing potential adverse effects on historic properties were developed. Region 6 understands, however, that the Texas Historical Commission is independently discussing means of improving its coordination with TNRCC under State law.

#### B. Endangered Species Act

Section 7(a)(2) of the Endangered Species Act (ESA), 33 USC 1536(a)(2), requires that federal agencies insure, in consultation with the United States Fish & Wildlife Service (FWS) and/or National Marine Fisheries Service (NMFS), that actions they undertake, authorize, or fund are unlikely to jeopardize the continued existence of listed threatened and endangered species or result in destruction or adverse modification of critical habitat. EPA consulted with both FWS and NMFS in reviewing the TPDES program approval request. Difficult issues arose and were resolved in its consultation with FWS.

After careful consideration in formal consultation, FWS concluded in a biological opinion that approving the TPDES program is unlikely to jeopardize listed species if applicable water quality standards are fully applied in TPDES permits, despite some loss of federal authority in some situations. With FWS assistance, EPA will use its oversight procedures to assure the standards are in fact applied, particularly in waters on which listed species depend. This effort will result in more attention, particularly of minor state permit actions, than EPA devotes to oversight of any other state NPDES program in Region 6. Both EPA and FWS are additionally committed to seeking even more protection for listed species by continuing to consider their needs in EPA's review of revisions to Texas' water quality standards. Region 6 believes these actions will increase the overall protection CWA affords listed species in Texas.

#### C. Coastal Zone Management Act

Pursuant to Section 307(c)(1)(C) of the Coastal Zone Management Act, Federal agencies carrying out an activity which affects any land or water use or natural resource within the Coastal Zone of a state with an approved Coastal Zone Management Plan must determine whether that activity is, to the maximum extent practicable, consistent with the enforceable requirements of the Plan and provide its determination to the state agency responsible for implementation of the Plan for review. Texas' approved Coastal Zone Management Plan is administered by the General Land Office and, more particularly, by its Coastal Coordination Council. TNRCC permit actions are themselves subject to consistency review under 31 TAC 505(11)(a)(6); thus approval of TNRCC's TPDES program does not affect Texas' coastal zone and is consistent with the enforceable requirements of Texas' Coastal Zone Management Plan.

#### D. Regulatory Flexibility Act

Based on General Counsel Opinion 78–7 (April 18, 1978), EPA has long considered a determination to approve or deny a State NPDES program submission to constitute an adjudication because an "approval," within the meaning of the APA, constitutes a "license," which, in turn, is the product of an "adjudication." For this reason, the statutes and Executive Orders that apply to rulemaking action are not applicable here. Among these are provisions of the Regulatory Flexibility Act (RFA), 5 U.S.C. 601 et seq. Under the RFA, whenever a Federal agency proposes or promulgates a rule under section 553 of the Administrative Procedure Act (APA), after being required by that section or any other law to publish a general notice of proposed rulemaking, the Agency must prepare a regulatory flexibility analysis for the rule, unless the Agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. If the Agency does not certify the rule, the regulatory flexibility analysis must describe and assess the impact of a rule on small entities affected by the rule.

Even if the NPDES program approval were a rule subject to the RFA, the Agency would certify that approval of the State's proposed TPDES program would not have a significant economic impact on a substantial number of small entities. EPA's action to approve an NPDES program merely recognizes that the necessary elements of an NPDES program have already been enacted as a matter of State law; it would, therefore, impose no additional obligations upon those subject to the State's program. Accordingly, the Regional Administrator would certify that this program, even if a rule, would not have a significant economic impact on a substantial number of small entities.

#### Notice of Decision

I hereby provide public notice of the Agency's approval of the application by the State of Texas for approval to administer, in accordance with 40 CFR 123, the TPDES program.

Dated: September 14, 1998.

**Gregg A. Cooke,**

*Regional Administrator Region 6.*

[FR Doc. 98–25314 Filed 9–23–98; 8:45 am]

**BILLING CODE 6560–50–P**